## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CABLE NEWS NETWORK, INC.
One CNN Center
Atlanta, GA 30303,

and

ABILIO JAMES ACOSTA
820 1st Street NE
Washington, DC 20002

*Plaintiffs*,

    v.

**Case No.**

DONALD J. TRUMP,
in his official capacity as
President of the United States
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

JOHN F. KELLY,
in his official capacity as Chief of Staff
to the President of the United States
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

WILLIAM SHINE,
in his official capacity as Deputy Chief of Staff
to the President of the United States
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

SARAH HUCKABEE SANDERS,
in her official capacity as Press Secretary
to the President of the United States
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

the UNITED STATES SECRET SERVICE,
950 H St NW
Washington, D.C. 20223;

RANDOLPH D. ALLES,
in his official capacity as Director of the
United States Secret Service
950 H St NW #7800
Washington, D.C. 20223;

and

JOHN DOE,
Secret Service Agent,
in his official capacity,
Address Unknown

*Defendants.*

# COMPLAINT

Plaintiffs Cable News Network, Inc. and Abilio James ("Jim") Acosta, for their complaint against Defendants Donald J. Trump, John F. Kelly, William Shine, Sarah Huckabee Sanders, the United States Secret Service, Randolph Alles, and John Doe, allege, by and through their attorneys, as follows:

## INTRODUCTION

1.     Plaintiff Jim Acosta has been a journalist for more than two decades.  For more than five years, Acosta has been CNN's national political correspondent and, since January 2018, he has been the network's chief White House correspondent.  Acosta has covered the White House since 2012 and, since 2013, has possessed press credentials—often called a "hard pass"—that allow him regular and unescorted access to the White House and White House briefings.  He is widely reputed as a diligent and thorough reporter for one of the nation's most respected and widely watched networks.

2.      But on November 7, 2018, Defendants revoked Acosta's White House credentials because, in the President's own words, Acosta failed to "treat the White House with respect" at a White House press briefing.  This severe and unprecedented punishment is the culmination of years of hostility by President Trump against CNN and Acosta based on the contents of their reporting—an unabashed attempt to censor the press and exclude reporters from the White House who challenge and dispute the President's point of view.

3.      While CNN and Acosta have been favorite targets of abuse by the administration, the President's criticism has been directed at other news organizations too.  The President has actively criticized and discredited any journalist or media outlet he believes might report something he considers negative.  As the President explained to Lesley Stahl of 60 Minutes: "You know why I do it?  I do it to discredit you all and demean you all so when you write negative stories about me no one will believe you."

4.      And the revocation of Acosta's credentials is only the beginning; as the President explained, there "could be others also" who get their credentials revoked.

5.      The Framers of our Constitution embraced a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964).  The President lacks the authority to quash "[t]he sort of robust political debate encouraged by the First Amendment"— debate that is "bound to produce speech that is critical of those who hold public office." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 51 (1988).  That is why the D.C. Circuit has been clear that "the protection afforded newsgathering under the first amendment guarantee of freedom of the press requires that . . . access [to White House press facilities] not be denied arbitrarily or for

less than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977).  And "notice . . . of the factual bases for denial [of access to White House press facilities] with an opportunity to rebut is a minimum prerequisite for ensuring that the denial is . . . [not] based on arbitrary or less than compelling reasons." *Id.* at 131.

6.     Plaintiffs bring this action to enforce this constitutional commitment, restore Acosta's well-deserved press credentials, and ensure that the press remains free to question the government and to report the business of the nation to the American people.

## PARTIES

7.     Plaintiff Abilio James ("Jim") Acosta is chief White House correspondent for Cable News Network, Inc. ("CNN") and is a member of the White House Correspondents' Association ("WHCA").  Acosta has been a journalist for more than two decades and is widely respected for his diligence and independence.  He was a national political correspondent for CNN from 2012 to 2018 and has been CNN's chief White House correspondent since January 9, 2018.  Acosta resides in New York state.

