THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CABLE NEWS NETWORK, INC. and ABILIO JAMES ACOSTA,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; JOHN F. KELLY, in his official capacity as Chief of Staff to the President of the United States; WILLIAM SHINE, in his official capacity as Deputy Chief of Staff to the President of the United States; SARAH HUCKABEE SANDERS, in her official capacity as Press Secretary to the President of the United States; the UNITED STATES SECRET SERVICE; RANDOLPH ALLES, in his official capacity as Director of the United States Secret Service; and JOHN DOE, Secret Service Agent, in his official capacity,<br><br>Defendants. | Case No. |

## DECLARATION OF SAM DONALDSON IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Sam Donaldson, hereby declare under penalty of perjury the following:

1. I worked as a reporter based in Washington, D.C. from 1961 to 2013. I am personally familiar with the facts set forth below and could and would testify competently thereto.

1

2.  From 1967 through 2013, I was employed as a broadcast journalist at ABC News. During my over 50-year career, I covered many of the most significant international and national news stories of the day, including the assassinations of President John F. Kennedy, Senator Robert Kennedy and The Reverend Martin Luther King, Jr., and was an eyewitness to the attempted assassination of President Ronald Reagan, the Vietnam War, the Watergate scandal, the First Persian Gulf War, President Clinton's impeachment, and every presidential campaign from 1964 through 2012. I have received many professional recognitions for my work, including four Emmy awards, two Peabody awards, and the Edward R. Murrow Award from Washington State University (Murrow's alma mater). Throughout my career, I have seen countless examples of the importance of the press's duty to keep the public informed and hold government accountable.

3.  During my career, I reported on the administrations of every president from John F. Kennedy to Barack Obama. I twice served as ABC's Chief White House Correspondent from 1977-1989, during the Carter and Reagan Administrations, and from 1998-1999, during the Clinton Administration.

4.  As ABC's Chief White House Correspondent, I attended hundreds of press conferences and press "availabilities," asked countless questions of many Presidents, and observed thousands of questions from my White House press corps colleagues. I was known as an aggressive reporter who confronted Presidents with tough questions and tried hard not to settle for non-answers.

5.  During the Reagan Administration, in particular, when the President developed a habit of going several months at a time without taking questions from the press, I took every opportunity I could to question him at public events outside the White House and even as he

walked to and from his limousine or helicopter. I believed then, and I still believe, that it was my duty as a journalist to seize those opportunities. I was aggressive in posing questions and pursuing answers because the job of obtaining factual information from and about the public servants I covered is a job (if I did it well) that contributed to holding government accountable to the citizens of this country. To do that job requires reporters to have as much free access to government as possible and the cooperation of the people in government in providing pertinent information.

6.   Despite my reputation as an unrelenting questioner of numerous presidents, I never had my security credentials revoked, nor was there ever even the remote threat to do so by any presidential administration, whether in relation to my conduct at a press conference or for any other reason. White House officials were free to complain to me or my employer about my coverage and occasionally they did. But never was there a move to silence me or demand that I report a story differently than I in my own judgment thought was correct and fair.

7.   During my two decades as a chief White House correspondent, I attended hundreds of press conferences at the White House and dozens during presidential trips. I have personally witnessed the full range of behavior at such briefings by reporters, the President, and White House staff. Since his employment by CNN, I have on many occasions seen Jim Acosta's reporting on television and found it to be most able and professional.

8.   I was shocked and dismayed by the White House's decision to revoke Acosta's press credentials. I am not aware of any prior situation in which a White House correspondent's hard pass was revoked. My colleagues and I never would have imagined such action was possible.

9. I personally watched the entire live televised press conference at the White House held by President Donald J. Trump on November 7, 2018, and have reviewed video tape of several portions. In my opinion, based on my two decades of experience and the hundreds of White House press conferences in which I have participated, Jim Acosta's conduct and questioning of the President were appropriate and within norms of professional conduct for journalists generally and for a White House reporter specifically.

10. President Trump and his administration should not have revoked Jim Acosta's press credentials. This action is unprecedented and wholly without justification. It appears to have been done solely because President Trump does not like Jim Acosta as he made clear in his public denunciation of Acosta at the Press Conference, a dislike apparently the result of the President's unhappiness that Acosta had that night as he had often in the past pressed him to explain his answer to a proper question about a matter of public interest. No president fully likes reporters who ask uncomfortable questions, which may call for answers explaining mistakes or flaws or controversial actions in a president's performance. But President Harry Truman summed up the necessary interplay between a president and the press corps when he advised government officials at every level: "If you can't take the heat, get out of the kitchen."

11. As a retired White House Correspondent, I remain committed to the role of the press in safeguarding our democracy. I am deeply concerned that Acosta's security credentials were revoked without just cause. The First Amendment forbids the abridgment of the freedom of the press through a government law because the Amendment's writers believed to do so would gravely harm the public interest and in this case attempting to do it through the "back door" of revoking Jim Acosta's press credentials ought not be allowed. If the press is not free to

cover the news because its reporter is unjustly denied access, it is not free. And if denying access to a reporter an organization has chosen to represent it – in effect asserting the president's right to take that choice away from a news organization and make it himself – is permitted, then the press is not free.

12.     In revoking Jim Acosta's credentials, the president is not only taking an unwarranted and in my opinion unconstitutional action against Acosta, he is doing something that will have a chilling effect on the press as a whole. What reporter or news organization will feel safe from White House retaliation because of what questions they ask or what news stories they write and publish if the action against Acosta is not reversed? I ask the Court to restore Jim Acosta's White House credentials.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of November 2018 in Albuquerque, New Mexico.

_Sam Donaldson_
Sam Donaldson