**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CABLE NEWS NETWORK, INC. and ABILIO
JAMES ACOSTA,

          Plaintiffs,

   v.

DONALD J. TRUMP, in his official capacity as
President of the United States; JOHN F. KELLY, in
his official capacity as Chief of Staff to the President
of the United States; WILLIAM SHINE, in his
official capacity as Deputy Chief of Staff to the
President of the United States; SARAH HUCKABEE
SANDERS, in her official capacity as Press Secretary
to the President of the United States; the UNITED
STATES SECRET SERVICE; RANDOLPH ALLES,
in his official capacity as Director of the United
States Secret Service; and JOHN DOE, Secret
Service Agent, in his official capacity,

          Defendants.

**Case No.**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTIONS FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

# CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

ARGUMENT ......................................................................................................................... 8

    I.  Plaintiffs' First Amendment and Due Process Claims Are Likely To Succeed. ................ 9

    A.  Plaintiffs Are Likely to Succeed in Demonstrating that the Revocation of
        Acosta's Credentials Violated the First Amendment. ...................................................... 9

    B.  Plaintiffs Are Likely to Succeed in Demonstrating that Defendants Violated the
        Due Process Clause. ................................................................................................... 15

    II.  Plaintiffs Will Be Irreparably Injured Absent Injunctive Relief. ................................... 19

    III.  The Balance of Equities and the Public's Interest Strongly Favor Injunctive
        Relief Here. ............................................................................................................... 21

CONCLUSION..................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Am. Broad. Cos. v. Cuomo*,
   570 F.2d 1080 (2d Cir. 1977)..................................................................................9, 20

*Anderson v. Cryovac, Inc.*,
   805 F.2d 1 (1st Cir. 1986)...........................................................................................10

*Borreca v. Fasi*,
   369 F. Supp. 906 (D. Haw. 1974).................................................................................10

*Branzburg v. Hayes*,
   408 U.S. 665 (1972)......................................................................................................9

*Cable News Network, Inc. v. Am. Broad. Cos.*,
   518 F. Supp. 1238 (N.D. Ga. 1981)....................................................................... *passim*

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010)....................................................................................................11

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
   447 U.S. 530 (1980)....................................................................................................11

*DeGuiseppe v. Vill. of Bellwood*,
   68 F.3d 187 (7th Cir. 1995).........................................................................................19

*Elrod v. Burns*,
   427 U.S. 347 (1976) (plurality opinion) ..................................................................19

*Freeman v. F.D.I.C.*,
   56 F.3d 1394 (D.C. Cir. 1995).....................................................................................18

*Hartman v. Moore*,
   547 U.S. 250 (2006)....................................................................................................10

*Hassay v. Mayor*,
   955 F. Supp. 2d 505 (D. Md. 2013).............................................................................21

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988)......................................................................................................13

*Knight First Amend. Inst. v. Trump*,
   302 F. Supp. 3d 541 (S.D.N.Y. 2018).........................................................................12

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)....................................................................................................18

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ..................................................................19

*Morgan Stanley DW Inc. v. Rothe*,
    150 F. Supp. 2d 67 (D.D.C. 2001) ...............................................................8

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*,
    675 F. Supp. 2d 411 (S.D.N.Y. 2009) ..........................................................9

*N.Y. Times v. Sullivan*,
    376 U.S. 254 (1964) ....................................................................................13

*NB ex rel. Peacock v. District of Columbia*,
    794 F.3d 31 (D.C. Cir. 2015) .................................................................15, 16

*Pell v. Procunier*,
    417 U.S. 817 (1974) ......................................................................................9

*Police Dep't of City of Chicago v. Mosley*,
    408 U.S. 92 (1972) ......................................................................................11

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ................................................................8, 19

*Reed v. Town of Gilbert, Ariz.*,
    135 S. Ct. 2218 (2015) ................................................................................10

*Regan v. Time, Inc.*,
    468 U.S. 641 (1984) ....................................................................................11

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ....................................................................................11

*Scott v. Harris*,
    550 U.S. 372 (2007) ....................................................................................17

*Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977) ............................................................ *passim*

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) ....................................................................................11

*Stevens v. N.Y. Racing Ass'n, Inc.*,
    665 F. Supp. 164 (E.D.N.Y. 1987) .............................................................10

*Stewart v. D.C. Armory Bd.*,
    789 F. Supp. 402 (D.D.C. 1992) ...................................................................8

*Telemundo v. City of Los Angeles*,
    283 F. Supp. 2d 1095 (C.D. Cal. 2003) ..........................................................................21, 22

*United States v. Stevens*,
    559 U.S. 460 (2010)...................................................................................................................13

*Westinghouse Broad. Co., Inc. v. Dukakis*,
    409 F. Supp. 895 (D. Mass. 1976) ...........................................................................................19

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008)........................................................................................................................8

*Zerilli v. Smith*,
    656 F.2d 705 (D.C. Cir. 1981) ..................................................................................................23

**Rules**

Local Civil Rule 65.1 .......................................................................................................................1

**Regulations**

31 C.F.R. § 409.1 ...........................................................................................................................14

**Constitutional Provisions**

U.S. Const., Amend. I ............................................................................................... *passim*

U.S. Const., Amend. V ............................................................................................... *passim*

Plaintiffs Cable News Network, Inc. ("CNN") and Abilio James ("Jim") Acosta bring this motion for a temporary restraining order and a preliminary injunction against Defendants Donald J. Trump, John F. Kelly, William Shine, Sarah Huckabee Sanders, Randolph D. Alles, the United States Secret Service, and John Doe Secret Service Agent.  Pursuant to Local Civil Rule 65.1(d), Plaintiffs request that this motion be heard on an expedited basis so that Plaintiffs' irreparable harm may be alleviated as quickly as possible.

