**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CABLE NEWS NETWORK, INC. and ABILIO JAMES ACOSTA,<br><br>      Plaintiffs,<br><br> v.<br>DONALD J. TRUMP, in his official capacity as President of the United States; JOHN F. KELLY, in his official capacity as Chief of Staff to the President of the United States; WILLIAM SHINE, in his official capacity as Deputy Chief of Staff to the President of the United States; SARAH HUCKABEE SANDERS, in her official capacity as Press Secretary to the President of the United States; the UNITED STATES SECRET SERVICE; RANDOLPH ALLES, in his official capacity as Director of the United States Secret Service; and JOHN DOE, Secret Service Agent, in his official capacity,<br><br>      Defendants. | Case No. 1:18-cv-02610-TJK |

**BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AS
AMICUS CURIAE SUPPORTING PLAINTIFFS' MOTIONS FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTEREST OF AMICUS CURIAE ............................................................................... 1

INTRODUCTION ......................................................................................................... 2

ARGUMENT ................................................................................................................. 3

  I. GOVERNMENT RETALIATION AGAINST A JOURNALIST FOR HIS REPORTING
     THREATENS THE FIRST AMENDMENT–PROTECTED ACTIVITY OF OTHER
     JOURNALISTS AND NEWS ORGANIZATIONS. ................................................ 3

    A. The Revocation of Acosta's Security Credentials in Response to His Pointed Questioning
       of the President Was Retaliatory and Came Against a Backdrop of the President's Many
       Threats to the Press. ....................................................................................... 3

    B. Government Retaliation Against Even One Journalist for Exercising His First
       Amendment Rights Can Have a Chilling Effect. ............................................. 5

    C. This Chilling Effect Is Acutely Felt by Independent Journalists and News Organizations
       Smaller than CNN, Which Might Be Unable to Mount a Legal Challenge to Similar
       Retaliation. ..................................................................................................... 7

  II. THE FIRST AMENDMENT PROVIDES CRUCIAL PROTECTION  AGAINST THE
     CHILL BROUGHT ON BY GOVERNMENT RETALIATION FOR THE EXERCISE OF
     FREE SPEECH ...................................................................................................... 9

    A. The First Amendment Protects and Encourages Pointed Questioning and Even Critical
       Coverage of the Government by the Press. ....................................................... 9

    B. To Fulfill the First Amendment's Guarantees, Courts Must Guard Against Government
       Action that Chills the Exercise of First Amendment Rights............................. 10

  III.  IT IS PARTICULARLY IMPORTANT TO REAFFIRM THE FIRST AMENDMENT'S
     ROBUST PROTECTIONS FOR FREE SPEECH AND A FREE PRESS, AS
     JOURNALISTS IN OTHER COUNTRIES FACE THREATS TO THEIR
     DEMOCRACIES PARTLY BECAUSE OF GOVERNMENTAL CRACKDOWNS. ... 13

CONCLUSION ............................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Cnty. Comm'rs, Wabaunsee County v. Umbehr*,
   518 U.S. 668 (1996) ................................................................................ 12

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) .................................................................................. 9

*CBS Inc. v. Young*,
   522 F.2d 234 (6th Cir. 1975) ..................................................................... 9

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................ 11

*Connick v. Myers*,
   461 U.S. 138 (1983) .................................................................................. 9

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
   194 F.3d 505 (4th Cir. 1999) ..................................................................... 9

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) .................................................................................... 9

*Grosjean v. American Press Co.*,
   297 U.S. 233 (1936) ........................................................................... 12, 16

*Hall v. Coe*,
   412 U.S. 1 (1973) .................................................................................... 12

*In re Shain*,
   978 F.2d 850 (4th Cir. 1992) ..................................................................... 9

*Laird v. Tatum*,
   408 U.S. 1 (1972) .................................................................................... 11

*Lamont v. Postmaster General of the United States*,
   381 U.S. 301 (1965) ................................................................................ 11

*Levine v. U.S. Dist. Court for the Cent. Dist. of Cal.*,
   764 F.2d 590 (9th Cir. 1985) ..................................................................... 9

*Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue*,
   460 U.S. 575 (1983) ................................................................................ 11

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ....................................................................... 9, 11, 16

*NAACP v. Button*,
   371 U.S. 415 (1963) ................................................................................ 6, 10

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) ....................................................................................... 9

*Sherrill v. Knight*,
   569 F.2d 124, (D.C. Cir. 1977) ................................................... 7, 9, 13, 15

*Terminiello v. City of Chicago*,
   337 U.S. 1 (1949) ......................................................................................... 10

*Waters v. Churchill*,
   511 U.S. 661 (1994) ..................................................................................... 12

*Wieman v. Updegraff*,
   344 U.S. 183 (1952) ....................................................................................... 6

## Other Authorities

Alexandra Stevenson, *Philippines Says It Will Charge Veteran Journalist Critical of Duterte*,
   N.Y. Times (Nov. 9, 2018) ........................................................................... 15

Attila Mong, *Independent Journalists in Hungary Brace for Tough Times in Next Orbán Term*,
   Committee to Protect Journalists (May 7, 2018) ........................................ 15

Brian Stelter, CNN Business, *White House Pulls CNN Reporter Jim Acosta's Pass After
   Contentious Press Conference* (Nov. 7, 2018, 10:58 P.M.) .................................... 3, 5

Cecile S. Gallego, *Increased Economic And Political Pressure Puts Investigative Reporting at
   Risk in Poland*, International Consortium of Investigative Journalists (Jan. 25, 2018) ............ 15

Drew Harwell, Wash. Post, *White House Shares Doctored Video to Support Punishment of
   Journalist Jim Acosta* (Nov. 8, 2018) ........................................................... 4

Freedom House, *Freedom in the World 2018: Democracy in Crisis* ........................................... 13

Joshua E. Keating, Foreign Policy, *Can the White House Revoke a Reporter's Credentials?*
   (June 7, 2010) ................................................................................................. 7

Marton Dunai, *Major Hungarian Opposition Newspaper to Close After Orban Victory*, Reuters
   (April 10, 2018) ............................................................................................. 14

White House, *Remarks by President Trump in Press Conference After Midterm Elections* (Nov.
   7, 2018, 11:57 A.M.) ...................................................................................... 3

World Bank, *Worldwide Governance Indicators* ......................................................... 14

Zia Weise, *How Did Things Get So Bad for Turkey's Journalists?*, The Atlantic
    (Aug. 23, 2018) ................................................................................................................ 14

## INTEREST OF AMICUS CURIAE

Amicus curiae is the Reporters Committee for Freedom of the Press (the "Reporters Committee"), an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media.[1]  Founded by journalists and media lawyers in 1970 when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today serves as a leading voice for the legal interests of working journalists and news organizations.

As an organization devoted to defending First Amendment freedoms, including the rights of journalists and media organizations to gather and report the news, the Reporters Committee has a powerful interest in ensuring that individual reporters and media outlets are not subject to retaliation for the content of their coverage or their questioning of government officials.  Because the retaliatory revocation of a White House correspondent's security credentials has ramifications for all members of the news media, the issues presented in this case are of profound importance to the Reporters Committee.

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than amicus curiae or its counsel made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION

Speech that questions, counters, and scrutinizes the government is fundamental to democracy.  Protecting—indeed, encouraging—such speech is a core purpose of the First Amendment, including its guarantee of a free press.  Because a press that gathers news and reports without fear or favor is an essential democratic institution, when the government seeks to punish disfavored journalists and news organizations for exercising their First Amendment freedoms, it threatens and harms us all.