8.     Plaintiff CNN, a division of Turner Broadcasting System, Inc., is a trusted source for news and information on television, the web, and mobile devices.  CNN reaches more individuals than any other cable television news organization in the United States.

9.     Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.

10.     Defendant John F. Kelly is the Chief of Staff to the President of the United States.  He is sued in his official capacity.

11.     Defendant William Shine is the White House Deputy Chief of Staff for Communications.  He is sued in his official capacity.

12.     Defendant Sarah Huckabee Sanders is Press Secretary to the President of the United States.  She is sued in her official capacity.

13.     Defendant the United States Secret Service is the federal law enforcement agency that administers and oversees security at the White House.

14.     Defendant Randolph Alles is Director of the United States Secret Service.  He is sued in his official capacity.

15.     Defendant John Doe is the Secret Service member who personally took away Acosta's White House press credentials, also known as a "hard pass," similar to that carried by White House employees, on November 7, 2018.  He is sued in his official capacity.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1).  A substantial part of the events giving rise to this claim occurred in this District, and Defendants are officers of the United States sued in their official capacities.

## FACTS

18.     Plaintiff Acosta is a journalist with more than twenty years of experience as a reporter.  He has covered national news stories including presidential campaigns, Hurricane Katrina, and the Iraq War.  Acosta has worked for CNN since 2007.  From 1995 to 2001, Acosta worked for multiple television networks as a reporter and substitute anchor.  From 2001 to 2003, Acosta was a correspondent for CBS Newspath.  From 2003 to 2007, Acosta was a CBS News correspondent.

19.     In February 2012, CNN named Acosta one of its national correspondents and subsequently made him a senior White House correspondent.

20.     Acosta has been CNN's chief White House correspondent since January 2018.  As part of his job, Acosta regularly covers presidential press conferences.

21.     Acosta is a member of the White House press corps, a group of reporters who cover the President, the White House, and executive functions in Washington, around the country, and around the world.  White House reporters ensure both that the public knows what is happening within the executive branch and that federal officials remain accountable to the public.

22.     Acosta began reporting from the White House in 2012.  In 2013, to gain regular access to the White House, like all White House correspondents, he applied for White House press credentials and a security clearance in order to obtain what is called a "hard pass."  Acosta underwent a Secret Service background check and was granted a "hard pass," which is valid for renewable two-year periods.

23.     A hard pass is essential for White House reporters because it provides access to areas designated for journalists in the West Wing, on Air Force One, and in other secured areas during presidential trips, which are routinely covered by the White House press corps.  For a White House correspondent like Acosta, the White House, or wherever the President is travelling, is his workplace.  Indeed, Acosta often writes and broadcasts directly from the White House, working out of a booth in the press area known as the "lower press room" or from the "upper press office," in close proximity to the Oval Office and the offices of the Press Secretary.  Because Acosta's work requires his physical presence at the White House or on the road with the President, he often goes weeks or months without visiting CNN's Washington bureau.  Accordingly, the press credentials allowing access to the White House grounds and press complex, and to the President and his entourage during trips, are necessary to provide workplace access.  Without this credential, a daily White House correspondent like Acosta effectively cannot do his or her job.

24.     The hard pass is essential in large part because it allows immediate access to White House grounds and its press offices.  A hard pass thus lets a reporter react to fast-developing, important news stories.  Without a hard pass, a reporter may well miss the newsworthy events, particularly including the many notable events that occur with little notice.  A hard pass is effectively required to be a White House correspondent for a national news organization such as CNN.

25.     Without a hard pass, a reporter must ask for advance approval each time he wishes to enter the White House.  Such access often needs to be requested at least 24 hours in advance. Since many White House news events, briefings, or appearances are frequently announced day-of, reporters without a hard pass are often effectively unable to cover these events.  Further, the White House may decline to admit a reporter requesting daily access.  Even if admitted, the reporter must wait in a security line with the general public and be screened before entering the White House and then be escorted by security around the press offices.  Without a hard pass, a White House correspondent simply cannot do his job.