## PRELIMINARY STATEMENT

Plaintiff Jim Acosta has been a journalist for more than two decades.  He has diligently reported on presidential campaigns, Hurricane Katrina, and the Iraq War.  For more than five years, Acosta has been CNN's national political correspondent and, since January 2018, he has been the network's chief White House correspondent.  Acosta has covered the White House since 2012 and, since 2013, has possessed press credentials—often called a "hard pass"— allowing him access to the White House and White House briefings.  *See* Decl. of Jim Acosta ¶¶ 2-9; Decl. of Sam Feist ¶¶ 3-4; Decl. of Todd Gillman ¶¶ 5-7; Compl. ¶¶ 1, 7, 18-19.

But on November 7, 2018, Defendants revoked indefinitely Acosta's White House credentials.  According to the President, Acosta is no longer permitted to cover the White House because he failed "to treat the White House and the Office of the Presidency with respect."  That justification, however, is merely an attempt to punish a reporter for his content, coverage, and critiques.  It is plainly unconstitutional.  Indeed, when Defendants initially revoked Acosta's credentials, they attempted to justify this unprecedented penalty by stating that Acosta had "plac[ed] his hands" on a staffer.  The President later disavowed that justification, and for good reason:  Defendants' account of what occurred is wrong.  Acosta did not "plac[e] his hands" on a staffer as eyewitnesses and video evidence confirm.  The only evidence the White House supplied to justify its claim is a video that was, according to wide reports, altered by and

obtained from a contributor to a fringe website known less for accuracy and more for hate speech and conspiracy theories.

The pretextual and unabashed attempt to censor a reporter and a network that the President views as one of his critics, however, is only the beginning.  As the President explained, there "could be others also" who get their credentials revoked for not "treat[ing] the White House and the Office of the Presidency with respect."  The revocation of Acosta's credentials is plainly unconstitutional.  Defendants' transparent attempt to ban from the White House a reporter the administration sees as a critic constitutes nothing more than a raw content- and viewpoint-based penalty for Acosta's and CNN's protected First Amendment activity.  In addition, the White House's actions violate the Fifth Amendment's due process guarantee:  The government provided no notice, no justification, and no opportunity for Acosta or CNN to be heard or to appeal the indefinite revocation of Acosta's credentials and White House access.  As the D.C. Circuit has held, "the protection afforded newsgathering under the first amendment guarantee of freedom of the press requires that this access [to White House press facilities] not be denied arbitrarily or for less than compelling reasons."  *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) (citation omitted).  And "notice . . . of the factual bases for denial [of access to White House press facilities] with an opportunity to rebut is a minimum prerequisite for ensuring that the denial is . . . [not] based on arbitrary or less than compelling reasons."  *Id.* at 131.  The government complied with none of these safeguards here, stripping Acosta of his credentials and White House access with no process whatsoever.

Under this binding D.C. Circuit precedent, a temporary restraining order and preliminary injunction are required here.  Our Constitution, well-established law, and the core principles of our democracy establish that the White House cannot be permitted to cast out and punish

reporters with whom it disagrees.  Acosta and the rest of the press corps must be free to do their jobs, reporting the news and challenging government officials without fear of reprisal from the President and his administration.

## BACKGROUND

Since the start of his campaign and continuing to the present day, President Trump has heavily criticized any journalist or news organization he believes might report something he considers negative.  As the President explained to Lesley Stahl of 60 Minutes:  "You know why I do it?  I do it to discredit you all and demean you all so when you write negative stories about me, no one will believe you."  Ex. 16; *see also* Ex. 2 ("If people don't cover me fairly, or if they actually make things up, I don't know why anybody should be allowed [into Trump campaign rallies].");  Compl. ¶ 3.[1]

In this regard, President Trump and his administration have been especially focused on CNN and Acosta.  At a news conference on January 11, 2017, for example, when Acosta was attempting to ask then-President-elect Trump a question, Trump told Acosta, "your organization is terrible" and "you are fake news."  Ex. 3; Acosta Decl. ¶ 11; Compl. ¶ 27.  Just a few weeks after he was inaugurated in 2017, President Trump tweeted that CNN was "the enemy of the American People."  Ex. 6; Compl. ¶ 29.  A few months later, President Trump tweeted a video depicting him tackling and punching a man with a CNN logo superimposed on his face, noting "#FraudNewsCNN" and "#FNN" in the tweet.  Ex. 7; Compl. ¶ 28; *see also* Ex. 8 ("While in the Philippines I was forced to watch @CNN, which I have not done in months, and again realized how bad, and FAKE, it is.  Loser!"); Ex. 9 ("[W]e should boycott Fake News CNN.  Dealing

---

[1]  Citations to Ex. __ are to the Exhibits to the Declaration of Theodore J. Boutrous, dated November 13, 2018.

with them is a total waste of time!"); Compl. ¶¶ 28-29.  A few weeks later, he described one

CNN journalist as "the dumbest man on television," Ex 13; Compl. ¶ 28; *see also* Ex. 14; Acosta

Decl. ¶ 11.