President Trump has made abundantly clear that he dislikes questions from the press that he perceives as critical of him or his administration.  In particular, the President has made clear that he dislikes the questions that CNN's Jim Acosta asks of him and of other senior Trump administration officials, and that he disapproves of CNN's and Acosta's coverage of his administration—acts of journalism that are protected by the First Amendment.  To dislike Acosta's and CNN's reporting is President Trump's prerogative; but to retaliate against them by revoking Acosta's White House security credentials (sometimes called a "hard pass") tramples on the Constitution.  Such retaliatory action not only harms CNN and Acosta but also aims to chill the constitutionally protected speech and newsgathering activity of other journalists whom the public depends upon to question government officials vigorously and to report candidly on the responses. The Reporters Committee seeks to inform this Court's understanding of the threat to our democracy posed by the retaliatory revocation of a journalist's access to the White House, a threat that will only continue to mount absent the Court's urgent intervention.

**ARGUMENT**

**I.    GOVERNMENT RETALIATION AGAINST A JOURNALIST FOR HIS REPORTING THREATENS THE FIRST AMENDMENT–PROTECTED ACTIVITY OF OTHER JOURNALISTS AND NEWS ORGANIZATIONS.**

   **A. The Revocation of Acosta's Security Credentials in Response to His Pointed Questioning of the President Was Retaliatory and Came Against a Backdrop of the President's Many Threats to the Press.**

On November 7, 2018, at an official White House press conference to which he had White House–approved access, CNN's Senior White House Correspondent, Jim Acosta, sought to ask President Trump questions the substance of which, it quickly became clear, angered the President. In response, the President criticized Acosta for the questions he had asked not only that day but also on earlier occasions, including to White House Press Secretary Sarah Huckabee Sanders. And he attacked Acosta personally, in apparent response to Acosta's persistently tough reporting about the President and his administration. President Trump told Acosta, "CNN should be ashamed of itself having you working for them. You are a rude, terrible person. You shouldn't be working for CNN. . . . You're a very rude person. The way you treat Sarah Huckabee is horrible. And the way you treat other people are [sic] horrible. You shouldn't treat people that way." White House, *Remarks by President Trump in Press Conference After Midterm Elections* (Nov. 7, 2018, 11:57 A.M.), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-conference-midterm-elections/. The President's attack on Acosta was an attack on Acosta's indisputably First Amendment–protected reporting for CNN.

Retaliation for Acosta's questioning of the President soon followed. The White House revoked Acosta's security credentials just hours after President Trump's exchange with him at the press conference. Brian Stelter, CNN Business, *White House Pulls CNN Reporter Jim Acosta's Pass After Contentious Press Conference* (Nov. 7, 2018, 10:58 P.M.), https://www.cnn.com/2018/11/07/media/trump-cnn-press-conference/index.html. While the

3

White House, through Sanders, laid the blame for the revocation on Acosta's interaction with a White House intern as she tried to wrestle away Acosta's microphone during his exchange with the President, *see* Sarah Sanders (@PressSec), Twitter (Nov. 7, 2018, 8:48 P.M.), https://twitter.com/PressSec/status/1060333176252448768, it soon became clear that the video evidence Sanders offered to support that justification had been altered, *see* Drew Harwell, Wash. Post, *White House Shares Doctored Video to Support Punishment of Journalist Jim Acosta* (Nov. 8, 2018), https://www.washingtonpost.com/technology/2018/11/08/white-house-shares-doctored-video-support-punishment-journalist-jim-acosta/, and that the White House's purported explanation was pretextual.  The President's own words to Acosta reveal what really prompted the revocation of Acosta's credentials: the White House's dislike of what it views as Acosta's aggressive questioning of senior government officials, and his blunt—and sometimes critical—coverage of the Trump administration.

This case does not arise in a vacuum.  During his presidency, Donald Trump has clearly and repeatedly stated his intent to retaliate against members of the news media whom he perceives as critical of him and his administration, including CNN, Acosta, and other reporters and news organizations.  For example, the President has repeatedly suggested that NBC should have its affiliate broadcast licenses revoked because of what he considers negative coverage of the administration.  Donald J. Trump (@realDonaldTrump), Twitter (Sept. 4, 2018, 7:58 A.M.), https://twitter.com/realdonaldtrump/status/1036991866124861440; Donald J. Trump (@realDonaldTrump), Twitter (Oct. 11, 2017, 6:55 A.M.), https://twitter.com/realdonaldtrump/status/918112884630093825.  President Trump also habitually refers to CNN and other prominent news organizations whose coverage of his administration he believes is negative as "fake news," "garbage journalism," and the "enemy of

the people."   Donald J. Trump (@realDonaldTrump), Twitter (Oct. 10, 2018, 6:01 A.M.),

https://twitter.com/realdonaldtrump/status/1050008315286171648;   Donald   J.   Trump