26.     Generally, the Secret Service may grant or deny a request for a security clearance made in connection with an application for a White House press pass.  31 C.F.R. § 409.1. However, the Secret Service's discretion is expressly limited.  Secret Service officials making that decision must "be guided solely by the principle of whether the applicant presents a potential source of physical danger to the President and/or the family of the President so serious as to justify his or her exclusion from White House press privileges." *Id.*  In applying that standard, the Special Agent in Charge of the Secret Service, Technical Security Division must apply designated procedures governing notices, responses, and hearings regarding decisions about applications. *Id.* § 409.2.

27.     The President dislikes CNN's and Acosta's coverage of him and his administration, and has made that clear since before he took office.  At a news conference on January 11, 2017, for example, then-President-elect Trump told Acosta, "your organization is terrible."  Acosta responded: "You're attacking us.  Can you give us a question?"  The President replied: "Don't be rude.  No, I'm not going to give you a question . . . .  You are fake news."

28.     Since being elected, President Trump has continuously tweeted negative remarks about CNN.  For example, on February 17, 2017, he stated that "The FAKE NEWS media (failing @nytimes, @NBCNews, @ABC, @CBS, @CNN) is not my enemy, it is the enemy of the American people!"  On July 2, 2017, he tweeted a video depicting him tackling and punching a man with a CNN logo superimposed on his face, adding the comments "#FraudNewsCNN" and "#FNN."  On December 11, 2017, he published a tweet calling CNN "Fake News" and called one CNN journalist "the 'dumbest man on television!'"  Since Mr. Trump was inaugurated, he has tweeted about CNN dozens of times.

29.     President Trump has not limited his criticisms of CNN to social media.  On July 13, 2018, at a press conference in England, in response to Acosta's attempt to ask a question, the President stated, "CNN is fake news, I don't take questions from CNN."  And at a campaign rally on August 30, 2018, he complained about CNN's coverage and said that CNN and its reporters are "just dishonest, terrible people."

## The November 7, 2018 Press Conference

30.     On Wednesday, November 7, 2018, President Trump held a press conference to discuss the 2018 midterm elections.  The press conference lasted approximately 90 minutes and was held in the East Room of the White House.  The press conference was open to credentialed members of the press, including those members of the White House press corps with hard passes.

The White House has for decades opened up such conferences to all members of the press credentialed to cover the White House.

31.     On November 7, Acosta used his hard pass to enter the White House and cover the press conference for CNN.

32.     President Trump delivered opening remarks and then invited questions from the media in attendance.  Acosta, sitting in the front row, raised his hand.  President Trump called on Acosta to "[g]o ahead" with a question.  Acosta was one of the first reporters the President called on for questions.

33.     Speaking through a hand-held microphone, as did all the White House journalists who asked questions, Acosta asked a question about one of President Trump's statements during the midterm campaign—namely, whether a caravan making its way to the United States from Central America constitutes "an invasion" of the country, a significant feature of the President's messaging during the just-ended campaign.  The President declined to respond, instead remarking: "You know what?  I think you should . . . I think you should let me run the country.  You run CNN. And if you did it well, your ratings would be much better."

34.     When Acosta attempted to ask a follow-up question, President Trump refused to take it.  A White House staffer then approached Acosta and attempted to grab the microphone. The staffer reached all the way across Acosta's body, successfully latched onto the microphone, and physically attempted to remove it from Acosta's right hand.  Acosta held onto the microphone, stated "Pardon me, ma'am," and continued to ask his question.

35.     The staffer finally sat down and allowed Acosta to ask his follow-up question.  The President again declined to answer Acosta, saying: "I'll tell you what, CNN should be ashamed of itself, having you work for them.  You are a rude, terrible person.  You shouldn't be working for

CNN." The President further stated that "[w]hen you report fake news, which CNN does, a lot, you are the enemy of the people."