President Trump's criticisms of CNN and Acosta have not been limited to the Twitter

universe.  On August 30, 2018, for example, President Trump complained during a campaign

rally about CNN's coverage of him and his administration and said that CNN and its reporters

are "just dishonest, terrible people."  Ex. 23; Compl. ¶ 29; *see also* Boutrous Decl. ¶¶ 4, 17, 20

(recounting and collecting similar incidents).

On November 7, 2018, the day after the 2018 midterm elections, President Trump held an

approximately 90-minute news conference in the East Room of the White House.  Acosta was

present and one of the first reporters the President called on for questions.  Speaking through a

hand-held microphone, as all the White House journalists who asked questions did, Acosta asked

a question about one of President Trump's statements during the midterm campaign—namely,

whether a caravan making its way to the United States from Central America constitutes "an

invasion" of the country, a significant feature of the President's messaging during the just-ended

campaign.  The President declined to respond, instead remarking: "You know what?  I think you

should . . . I think you should let me run the country.  You run CNN.  And if you did it well, your

ratings would be much better."

When Acosta attempted to ask a follow-up question, President Trump refused to take it.

A White House staffer then approached Acosta and attempted to grab the microphone.  The

staffer reached all the way across Acosta's body, successfully latched onto the microphone, and

physically attempted to remove it from Acosta's right hand.  Acosta held onto the microphone,

stated "Pardon me, ma'am," and continued to ask his question.

4

The staffer then sat down and allowed Acosta to ask his follow-question.  The President

again declined to answer Acosta, saying: "I tell you what, CNN should be ashamed of itself,

having you work for them.  You are a rude, terrible person.  You shouldn't be working for

CNN."  The President further stated that "[w]hen you report fake news, which CNN does, a lot,

you are the enemy of the people."  The entire press conference (including the specific exchange

in question at minutes 27:31 to 30:13) can be viewed here:  *President Trump on 2018 Election*

*Results*, C-SPAN, https://www.c-span.org/video/?454223-1/president-trump-calls-2018-

midterm-elections-very-close-complete-victory, *available at* Ex. 27 (C-SPAN Video Clip); *see*

*also* Ex. 28 (Associated Press Video Clip); Acosta Decl. ¶¶ 13-18; Compl. ¶¶ 30-38.

That evening, following the President's press conference described above, Defendants

revoked Acosta's credentials to enter White House grounds.  Acosta Decl. ¶¶ 16-17.  They did so

without notice, without providing Acosta any justification, and without an opportunity to appeal

the revocation or otherwise respond.  Acosta Decl. ¶ 17; Ex. 45; Feist Decl. ¶ 22; Compl. ¶¶ 47-

48.  The revocation of Acosta's credentials was unprecedented: As Sam Donaldson has noted, in

his nearly five decades as a reporter in Washington and two decades as a chief White House

correspondent, he is unaware "of any prior situation in which a White House correspondent's

hard pass was revoked.  My colleagues and I never would have imagined such action was

possible."  Decl. of Sam Donaldson ¶¶ 1, 2, 3, 7; 8; *see also* Feist Decl. ¶ 14; Gillman Decl. ¶ 8.

As a candidate, President Trump himself recognized how improper it would be to revoke the

press credentials of White House reporters if he prevailed in the election and became President,

noting that banning reporters from campaign rallies (as he had done) is "a different thing.  In my

case I'm a person running for office.  I rent these large arenas . . . so I have an option. . . .  *When*

*I'm representing the United States I wouldn't do that*." Ex. 1 (Stelter Interview Tr.) (emphasis added).

White House official Sarah Sanders tweeted that Acosta's credentials were revoked due to the interaction between him and the White House staffer who had attempted to take his microphone. Compl. ¶ 39. Ms. Sanders tweeted that the White House "will . . . never tolerate a reporter placing his hands on a young woman just trying to do her job as a White house intern." Ex. 30. Ms. Sanders later posted to her Twitter account a video that has widely been reported to be manipulated, purporting to show Acosta "placing his hands" on the staffer, and called Acosta's conduct "absolutely unacceptable." Ex. 30, 31, 37; *see* Acosta Decl. ¶ 23; Compl. ¶ 43. The next day, President Trump advised that other reporters' credentials could be revoked and noted that the White House is a "sacred place," that "[y]ou have to treat the White House with respect," and that "[y]ou have to treat the presidency with respect." Ex. 51 at 6; *see* Acosta Decl. ¶ 24; Compl. ¶¶ 2, 58.

Many eyewitnesses present at the November 7 press conference have responded to the White House allegations, unequivocally denying that Acosta placed his hands on the staffer. Exs. 32, 35, 43, 48; Compl. ¶ 40. It has further been reported that the video Ms. Sanders disseminated to the public came from a contributor to InfoWars, an organization whose "conspiracy theories and hateful content" have led to it "being banned earlier this year by most major social media platforms." Ex. 42; *see also* Exs. 39, 49, 50 (calling the White House video post "visual propaganda"); Acosta Decl. ¶ 23. Moreover, according to numerous reports, the video had been "altered to exaggerate the aggressiveness of Acosta's actions." Ex. 50. Rather than portraying what actually occurred at the press conference, it appears to have been edited to suggest a more physical confrontation between Acosta and the staffer. As the *Washington Post*

explained, the video makes it appear that Acosta "swiftly chop[ped] down on the arm of an aide as he held onto a microphone while questioning President Trump.  But in the original video, Acosta's arm appears to move only as a response to a tussle for the microphone.  His statement, 'Pardon me, ma'am,' is not included in the video Sanders shared."  Ex. 44; Ex. 48 (*New York Times* reporting the same); Ex. 46 (CBS reporting the same); Ex. 49 (*The Independent* reporting the same); *see also* Compl. ¶¶ 44-45.  Counselor to the President Kellyanne Conway attempted to deny the video had been altered but then admitted it had been "sped up."  Ex. 52.