(@realDonaldTrump),   Twitter   (Aug.   29,   2018,   5:40   A.M.),

https://twitter.com/realdonaldtrump/status/1034782741714399232;   Donald   J.   Trump

(@realDonaldTrump), Twitter (July 1, 2017, 6:12 A.M.), https://twitter.com/realdonaldtrump/

status/881138485905772549.

President Trump's attacks on the press show no signs of relenting.  Indeed, he has publicly

said that "it could be others also," in addition to Acosta, who lose their White House security

credentials, presumably based on how they, too, exercise their First Amendment rights to ask

probing questions and report on the President and his administration.  Stelter, *supra*.  He even

named another potential target: longtime White House correspondent for American Urban Radio

and CNN political analyst April Ryan.  *Id.*

### B. Government Retaliation Against Even One Journalist for Exercising His First Amendment Rights Can Have a Chilling Effect.

The government's retaliation against CNN and Acosta for engaging in constitutionally

protected newsgathering and reporting—which includes protected speech in the form of questions

to senior officials—harms Plaintiffs in the ways described in detail in their filings with this Court.

It also seeks to chill reporting by other journalists and news organizations who cover the Trump

administration, thus harming them and the public that depends on the press to monitor what

democratically elected leaders are saying and doing.

Sixty-six years ago, Justice Frankfurter explained that it is human nature for a wider set of

would-be speakers—in that case, teachers—to shudder and shrink from the full-throated exercise

of their First Amendment freedoms in the face of retaliation against even a handful of their number:

"Such unwarranted inhibition upon the free spirit of teachers affects not only those who, like the

appellants, are immediately before the Court.  It has an unmistakeable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice; it makes for caution and timidity in their associations by potential teachers." *Wieman v. Updegraff*, 344 U.S. 183, 221 (1952) (Frankfurter, J., concurring).

Retaliation against even *one* speaker acts as a threat of sanctions to which all of those similarly situated must inevitably pay heed.  As the Supreme Court has recognized, "The threat of sanctions may deter the[] exercise [of First Amendment rights] almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963).  And the chilling effect that looms as a result of government retaliation against one journalist—in this case, a reporter for a major news network who posed pointed questions to the President—is particularly potent where, as here, it is amplified by the explicit threat of retaliation against other journalists and news organizations.  As discussed above, the White House revoked Acosta's security credentials in an atmosphere drenched in intimations of retaliation against members of the media for coverage the administration deems unfavorable, and it followed that revocation with an explicit threat that there "could be others" who also lose their White House security credentials.

This threat of future sanctions menaces other journalists and news organizations, and is designed to deter them from vigorously carrying out their essential, constitutionally recognized duty to the American people to confront our leaders with hard questions, lest they too lose their valuable White House security credentials, or face other punishment.  Such intimidation harms not just those reporters and news organizations but all who depend on the press to report on the workings of our government.

**C. This Chilling Effect Is Acutely Felt by Independent Journalists and News Organizations Smaller than CNN, Which Might Be Unable to Mount a Legal Challenge to Similar Retaliation.**

This case thus represents a critical juncture.  The White House has retaliated against Plaintiffs for engaging in protected First Amendment activity, and Plaintiffs are seeking judicial vindication of their rights under the First Amendment.  Yet litigation will not always be a feasible option for those subjected to unconstitutional punishment by this White House—or by future administrations.  Independent journalists and many news organizations smaller than CNN would be unable to mount such a challenge to similar government retaliation for their reporting, making it all the more crucial for this Court to defend American journalistic freedom here and now.