36.     President Trump then turned to take a question from Peter Alexander of NBC News and told Alexander to "go ahead." Before asking a question of his own, Alexander stated with regard to the President's statements about Acosta, "I think that's unfair," and "[i]n Jim's defense, I've traveled with him and watched him. He's a diligent reporter who busts his butt like the rest of us." The President responded: "Well, I'm not a big fan of yours either. So, you know."

37.     President Trump returned to his criticisms of CNN seconds later, pointing at Acosta and saying that "[w]hen you report fake news, which CNN does, a lot, you are the enemy of the people."

38.     The entire press conference (including the specific exchange in question at minutes 27:31 to 30:13) can be viewed here: *President Trump on 2018 Election Results*, C-SPAN, at 27:31-30:13, https://www.c-span.org/video/?454223-1/president-trump-calls-2018-midterm-elections-very-close-complete-victory (Nov. 7, 2018). A clip of the specific exchange described above can also be viewed here: *White House Suspends CNN's Acosta After Trump Confrontation*, Associated Press, https://www.apnews.com/acb35d90ddd740d49cf639d9d48080e4 (Nov. 7, 2018) (embedded in story).

## The White House Revokes Acosta's Press Credentials

39.     Hours after the press conference concluded, Press Secretary Sanders issued an official statement announcing that "the White House is suspending the hard pass of [Acosta] until further notice." The Press Secretary accused Acosta of "placing his hands" on the White House staffer who attempted to take the microphone from Acosta during the press conference. The Press Secretary added that the alleged conduct "is absolutely unacceptable" and stated "[w]e will not

tolerate this inappropriate behavior."  The White House's statement indicated that this alleged "incident" was the basis of its decision to revoke Acosta's credentials.

40.     Members of the media who attended the press conference and saw the encounter disputed Press Secretary Sanders's characterization of the account.  Chuck Ross of *The Daily Caller* wrote that there is "[p]lenty to criticize Acosta about, but he did not 'place his hands' on the intern.  It's ridiculous for anyone to suggest he did."  Jeff Mason of Reuters, a former president of the WHCA, wrote that he was seated next to Acosta at the press conference "and did not witness him 'placing his hands' on the young intern, as the White House alleges. He held on to the microphone as she reached for it."

41.     That night, Acosta attempted to continue reporting on President Trump's press conference and the midterm elections.  He returned to the White House to do live coverage for CNN's "Anderson Cooper 360" show.  But when Acosta arrived at the White House gate, a Secret Service officer stood in the doorway in front of the security booth that leads into the White House and blocked his path.  The Secret Service officer refused to let Acosta enter the White House grounds, and instead told Acosta to surrender his hard pass.  Acosta gave his hard pass to the officer and thanked him for his service.

42.     The White House had not told Acosta that his credentials were revoked in advance of the revocation.  Instead, Acosta found out when he saw the Press Secretary's statement on his mobile phone as he was on his way to report from the White House for the "Anderson Cooper 360" segment.

43.     Later that night, Press Secretary Sanders issued another statement via tweet announcing that the White House "stand[s] by our decision to revoke" Acosta's hard pass.  The statement also claimed that Acosta's alleged "inappropriate behavior" was "clearly documented

in" a "video" embedded in the tweet.  The fifteen-second video purported to depict the moment the White House staffer attempted to take the microphone out of Acosta's hand.

44.     But the video shared by Press Secretary Sanders was apparently doctored, as has been reported widely.  It has further been reported that the video Ms. Sanders disseminated to the public came from a contributor to InfoWars, an organization whose "conspiracy theories and hateful content" have led to it "being banned earlier this year by most major social media platforms."

45.     Analyses comparing the video included in Press Secretary Sanders's tweet and unaltered video captured by C-SPAN of the same event shows that the version shared by Press Secretary Sanders appears to have been edited.  As the *Washington Post* has explained, the video makes it appear that Acosta "swiftly chop[ped] down on the arm of an aide as he held onto a microphone while questioning President Trump.  But in the original video, Acosta's arm appears to move only as a response to a tussle for the microphone.  His statement, 'Pardon me, ma'am,' is not included in the video Sanders shared."  Counselor to the President Kellyanne Conway has since attempted to deny the video had been altered but then admitted it had been "sped up."  But the unaltered video captured by C-SPAN shows what really occurred: Acosta was only attempting to hold onto the microphone as the staffer tried to grab it from him.