Video provided by independent news outlets makes the accuracy of the *Post*'s account plain.  *Compare* Ex. 28 (Associated Press Video Clip), *with* Ex. 38 (S. Sanders Tweeted Video Clip).  Video editing professionals have even layered the White House's clip on top of the video provided by independent sources to show the key discrepancies.  Exs. 39; *see also* Exs. 43, 44. In response to the apparent doctoring of the video the White House circulated to the American public, the White House News Photographers Association released a statement that "[a]s visual journalists, we know that manipulating images is manipulating truth.  It's deceptive, dangerous and unethical.  Knowingly sharing manipulated images is equally problematic, particularly when the person sharing them is a representative of our country's highest office with vast influence over public opinion."  Ex. 41; Ex. 43.

Of course, President Trump's comments at the press briefing, which focused on the questions Acosta was asking and the content of his news reporting, left no doubt that Acosta's credentials and White House access were revoked for content- and viewpoint-based reasons having nothing to do with the interaction between him and the staffer.  *See* Acosta Decl. ¶¶ 23-24.  In fact, two days later, on November 9, President Trump admitted in a public statement on the White House lawn that the interaction between Acosta and the staffer was not the basis for

revoking Acosta's credentials, stating:  "I don't hold [Acosta] for that because it wasn't overly, you know, horrible."  Ex. 51 at 10; *see also* Donaldson Decl. ¶ 9 ("[B]ased on my two decades of experience and the hundreds of White House press conferences in which I have participated, Jim Acosta's conduct and questioning of the President were appropriate and within norms of professional conduct for journalists generally and for a White House reporter specifically."); *accord* Feist Decl. ¶ 17 ("An effective correspondent cannot simply sit down when the President or other public official avoids a question through interruptions and personal attacks."); Compl. ¶ 53.  President Trump further acknowledged that Defendants had revoked the credentials because he believed Acosta had failed to "treat the White House with respect" and "to treat the presidency with respect."  Ex. 51 at 6.  The President then threatened to take away the credentials of other allegedly disrespectful reporters.  *Id.* ("Q. Mr. President, how long are you going to leave Jim Acosta in the penalty box?" A. "As far as I'm concerned, I haven't made that decision. But it could be others also."); Compl. ¶ 53.

## ARGUMENT

A Plaintiff seeking a temporary restraining order or preliminary injunction must demonstrate: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable injury in the absence of preliminary relief; (3) that the balance of the equities tips in his favor; and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction."); *Stewart v. D.C. Armory Bd.*, 789 F. Supp. 402, 404 (D.D.C. 1992).  As the D.C. Circuit has held, "[t]he loss of First Amendment 'freedoms,' . . . unquestionably constitutes irreparable injury."  *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  Thus, in First Amendment cases, "the

likelihood of success 'will often be the determinative factor' in the preliminary injunction

analysis." *Id.*

Here, all four factors counsel strongly in favor of emergency relief.  The Court should

grant a temporary restraining order and preliminary injunction in favor of Plaintiffs.

**I.  Plaintiffs' First Amendment and Due Process Claims Are Likely To Succeed.**

**A.  Plaintiffs Are Likely to Succeed in Demonstrating that the Revocation of Acosta's Credentials Violated the First Amendment.**

The law is well settled that "arbitrary or content-based criteria for press pass issuance are

prohibited under the first amendment."  *Sherrill*, 569 F.2d at 129.  As the Court of Appeals has

explained:

> [T]he White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom.  These press facilities are perceived as being open to all bona fide Washington-based journalists, whereas most of the White House itself, and press facilities in particular, have not been made available to the general public. White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press, requires that this access not be denied arbitrarily or for *less than compelling reasons.*

*Id.* (citing *Branzburg v. Hayes*, 408 U.S. 665, 681, 707 (1972); *Pell v. Procunier*, 417 U.S. 817,

829-35 (1974)) (emphasis added); *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir.

1977) ("[O]nce there is a public function, public comment, and participation by some of the

media, the First Amendment requires equal access to all of the media or the rights of the First

Amendment would no longer be tenable."); *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*,

675 F. Supp. 2d 411, 431 (S.D.N.Y. 2009) (collecting cases); *Cable News Network, Inc. v. Am.*

*Broad. Cos.*, 518 F. Supp. 1238, 1244 (N.D. Ga. 1981) ("[T]he rights guaranteed and protected

by the First Amendment include a right of access to news or information concerning the operations and activities of government.").

It goes without saying that the government has no legitimate interest in refusing reporters access to the White House based on the content or viewpoint of their reporting. *Cable News Network*, 518 F. Supp. at 1245; *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986). "The danger in granting favorable treatment to certain members of the media is obvious: it allows the government to influence the type of substantive media coverage that public events will receive. Such a practice is unquestionably at odds with the first amendment." *Id.*

The First Amendment also "prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out," *Hartman v. Moore*, 547 U.S. 250, 256 (2006), and to discrimination "based upon the content of the journalist's publications," *Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987). Even when a restriction is not content-based on its face, it is impermissible where circumstantial evidence demonstrates it was motivated by content or viewpoint. *See id.* (finding it likely that a restriction was content-based where the imposer stated off the record that it was based on specific journalists' coverage detracting from attention to the imposer's event). When a government official's "criticism [of the press] transforms into an attempt to use the powers of a governmental office to intimidate or to discipline the press or one of its members because of what appears in print, a compelling governmental interest that cannot be served by less restrictive means must be shown for such use to meet Constitutional standards." *Borreca v. Fasi*, 369 F. Supp. 906, 910 (D. Haw. 1974).