White House security credentials are very valuable commodities.  Many White House correspondents have invested decades of their professional careers—and, indeed, their lives—building the knowledge, credibility, and sources to serve in these coveted roles, and to deliver critical news stories to the American people.  Many, like Acosta, have covered the White House across multiple administrations, developing experience and expertise that enhance their effectiveness in that role.  Their marketability as journalists, as well as the marketability of their respective media organizations, depends on their continued ability to cover the White House.

Although the White House may surely restrict security credentials based on reasonable, relevant, and content-neutral considerations such as, for example, security and size, *see Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977); *see also* Joshua E. Keating, Foreign Policy, *Can the White House Revoke a Reporter's Credentials?* (June 7, 2010), https://foreignpolicy.com/2010/06/07/can-the-white-house-revoke-a-reporters-credentials/,  there is no question that Acosta, who has possessed security credentials permitting him access to White House briefings since 2013, implicates no such considerations.  Moreover, while the White House

is entitled to uphold reasonable decorum at press conferences through content-neutral rules, Acosta's persistent questioning quite clearly falls within the traditional bounds of behavior for a White House press corps keen to put tough questions to a President who has made himself available to answer them.  The White House cannot use purported decorum concerns as a pretext to strip valuable security credentials from a reporter in retaliation for questioning it does not like—not disruptive or obscene speech, but merely unwanted, pointed questioning from an experienced member of the White House press corps.

Such retaliatory government action chills the exercise of First Amendment rights by threatening similar retaliation against journalists and news organizations if they, too, discharge their duties to ask government officials hard questions and publish stories the President may view as unfavorable.  This threat is acutely felt by independent journalists and news organizations that may lack the resources to do what Plaintiffs have done in filing this lawsuit.  Mounting a legal challenge is expensive, and the Reporters Committee, an organization that provides pro bono legal support and representation to journalists and news organizations, understands all too well the economic challenges facing many reporters and media outlets today, including nonprofit news organizations.  Undertaking litigation against the federal government might simply be infeasible. And, even for those who could afford the litigation to vindicate their First Amendment rights, the possibility of facing additional retaliation for suing the government could overwhelm news organizations and independent journalists with limited resources to defend themselves.

This, therefore, is the moment to affirm the First Amendment's protections for journalists and news organizations against government retaliation for their reporting—before those unable to defend themselves are similarly targeted.

## II.   THE FIRST AMENDMENT PROVIDES CRUCIAL PROTECTION AGAINST THE CHILL BROUGHT ON BY GOVERNMENT RETALIATION FOR THE EXERCISE OF FREE SPEECH.

### A. The First Amendment Protects and Encourages Pointed Questioning and Even Critical Coverage of the Government by the Press.

A future in which White House reporters face reprisal for asking our leaders tough questions is a future in which the First Amendment has failed us.  The First Amendment safeguards "uninhibited, robust, and wide-open" debate of public issues.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  Indeed, "speech concerning public affairs is more than self-expression; it is the essence of self-government."  *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964).  It "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)).

By doggedly asking questions of the government and reporting on its statements and actions, journalists foster informed public debate and enable citizens to hold government officials accountable.  The First Amendment expressly recognizes this pivotal role played by a determined and relentless press in our democracy, and it guarantees the right of journalists and news organizations not only to speak, broadcast, and publish free from government interference but also to gather news.  As the Supreme Court has stated, the First Amendment protects "a 'right to gather information'" because, "'without some protection for seeking out the news, freedom of the press could be eviscerated.'"  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)); *see also Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999) (recognizing "First Amendment interests in newsgathering" (quoting *In re Shain*, 978 F.2d 850, 855 (4th Cir. 1992) (Wilkinson, J., concurring))); *Levine v. U.S. Dist. Court for the Cent. Dist. of Cal.*, 764 F.2d 590, 594 (9th Cir. 1985) (finding that a district

court order that "impair[ed] the media's ability to gather news" raised "an issue under the first amendment"); *CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975) (finding that newsgathering "qualifies for First Amendment protections").  And, as the D.C. Circuit has held in the specific context of discussing White House security credentials, "arbitrary or content-based criteria for press pass issuance are prohibited under the [F]irst [A]mendment."  *Sherrill*, 569 F.2d at 129.