46.     The content and viewpoint of CNN's and Acosta's reporting on the Trump administration—not his interaction with the staffer at the November 7 press conference—were the real reason the White House indefinitely revoked his press credentials.

47.     Neither the White House nor the Secret Service has provided Acosta any formal notice of the reasons for, opportunity to be heard regarding, or opportunity to challenge, the decision to revoke his hard pass.

48.     On November 8, 2018, CNN's CEO Jeff Zucker wrote Defendant John F. Kelly requesting that Acosta's credentials be "reinstated immediately," noting that prior to the revocation, "no complaints were raised with CNN and there was no attempt to reach anyone at CNN before taking this unlawful action."  Zucker added, "this is now the third instance where CNN journalists were targeted for exclusion by this administration . . ." as part of a "pattern of targeted harassment."

49.     Defendants have not reinstated Acosta's press credentials or returned his hard pass and have informed CNN and Acosta they do not intend to do so.  The White House also rejected Acosta's application for a day pass on November 8, 2018.

50.     On November 9, 2018, Defendants prohibited Acosta from fully covering the President on a trip to Paris to mark the centennial of the end of the First World War.  Although Acosta traveled to Paris, he was told that he would not be allowed to access the President's events, including an event that had been planned (but was ultimately cancelled due to inclement weather) to visit with French President Emmanuel Macron a cemetery to honor the fallen.  Although the French government issued credentials to Acosta, the Secret Service refused to allow Acosta to attend an allegedly "open" press event whose attendees included journalists from around the world.

51.     Without his press credentials, Acosta's ability to perform his duties as CNN's Chief White House correspondent is effectively eliminated.

52.     Because CNN's chief White House correspondent has effectively been prohibited from reporting from the White House and the President's trips, its newsgathering and reporting abilities have been significantly hampered, causing harm not just to CNN, but also to its many viewers and readers who rely on CNN as an essential news source.

53.     On November 9, 2018, during remarks to the press, the President was asked about the revocation of Acosta's press pass.  The President stated that while he believed Acosta "was not nice to that young woman," "I don't hold him for that because it wasn't overly, you know, horrible."  When a reporter asked "Mr. President, how long are you going to leave Jim Acosta in the penalty box?" the President responded: "As far as I'm concerned, I haven't made that decision. But it could be others also."

### FIRST CAUSE OF ACTION
### Violation of the First Amendment

54.     Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

55.     Defendants' decision to revoke Acosta's press credentials violates the First Amendment.

56.     Plaintiffs' access to the White House, their coverage of the November 7, 2018 press conference, and Acosta's questions to President Trump during that conference are and were all protected activities under the First Amendment of the United States Constitution.

57.     Defendants have deprived Plaintiffs of their right to access the White House grounds by revoking Acosta's White House credentials.  Without those credentials, Acosta cannot access the White House and cannot effectively serve as a White House correspondent, thus depriving Plaintiff CNN of its chief White House correspondent.

58.     Defendants initially claimed that they revoked Acosta's press pass because he "plac[ed] his hands" on an intern.  That contention is not accurate.  The President himself has stated that the Acosta's conduct was not "overly horrible" and that Acosta's credentials were actually suspended because he failed to "treat the White House with respect."

59.     Defendants' justifications for impeding Plaintiffs' First Amendment rights are hollow and hardly sufficiently compelling to justify the indefinite revocation of Acosta's White House credentials.  Consequently, the only reasonable inference from Defendants' conduct is that they have revoked Acosta's credentials as a form of content- and viewpoint-based discrimination and in retaliation for Plaintiffs' exercise of protected First Amendment activity.