Content-based and viewpoint-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015); *accord*

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints."); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is . . . an egregious form of content discrimination."); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) ("[T]he government's ability to impose content-based burdens on speech raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace."); *Regan v. Time, Inc.*, 468 U.S. 641, 648-49 (1984) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment."); *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 538 (1980) ("[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. . . .  To allow a government [to discriminate based on viewpoint] would be to allow that government control over the search for political truth." (citation and quotation marks omitted)); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) ("Any [content-based restriction on speech] would completely undercut the profound national commitment to the principle that debate on public issues should be uninhibited, robust, and [wide]-open." (citation and quotation marks omitted)).

Here, there can be no question that the revocation of Acosta's credentials is a content- and viewpoint-based punishment imposed on him because the President and his administration do not like CNN or Acosta's reporting.  President Trump has been very clear about his antipathy in this regard.  Throughout the first two years of his tenure in office—and even before—he has described CNN as the "enemy of the people" and a purveyor of "fake news."  *See supra* at 3-4. Just two days after Acosta's expulsion, the President berated Abby Phillip, a Harvard educated

CNN correspondent, when she asked whether the President wanted his new Attorney General to "rein in Robert Mueller." Ex. 51 at 11-12. In response, the President stated: "What a stupid question that is. What a stupid question. But I watch you a lot. You ask a lot of stupid questions." *Id.*; Feist Decl. ¶ 20.

By contrast—the President has encouraged and supported those media outlets he deems sufficiently favorable. Since his inauguration, the President has tweeted about CNN dozens of times, including numerous tweets that contrast Fox News's favorable coverage of the President to CNN's more critical reporting. Just days after he took office, for instance, President Trump tweeted "Congratulations to @FoxNews for being number one in inauguration ratings. They were many times higher than FAKE NEWS @CNN - public is smart!" Ex. 4. Weeks later, he stated "[t]he fake news media is going crazy with their conspiracy theories and blind hatred. @MSNBC & @CNN are unwatchable. @foxandfriends is great!" Ex. 5. His commentary continued well into the 2018 midterm election campaign. *See, e.g.*, Ex. 17 ("Real @FoxNews is doing great, Fake News CNN is dead!"); Ex. 21 ("Wow, @foxandfriends is blowing away the competition in the morning ratings. Morning Joe is a dead show with very few people watching and sadly, Fake News CNN is also doing poorly. Too much hate and inaccurately reported stories - too predictable!"). Defendant Shine, in fact, was co-president of Fox News Channel and Fox Business Network before he joined the President's communications team. Ex. 18.

Defendants thus clearly believe that CNN's and Acosta's coverage of the current administration is unfair and overly critical. But such a concern—accurate or not—is a constitutionally infirm basis for revoking a reporter's access to the White House. *See Knight First Amend. Inst. v. Trump*, 302 F. Supp. 3d 541, 575 (S.D.N.Y. 2018) (noting that when the President blocked Twitter users who disagreed with him, those users "indisputably [were]

blocked as a result of viewpoint discrimination").  The Framers of our Constitution embraced a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964).  The President lacks the authority to quash "[t]he sort of robust political debate encouraged by the First Amendment"—debate that is "*bound* to produce speech that is critical of those who hold public office."  *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 51 (1988) (emphasis added); *accord United States v. Stevens*, 559 U.S. 460, 470 (2010) ("The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs.  Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it."); *see also* Acosta Decl. ¶ 12; Donaldson Decl. ¶ 10 ("No president fully likes reporters who ask uncomfortable questions, which may call for answers explaining mistakes or flaws or controversial actions in a president's performance.  But President Harry Truman summed up the necessary interplay between a president and the press corps when he advised government officials at every level 'If you can't take the heat, get out of the kitchen.'").

In the face of this, the White House at first offered an unsupported reason: that they revoked Acosta's credentials because he engaged in "inappropriate behavior" by "placing his hands on a young woman just trying to do her job as a White House intern."  Exs. 30, 31, 37.  But that justification is neither factually true nor legally adequate.  First, the contention that Acosta placed his hands on the intern is false, as eyewitnesses and contemporaneous, un-doctored video confirm.  Reuters correspondent Jeff Mason, formerly the president of the White House Correspondents' Association, tweeted:  "I was seated next to @Acosta at today's press

conference and did not witness him 'placing his hands' on the young intern, as the White House alleges . . . ."  Ex. 36.  Other reporters spoke out similarly.  Exs. 32, 35; Compl. ¶ 40. Independent experts have demonstrated that the video Ms. Sanders posted of the interaction between Acosta and the White House intern was altered to make it appear more confrontational than it was.  Exs. 39, 43, 48, 49; *compare* Ex. 28 (Associated Press Video Clip), *with* Ex. 38 (S. Sanders Tweeted Video Clip).