Wide-open discussion or debate, of course, does not always engender agreement.  On the contrary, speech "invites dispute" because it "strike[s] at prejudices and preconceptions," and can "have profound unsettling effects."  *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).  And pointed questioning and persistent coverage by members of the news media is often unwelcome by government officials.  But, because "First Amendment freedoms need breathing space to survive," we—including and especially those of us who are public officials—must tolerate speech that we do not like.  *Button*, 371 U.S. at 433.

The President's powers neither shelter him from the buffeting winds of an open, democratic society nor shield him from the scrutiny of an independent, relentless press.  Political discourse in general often entails "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" that must be borne by those in high office.  *Sullivan*, 376 U.S. at 270.  And, plainly, the First Amendment protects tough questions posed to a President by an experienced reporter at a White House press conference.

**B. To Fulfill the First Amendment's Guarantees, Courts Must Guard Against Government Action that Chills the Exercise of First Amendment Rights.**

It is precisely because the press's ability to speak freely when questioning the government is so central to the First Amendment and critical to the functioning of our constitutional democracy that the need to guard against the chilling effect produced by the government's retaliation against CNN and Acosta is urgent.  And courts have long recognized that to fulfill the guarantees of the

10

First Amendment—including the guarantee of a press that is free to question and scrutinize the government—courts must be vigilant against government action that has a chilling effect on the exercise of these fundamental First Amendment rights.

That recognition contributed to the result in *New York Times v. Sullivan*, the Supreme Court's famous defense of press freedom in the face of the potential chill from libel litigation. There, the Court explained: "Whether or not a newspaper can survive a succession of [libel] judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive." *Sullivan*, 376 U.S. at 278. The dangers recognized by the *Sullivan* Court continue to reappear in different contexts as new threats emerge to the press and its important work in holding the government accountable. And, as the Court has recently reaffirmed, "constitutional violations may arise from the chilling effect of 'regulations that fall short of a direct prohibition against the exercise of First Amendment rights.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417–18 (2013) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)); *see also Lamont v. Postmaster General of the United States*, 381 U.S. 301, 307 (1965) (striking down a law requiring the Post Office to detain mail deemed "communist political propaganda" in part because "[t]his requirement is almost certain to have a deterrent effect").

In *Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), for example, the Supreme Court invalidated a tax on paper, including newsprint, and ink *not* because of manifest viewpoint discrimination but because of the "potential for abuse" in any law that singles out the media (or certain members of the media). *Id.* at 591. Even subtle regulatory intimidation directed to a targeted media company can impact the exercise of editorial freedom. As the Court stated, the prospect of "burdensome taxes . . . can operate as effectively as

a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government." *Id.* at 585.

The dangers of a chilling effect loom particularly large when those who have unique opportunities to confront and question the government are involved.  As the Supreme Court has recognized in a situation involving an independent contractor with the government, "retaliation for speech may chill speech on matters of public concern by those who, because of their dealings with the government, 'are often in the best position to know what ails the agencies for which they work.'"  *Bd. of Cnty. Comm'rs, Wabaunsee County v. Umbehr*, 518 U.S. 668, 674 (1996) (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (plurality)).  The Court's holding is all the more applicable to journalists who cover the government; as the Court itself has aptly recognized, "[t]he newspapers, magazines and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity, and, since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern."  *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936).  When a White House correspondent asks a question to the President or Press Secretary, that correspondent asks not only for himself or herself but for all of us—the vast majority of whom lack the basis for formulating the most effective questions and the opportunity to put those questions to our most senior officials.  Attempting to silence those who have the information and the opportunity impoverishes us all.