60.     The sole justification for Defendants' conduct is their dislike for Plaintiffs' coverage of the administration and critique of the President.  But that is insufficient to justify such a substantial restriction on Plaintiffs' First Amendment rights.

61.     As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

**SECOND CAUSE OF ACTION**
**Violation of the Fifth Amendment**

62.     Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

63.     Defendants' decision to revoke Acosta's press credentials violates the Fifth Amendment right to due process.

64.     Plaintiffs have protected liberty and property interests in Acosta's press credentials and the access it affords to the White House.  The credentials allow Acosta access to his office in the White House and allow him to do his job effectively.  Absent his credentials, he cannot serve as a White House correspondent.

65.     Acosta received no direct notice from the White House that his credentials had been revoked, let alone any notice prior to the revocation.  Instead, the White House announced the revocation itself via Twitter after Defendants already decided to effectively ban Acosta from the White House grounds.

66.     Defendants did not provide Plaintiffs a written explanation, nor any explanation at all, before revoking Acosta's press credentials.  The only written explanation was a short statement posted on Twitter that Acosta was suspended because he "plac[ed] his hands" on a White House staffer.  Even if this tweet were accurate—and it is not, as the reportedly doctored video Defendant Sanders posted would later show—it would not suffice to demonstrate *prior* notice of the revocation.

67.     Defendants did not provide Plaintiffs an opportunity to be heard before revoking Acosta's press credentials.  Nor have they provided him any avenue to challenge or appeal the revocation of his credentials.  Rather, Defendants have stated that they do not plan to ever rescind the revocation of Acosta's credentials.

68.     As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

### THIRD CAUSE OF ACTION
### Violations of the Administrative Procedure Act, 5 U.S.C. § 706
### (Against all Defendants other than President Trump)

69.     Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

70.     Defendants' revocation of Acosta's press credentials constitutes a final agency decision by the Secret Service.

71.     Defendants had no legal or rational justification to revoke Acosta's credentials.  The only justification they provided publicly—that Acosta "plac[ed] his hands" on a staffer—is not accurate, and the other stated justification—that Acosta failed "to treat the White House and the Office of the Presidency" with sufficient "respect"—is not sufficient as a matter of law.

72.     By revoking Acosta's White House hard pass, Defendants acted arbitrarily, capriciously, and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

73. By revoking Acosta's White House press credentials solely based on Plaintiffs' viewpoint, the content of their speech, and their protected First Amendment activity and by affording Acosta no process to contest this decision, Defendants infringed Plaintiffs' First and Fifth Amendment rights, in violation of 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter each of the following forms of relief:

a. Immediate restoration of Acosta's press credentials and hard pass so that Plaintiffs may continue to report from White House briefings and perform their jobs on White House grounds and at other presidential events;

b. In the alternative, immediate restoration of Acosta's press credentials pending "due process," including but not limited to a formal written explanation as to why the pass is being revoked, an opportunity for Plaintiffs to respond to the allegations and be heard before a neutral arbiter, and a final written decision;

c. A declaration that the revocation of Acosta's press credentials was unconstitutional, in violation of the First Amendment and the Due Process Clause of the Fifth Amendment;

d. A declaration that the revocation of Acosta's press credentials violated the Administrative Procedure Act, 5 U.S.C. § 706(2); and

e. An order granting Plaintiffs costs, fees, and disbursements incurred in connection with these proceedings and such further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial.

Dated: November 13, 2018

Theodore J. Boutrous, Jr., (D.C. Bar No. 420440)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Ave.,
Los Angeles, California 90071
Tel:  (213) 229-7804
tboutrous@gibsondunn.com

Theodore B. Olson (D.C. Bar No. 367456)
Joshua S. Lipshutz (D.C. Bar No. 1033391)
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 955-8668
tolson@gibsondunn.com
jlipshutz@gibsondunn.com

Anne Champion (*pro hac vice forthcoming*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166-0193
Tel:  (212) 351-5361
achampion@gibsondunn.com

*Counsel for Plaintiffs Cable News Network, Inc. and Abilio James Acosta*