The manipulated video undergirding the administration's revocation of Acosta's credentials shows that its justification was pretextual and not in good faith.  *Cf. Sherrill*, 569 F.2d at 131 n.22 ("It is apparent that all parties to this case recognize the right of a journalist to a White House press pass if he has obtained House and Senate press credentials, resides in Washington, and has a need to report from the White House, *unless* he is a source of potential danger to the President or his family.  There is no indication that the Secret Service has ever denied press credentials for any other reason." (emphasis added)); 31 C.F.R. § 409.1 ("In granting or denying a request for a security clearance made in response to an application for a White House press pass, officials of the Secret Service will be guided solely by the principle of whether the applicant presents a potential source of physical danger to the President and/or the family of the President so serious as to justify his or her exclusion from White House press privileges."); *see also* Compl. ¶ 26.  Indeed, on November 9, the President himself stated, regarding the alleged confrontation between Acosta and the White House staffer, that he doesn't "hold [Acosta] for that because it wasn't overly, you know, horrible."  Ex. 51 at 10.  He further noted that Acosta's credentials were revoked—and other reporters' credentials could be, too— because they did not "treat the White House" and "the presidency" "with respect," *id.* at 6—a

clear reference to the content of Acosta's reporting, and a particularly transparent one at that

given the President's prior statements calling Acosta "actually a nice guy."  Ex. 20.

> **B.  Plaintiffs Are Likely to Succeed in Demonstrating that Defendants Violated the Due Process Clause.**

To bring a claim under the Due Process Clause, "a plaintiff must show (i) deprivation of

a protected liberty or property interest, (ii) by the government; (iii) without the process that is

'due' under the Fifth Amendment."  *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41

(D.C. Cir. 2015) (citations omitted).  Here, because the Administration's decision to revoke

indefinitely Acosta's pass violated his liberty and property interests without affording

appropriate process—or any process at all—Plaintiffs are likely to succeed on the merits of their

due process claim.

First, there is no question that the revocation of Acosta's pass deprived him of a protected

interest.  The D.C. Circuit has held that the interest of a White House correspondent and his

publication in a White House press pass "*undoubtedly* qualifies as liberty which may not be

denied without due process of law under the [Fifth Amendment]."  *Sherrill*, 569 F.2d at 130

(emphasis added); *see also id.* at 129 ("Not only newsmen and the publications for which they

write, but also the public at large have an interest protected by the [First Amendment] in assuring

that . . . individual newsmen not be arbitrarily excluded from sources of information").  Acosta

and CNN's liberty and property interests in Acosta's press pass are, if anything, far stronger than

the interest the Court of Appeals addressed in *Sherrill*; although the Court there addressed an

*applicant's* interest in receiving a press pass for which he applied, *id.* at 130-31, Acosta has held

his pass for years and uses it regularly, and he and CNN require it to perform the constitutionally

protected duties of reporting on the White House.  Acosta Decl. ¶¶ 8, 18-20.

Moreover, the property interests here are significant.  At stake is Acosta and CNN's ability to continue gathering and publishing news on the President and his administration. Acosta Decl. ¶¶8 (noting that the "hard pass" is "essential to my job"); *id.* ¶¶ 18-20; Feist Decl. ¶ 12; Compl. ¶¶ 22-25.  The West Wing of the White House, or the President's location during trips, is Acosta's and his fellow correspondents' office, and Acosta's credentials—including his hard pass—provide him necessary access to that workplace.  Feist Decl. ¶¶ 7-8, 13; Acosta Decl. ¶¶ 6-8; Compl. ¶¶ 22-25.  As Acosta has explained, without his security credentials, he effectively cannot do his job of reporting on the administration—for CNN or any other news organization.  Acosta Decl. ¶¶ 18-20; Gillman Decl. ¶¶ 9-15; Compl. ¶ 24.  A hard pass lets Acosta react to "the often spontaneous newsgathering opportunities that present themselves at the White House, from informal conversations with administration staff to surprise announcements by the White House."  Acosta Decl. ¶ 8; Feist Decl. ¶¶ 5-12; Gillman Decl. ¶¶ 9-15; Compl. ¶ 25.  Without his credentials, he will miss the newsworthy events about which he has long reported and which allowed him to achieve the prestigious role he has attained—that of CNN's chief White House correspondent.  Acosta Decl. ¶¶ 8, 18-20; Feist Decl. ¶ 4-11; Gillman Decl. ¶¶ 9-15.  According to Todd Gillman, a member of the White House Correspondents' Association who counsels his colleagues on obtaining their security credentials, a hard pass is critical for *anyone* who reports daily on or at the White House.  Gillman Decl. ¶ 9.  And as the Court of Appeals has recognized, "[n]ot only newsmen and the publications for which they write, but also the public at large have an interest" in the ability of journalists to do their jobs.  *Sherrill*, 569 F.2d at 129.

Second, this deprivation "occurred at the hands of the government."  *NB ex rel. Peacock*, 794 F.3d at 42.  The White House Press Secretary announced the deprivation on her government-

16

controlled Twitter account and a Secret Service agent enforced the deprivation by taking

Acosta's pass at the White House gate.  *See supra* 5-6.

Finally, the Administration unquestionably provided inadequate process—in fact, no

process at all.  Acosta Decl. ¶ 17.  In *Sherrill*, the Court of Appeals concluded that the White

House could not deny even an *application* for a press pass without providing "notice of the

factual bases for denial, an opportunity for the applicant to respond to these, and a final written

statement of the reasons for denial."  569 F.2d at 130.  Acosta and CNN are entitled to at least

the same process for the revocation of a press pass.  "[N]otice . . . of the factual bases for denial

with an opportunity to rebut is a minimum prerequisite for ensuring that the denial is . . . [not]

based on arbitrary or less than compelling reasons."  *Id.* at 131.  And a final written statement of

the reasons for denial is necessary to ensure that the Administration "has neither taken

additional, undisclosed information into account, nor responded irrationally to matters put

forward by way of rebuttal or explanation."  *Id.*

Both reasons apply here even more so than in *Sherrill*—especially where the only

justification the Administration has offered is what the Supreme Court has called, in a different

context, a "visible fiction."  *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see supra* Part I.A.  The

Administration revoked Acosta's pass on the basis of the content of his reporting and then tried

to justify it with a manipulated video, contradicted by video evidence and eyewitness testimony.