The government's effort to chill vigorous press engagement with senior government officials by revoking Acosta's credentials underscores the stakes in this case, not only for Plaintiffs but also for all journalists and news organizations that cover the Trump administration.  The

Supreme Court has recognized, in the labor context, how the threat of sanction for the exercise of legally protected speech extends beyond those directly punished—and, in turn, how vindicating those rights redeems the rights of others: "When a union member is disciplined for the exercise of [free speech], the rights of all members of the union are threatened.  And, by vindicating his own right, the successful litigant dispels the 'chill' cast upon the rights of others."  *Hall v. Coe*, 412 U.S. 1, 8 (1973).  The threat posed to press freedom by the government's retaliatory action here, and the urgent need for dispelling the chill it casts, are of grave concern to the Reporters Committee, and indeed should be of concern to all Americans who depend on journalists to question our elected officials.  As the D.C. Circuit has recognized, "Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the [F]irst [A]mendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information."  *Sherrill*, 569 F.2d at 129–30.

### III.   IT IS PARTICULARLY IMPORTANT TO REAFFIRM THE FIRST AMENDMENT'S ROBUST PROTECTIONS FOR FREE SPEECH AND A FREE PRESS, AS JOURNALISTS IN OTHER COUNTRIES FACE THREATS TO THEIR DEMOCRACIES PARTLY BECAUSE OF GOVERNMENTAL CRACKDOWNS.

Defendants' actions are decidedly out of step with the traditions of freedom of speech and of the press enshrined in our Constitution that have long made the United States a beacon for press freedom around the world.  Crackdowns on journalists occurring now in other parts of the world— crackdowns characteristic of authoritarian governments—are contributing to degradations in democracy in the countries subjected to them.  These disturbing trends underscore the importance of reaffirming the First Amendment protections that protect and enable a free and vibrant press.

In countries such as Austria, Hungary, Poland, the Philippines, and Turkey, state efforts to suppress speech are tied to declining levels of democracy, according to key indicators.  In its 2018

"Freedom in the World" report, Freedom House, an independent watchdog organization dedicated to the expansion of freedom and democracy around the world, explained that "[d]emocracy is in crisis" as "[t]he values it embodies—particularly the right to choose leaders in free and fair elections, freedom of the press, and the rule of law—are under assault and in retreat globally." Freedom House, *Freedom in the World 2018: Democracy in Crisis*, https://freedomhouse.org/report/freedom-world/freedom-world-2018.   Freedom House's report points specifically to assaults on press freedoms in countries like Turkey as integral to those countries' democratic degradation.  Similarly, the World Bank measures press freedom as a key indicator of governance; and the World Bank's declining scores for Austria, Hungary, Poland, and Turkey in recent years demonstrate how quickly this crucial underpinning of democratic governance can erode.  *See* World Bank, *Worldwide Governance Indicators*, http://info.worldbank.org/governance/wgi/#reports.   A former newspaper editor in Turkey cautions that Western democracies should view Turkey as a warning for how quickly freedom of the press and, in turn, the rule of law can erode: "When you look at Poland, Hungary, and now the U.S., I do see distinct similarities in how these illiberal populist governments operate.  It's the same rhetoric."  Zia Weise, *How Did Things Get So Bad for Turkey's Journalists?*, The Atlantic (Aug. 23, 2018), https://www.theatlantic.com/international/archive/2018/08/destroying-free-press-erdogan-turkey/568402/ (quoting Ezgi Başaran).

In particular, foreign governments are suppressing speech by forcing the disintegration of independent media outlets and, where that proves insufficient, by targeting individual journalists disfavored by the authorities.  In Hungary, for example, the government has targeted independent media outlets critical of the government by eliminating their sources of funding.  Most media outlets in Hungary cannot operate profitably without state advertising; and, after Prime Minister