*See supra id.*  Given these facts, due process safeguards are essential to prevent the

Administration from banning from the White House a major media outlet's leading national

correspondent based on pretextual, inaccurate reasons.  Worse, in the days since Acosta's

credentials were taken from him, President Trump has warned that other journalists may be next,

saying, "As far as I'm concerned, . . . it could be others also."  Ex. 51 at 6.

Cases arising under the Due Process Clause often turn on a careful examination of whether the deprived plaintiff received *adequate* process given the nature of the deprivation. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976). Here, the Administration provided Acosta and CNN with no process whatsoever—Acosta was blocked from entering his work space at the White House without notice and stripped of his "hard pass," *see* Ex. 29, Ex. 34, at the same time Ms. Sanders was announcing the revocation in a tweet. Ex. 30; Acosta Decl. ¶ 17; Feist Decl. ¶¶ 15-16; Ex. 45; Feist Decl. ¶ 22; Compl. ¶¶ 47-48. The due process violation is self-evident.

Finally, the Administration's interest in controlling access to the White House to protect the President's safety, which *Sherrill* described as the *only* relevant governmental interest here, 569 F.2d at 130-31 & n.22, played no role in the decision to revoke Acosta's credentials. Nor has the government claimed this is one of the "extraordinary situations" when the government interest at stake demands immediate action without the opportunity for process, or where process is simply impracticable. *See Freeman v. F.D.I.C.*, 56 F.3d 1394, 1403 (D.C. Cir. 1995). The Administration has never suggested—nor could it suggest in good faith—that Acosta's presence in the White House briefing room caused "concern for the physical security of the President or his family," *see Sherrill*, 569 F.2d at 131 n.22, or any other exigent circumstance requiring urgent decisionmaking. *See* Acosta Decl. ¶ 9 ("During my tenure as a White House correspondent, I have never had any altercations with any member of any president's administration or the Secret Service. Never during that time, until November 7, 2018, was my press credential ever threatened in any manner."). Granting reasonable process before revoking a press pass under these circumstances poses no risk to the government's interests.

The Administration has violated the Due Process Clause and emergency relief must issue to redress this violation.  At a minimum, the Court should require the Administration to restore Acosta's credentials until it affords him adequate process.

## II.  Plaintiffs Will Be Irreparably Injured Absent Injunctive Relief.

A long and unbroken line of cases have established that "[t]he loss of First Amendment 'freedoms,' . . . unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (same); *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (same); *Westinghouse Broad. Co., Inc. v. Dukakis*, 409 F. Supp. 895, 896 (D. Mass. 1976). That includes First Amendment violations "for even minimal periods of time." *Pursuing Am.'s Greatness*, 831 F.3d at 511.  Indeed, the mere fact that First Amendment violations may have a chilling effect on speech is enough to satisfy the irreparable injury standard.  *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) ("[R]etaliation need not be monstrous to be actionable under the First Amendment; it need merely create the potential for chilling . . . speech on matters of public concern.").  With both his actions and his words, President Trump has put other reporters on notice that they risk losing their press credentials unless they "treat the White House with respect."  Ex. 51 at 6; Acosta Decl. ¶ 24.

More pointedly, courts have held that restrictions on a reporter's coverage of White House and government affairs, like the serious restrictions imposed on Acosta here, constitute irreparable injury—to the reporters themselves, to the outlets they work for, and to the public at large.  In *Cable News Network, Inc. v. American Broadcasting Companies, Inc.*, 518 F. Supp. 1238 (N.D. Ga. 1981), for example, several television crews were excluded from White House pool coverage.  *Id.* at 1245-46.  The court granted a preliminary injunction, noting that, absent such relief, the plaintiffs would "suffer irreparable injury."  *Id*. at 1245.  The court reasoned that

by excluding these news outlets, "a complete visual record of the Presidential activities covered by the press pools is lost forever"—a loss that "clearly constitutes irreparable injury to [the news outlets], as well as the public." *Id.* at 1246. Similarly, in *American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977)—a case involving the ouster of ABC's television crew from several Democratic candidates' campaign headquarters—the court concluded "[t]here [was] no question that irreparable harm [would] result if ABC [were] not permitted to broadcast live coverage . . . not only to ABC but to the public which views the events on its channel." *Id.* at 1082. The court explained that excluding ABC from covering the election's events would limit the public's news-viewing options—and for some, "such as people in hospitals or other institutions who have a single channel to watch," excluding ABC would foreclose their ability to watch the news altogether, irreparably harming the news station and public. *Id.*

Similarly, here, the revocation of Acosta's press credentials irreparably harms Acosta, CNN, and the public at large. Acosta Decl. ¶¶ 8, 18-20; Donaldson Decl. ¶¶ 11-12; Feist Decl. ¶¶ 18-19; Compl. ¶¶ 51-52. Indeed, the day after Defendants revoked Acosta's credentials, the President traveled to Paris to mark the centennial of the end of the First World War. Acosta Decl. ¶ 18; Feist Decl. ¶ 19; Compl. ¶ 50. As CNN's chief White House correspondent, Acosta, too, traveled to Paris and attempted to cover the trip and the President's activities. Acosta Decl. ¶ 18; Feist Decl. ¶ 19. But the White House denied him access to the main presidential event. Acosta Decl. ¶ 18; Feist Decl. ¶ 19. What's more, even when the French government issued credentials to Acosta, the Secret Service *still* refused to allow Acosta to attend an allegedly "open" press event that journalists from around the world attended. Acosta Decl. ¶ 18; Feist Decl. ¶ 19; Ex. 53; Compl. ¶ 50.