Viktor Orbán made campaign promises to "seek amends" from his opponents—including journalists—the country's biggest opposition newspaper, *Magyar Nemzet*, shut down, as did, the very same week, a small, independent English-language news site.   Marton Dunai, *Major Hungarian Opposition Newspaper to Close After Orban Victory*, Reuters (April 10, 2018), https://www.reuters.com/article/us-hungary-election-media/major-hungarian-opposition-newspaper-to-close-after-orban-victory-idUSKBN1HH10S;   Attila   Mong,   *Independent Journalists in Hungary Brace for Tough Times in Next Orbán Term*, Committee to Protect Journalists (May 7, 2018), https://cpj.org/blog/2018/05/independent-journalists-in-hungary-brace-for-tough.php.   Similarly, the Polish Government has suffocated independent media outlets by canceling advertisements and ordering state agencies to cancel subscriptions, including copies at newsstands set up at gas stations controlled by the state-run energy company.   Cecile S. Gallego, *Increased Economic And Political Pressure Puts Investigative Reporting at Risk in Poland*, International   Consortium   of   Investigative   Journalists   (Jan.   25,   2018), https://www.icij.org/blog/2018/01/increased-economic-political-pressure-puts-investigative-reporting-risk-poland/.   And the Government of the Philippines recently indicated that it intends to charge with tax evasion a veteran journalist, Maria Ressa, and her news organization, *The Rappler*, in what appears to be direct retaliation for stories critical of President Duterte.   Alexandra Stevenson, *Philippines Says It Will Charge Veteran Journalist Critical of Duterte*, N.Y. Times (Nov. 9, 2018), https://www.nytimes.com/2018/11/09/business/duterte-critic-rappler-charges-in-philippines.html.

Suppression of independent media outlets and individual journalists who seek to hold governments to account is proving a vicious weapon for stifling speech and degrading democracy abroad.   Here, the First Amendment is—and must continue to serve as—a cornerstone of our

democracy.  To protect this vital democratic underpinning, the Court should reaffirm the First Amendment's protections against government retaliation of the kind Plaintiffs allege here.

## CONCLUSION

Plaintiffs Acosta and CNN appear before this Court to seek vindication of the "important [F]irst [A]mendment rights implicated by" the White House's revocation of the security pass of a "bona fide Washington journalist[]."  *Sherrill*, 569 F.2d at 130.  But *all* members of the news media feel the threat to First Amendment freedoms posed by the government's retaliatory revocation of Acosta's security credentials—a threat made all the more real by President Trump's promise that there "could be others" who also lose their White House security credentials.

In forcefully and unflinchingly questioning the President, Acosta was engaged in precisely the kind of constitutionally protected newsgathering and questioning of the government that the First Amendment safeguards and upon which our democracy depends.  For Defendants to retaliate for that exercise of constitutional rights and attempt to intimidate others from exercising those same rights tramples on the First Amendment, impoverishes our democracy, and presents shades of the dangerous developments elsewhere in the world—developments against which our Constitution was intended as a bulwark.  Courts have long protected and defended the press in the face of assaults including the pursuit of punishing libel litigation, *see N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964), out of a recognition that, in the Supreme Court's words, "[a] free press stands as one of the great interpreters between the government and the people.  To allow it to be fettered is to fetter ourselves."  *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936).

The Reporters Committee therefore respectfully urges this Court to grant as quickly as possible the relief sought by Plaintiffs.

Respectfully submitted,

/s/ *Joshua A. Geltzer*
JOSHUA A. GELTZER (D.C. Bar
No. 1018768)
    *Counsel of Record for Amicus Curiae*
JONATHAN L. BACKER[*]
MARY B. MCCORD
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
Telephone:     202.661.6728
jg1861@georgetown.edu

BRUCE D. BROWN
KATIE TOWNSEND
GABRIEL ROTTMAN
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street Nw, Ste. 1020
Washington, DC 20005
Telephone:     202.795.9300
bbrown@rcfp.org

*Counsel for Amicus Curiae*

[*] *pro hac vice* motion pending

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2018, I filed this Motion with the United States

District Court for the District of Columbia using the CM/ECF system, which will cause it to be

served on all counsel of record.


Dated: November 13, 2018                                    Respectfully submitted,


                                        /s/ *Joshua A. Geltzer*
                                        JOSHUA A. GELTZER (D.C. Bar
                                        No. 1018768)
                                        INSTITUTE FOR CONSTITUTIONAL
                                        ADVOCACY AND PROTECTION
                                        Georgetown University Law Center
                                        600 New Jersey Ave., NW
                                        Washington, D.C. 20001
                                        Telephone:   202.661.6728
                                        jg1861@georgetown.edu