CNN's and Acosta's ability to cover these vital, international public events, therefore, has already been irreparably harmed, and that harm will no doubt continue.  Acosta Decl. ¶¶ 18-20; Feist Decl. ¶ 21.  By continuing to withhold Acosta's credentials, Defendants are preventing CNN's chief White House correspondent from doing his job, foreclosing an essential source of news for the American public.  Acosta Decl. ¶¶ 18-20; Feist Decl. ¶ 21.  And every day the revocation is allowed to stand, it chills the vigilance of the entire press corps: "What reporter or news organization will feel safe from White House retaliation because of what questions they ask or what news stories they write and publish if the action against Acosta is not reversed?"  Donaldson Decl. ¶ 12.

## III.  The Balance of Equities and the Public's Interest Strongly Favor Injunctive Relief Here.

In light of the substantial First Amendment violations at stake here, the balance of equities sharply tips in Plaintiffs' favor.  "Ordinarily, such a threatened injury to the plaintiff will easily outweigh whatever burden the injunction may impose, because the government is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions."  *Hassay v. Mayor*, 955 F. Supp. 2d 505, 517 (D. Md. 2013) (citation and quotation marks omitted); *Telemundo v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1103-04 (C.D. Cal. 2003) (where news outlet had initially been compelled to delay one of its broadcasts in light of defendants' production, holding that "equitable considerations [did] not weigh in favor of denying the preliminary injunction" on the ground that defendants' "commercial interest in the production . . . [did] not outweigh [the news outlet's] First Amendment rights and the public interest in diversity of coverage of newsworthy events").  In such situations, any harm to defendants is insignificant.  Indeed, even in *Cable News Network*—which involved the wholesale exclusion of several television outlets from White House pool coverage—the court held that the

restoration of access to these outlets "would merely involve some minor inconvenience to the White House press staff," a harm that would pale in comparison to the irreparable harm Plaintiffs and the public would endure absent such relief.  518 F. Supp. at 1246; *see* Acosta Decl. ¶¶ 8, 18-20; Feist Decl. ¶¶ 18-20.

Moreover, the public interest here strongly militates in Plaintiffs' favor.  Even President Trump himself as a candidate recognized how improper it would be to revoke the press credentials of White House reporters if he prevailed in the election and became President.  Ex. 1.  And courts have consistently held that the public's unfettered access to news coverage is an interest warranting injunctive relief.  *See, e.g.*, *Sherrill*, 569 F.2d at 129-30 (explaining that "the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information"); *Telemundo*, 283 F. Supp. 2d at 1103-04 (granting injunctive relief to Telemundo, which had been faced with the threat of restrictions on one of its broadcasts, because "[t]he public has an interest in viewing live coverage of the event").  Consistent with these cases, here, "[t]he pending analysis should clearly indicate that the public interest will be significantly benefitted, and in no way harmed, by the granting of the injunctive relief sought.  [Acosta's] participation in White House [] coverage benefits the public by informing it of the activities of its government."  *Cable News Network, Inc.*, 518 F. Supp. at 1246.

Worse, Defendants' actions are designed to and will chill not just Acosta's reporting, but also reporting generally—particularly reporting critical of the government.  As Acosta has explained, "[t]his is a test for all of us . . . I do think they are trying to shut us down, to some extent, inside the White House press corps," by "send[ing] a message to our colleagues."  Ex. 47

at 1; *see also* Acosta Decl. ¶ 24; Donaldson Decl. ¶¶ 11-12.  President Trump has said essentially

the same thing, warning on November 9 that reporters have to "treat the White House with

respect," and that absent such respect, there "could be others also" who have their credentials

revoked.  Ex. 51 at 6.  The revocation of Acosta's credentials are bound to have a rippling effect

across the industry, particularly if they are not redressed.  "Without an unfettered press, citizens

would be far less able to make informed political, social, and economic choices.  But the press'

function as a vital source of information is weakened whenever the ability of journalists to gather

news is impaired."  *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981).  The public has a

profound interest in access to news coverage at large—an interest that, absent injunctive relief,

will be substantially undermined.  Accordingly, the public interest strongly weighs in favor of

preliminary injunctive relief.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a temporary

restraining order and preliminarily enjoin Defendants, requiring them to restore Acosta's press

credentials and White House access.

Dated: November 13, 2018

Respectfully submitted.

Theodore J. Boutrous, Jr., (D.C. Bar No. 420440)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Ave.,
Los Angeles, California 90071
Tel:  (213) 229-7804
tboutrous@gibsondunn.com

Theodore B. Olson (D.C. Bar No. 367456)
Joshua S. Lipshutz (D.C. Bar No. 1033391)
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 955-8688
tolson@gibsondunn.com
jlipshutz@gibsondunn.com

Anne Champion (*pro hac vice forthcoming*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166-0193
Tel:  (212) 351-5361
achampion@gibsondunn.com

*Counsel for Plaintiffs Cable News Network,
Inc., and Abilio James Acosta*