# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CABLE NEWS NETWORK, INC. and
ABILO JAMES ACOSTA,

               Plaintiffs,

     v.

DONALD J. TRUMP, in his official capacity
as President of the United States; JOHN F.
KELLY, in his official capacity as Chief of
Staff to the President of the United States;
WILLIAM SHINE, in his official capacity as
Deputy Chief of Staff to the President of the
United States; SARAH HUCKABEE
SANDERS, in her official capacity as Press
Secretary to the President of the United States;
the UNITED STATES SECRET SERVICE;
RANDOLPH ALLES, in his official capacity
as Director of the United States Secret Service;
and JOHN DOE, Secret Service Agent, in his
official capacity,

               Defendants.

Case No.:  1:18-CV-2610 (TJK)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 4

ARGUMENT ........................................................................................................................ 5

I.      Plaintiffs Are Not Likely to Succeed on Their First Amendment Claim. ......................... 6

     A.      The President Has Broad Discretion in Granting White House Access to
             Journalists. .................................................................................................. 6

     B.      Even if the D.C. Circuit's Decision in *Sherrill* Applies to All White House
             Decisions About Hard Passes, the Decision to Revoke Mr. Acosta's Pass
             Was Permissible. .......................................................................................... 10

II.     Plaintiffs Are Not Likely to Succeed in Demonstrating that Defendants Violated the
        Due Process Clause. ...................................................................................................... 12

III.    The Most Plaintiffs Can Obtain is Additional Process. ................................................... 18

IV.     Plaintiffs Cannot Demonstrate Irreparable Injury........................................................... 19

V.      The Balance of Harms and the Public Interest Weigh Against Injunctive Relief. ........... 21

CONCLUSION...................................................................................................................... 23

## **TABLE OF AUTHORITIES**

**CASES** **PAGE(S)**

*American Broadcasting Companies, Inc. v. Cuomo*,
  570 F.2d 1080 (2d Cir. 1977) ................................................................. 19

*Anderson v. Cryovac, Inc.*,
  805 F.2d 1 (1st Cir. 1986) ....................................................................... 7

*\*Baltimore Sun Co. v. Ehrlich*,
  437 F.3d 410 (4th Cir. 2006) ............................................................. 7, 15

*Brown v. District of Columbia*,
  115 F. Supp. 3d 56 (D.D.C. 2015) ........................................................ 14

*Cable News Network, Inc. v. American Broadcasting Companies, Inc.*,
  518 F. Supp. 1238 (N.D. Ga. 1981) ................................................. 18, 20

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ............................................................... 17

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) ................................................................................. 7

*City of Los Angeles v. David*,
  538 U.S. 715 (2003) ......................................................................... 15, 16

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) ................................................................... 6

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985) ............................................................................... 14

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) ................................................................. 5

*DeGuiseppe v. Vill. of Bellwood*,
  68 F.3d 187 (7th Cir. 1995) ................................................................... 18

*FBME Bank Ltd. v. Lew*,
  209 F. Supp. 3d 299 (D.D.C. 2016) ....................................................... 15

*FDIC v. Mallen*,
  486 U.S. 230 (1988) ............................................................................... 17

*FEC v. GOPAC, Inc.*,
    897 F. Supp. 615 (D.D.C. 1995) ........................................ 17

*Fenceroy v. Morehouse Parish School Bd.*,
    No. Civ. A. 05-0480, 2006 WL 39255 (W.D. La. Jan. 6, 2006) ............................. 12

*Forcade v. Knight*,
    416 F. Supp. 1025 (D.D.C. 1976) ........................................ 3

*Gallucci v. Chao*,
    374 F. Supp. 2d 121 (D.D.C. 2005) ........................................ 13

*Gilbert v. Homar*,
    520 U.S. 925 (1997) ........................................ 15

*Humberson v. U.S. Atty's Office for D.C.*,
    236 F. Supp. 2d 28 (D.D.C. 2003) ........................................ 13

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
    933 F. Supp. 2d 58 (D.D.C. 2013) ........................................ 5, 6

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ........................................ 13, 14, 15

*Morrissey v. Brewer*,
    408 U.S. 471 (1972) ........................................ 13

*NB ex rel. Peacock v. District of Columbia*,
    794 F.3d 31 (D.C. Cir. 2015) ........................................ 12-13

*Nichols v. Agency for Int'l Dev.*,
    18 F. Supp. 2d 1 (D.D.C. 1998) ........................................ 18

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................ 20

*Nurriddin v. Acosta*,
    327 F. Supp. 3d 147 (D.D.C. 2018) ........................................ 13-14

*Pell v. Procunier*,
    417 U.S. 817 (1974) ........................................ 8

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ........................................ 17

*Roberts v. United States*,
    741 F.3d 152 (D.C. Cir. 2014) ............................................................... 13

*Schrier v. Univ. of Colorado*,
    427 F.3d 1253 (10th Cir. 2005) ............................................................. 19

*\*Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977) ........................................................ *passim*

*Taylor v. Hayes*,
    418 U.S. 488 (1974) ............................................................................... 16

*Telemundo of Los Angeles v. City of Los Angeles*,
    283 F. Supp. 2d 1095 (C.D. Cal. 2003) ................................................ 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................. 5, 20

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .................................................. 17, 18, 20

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ..................................................................................... 7

## FEDERAL RULES

Fed. R. Crim. P. 42 ........................................................................................ 16

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

31 C.F.R. § 409.1 .......................................................................................... 13

## OTHER AUTHORITIES

*CNN sues Trump and White House aides* (Nov. 13, 2018),
    https://www.cnn.com/business/live-news/cnn-sues-trump-acosta-reaction/ h_60ac 92e98a6
    edf377df982c9ecd131ad [hereinafter "Sanders Statement"] ............................................. *passim*

## INTRODUCTION

On November 7, 2018, the White House revoked the "hard pass" of CNN Chief White House Correspondent Jim Acosta—the pass that permitted him broad, on-demand access to the White House grounds—following an incident in which he disrupted the fair and orderly administration of a press conference during an exchange with the President.  That discretionary decision was lawful.  The President and White House possess the same broad discretion to regulate access to the White House for journalists (and other members of the public) that they possess to select which journalists receive interviews, or which journalists they acknowledge at press conferences.  Plaintiffs deny that this broad discretion exists, but under even their curtailed view of the White House's authority, revoking Mr. Acosta's pass was permissible.  That revocation was premised on stated reasons that are viewpoint- and content-neutral and are evident from the video of the November 7 press conference.  Because the White House's decision comports with the First Amendment and the Due Process Clause, and because Plaintiffs have fallen short of the high showing necessary for the extraordinary remedy of emergency relief, the motion for a temporary restraining order should be denied.

Foremost, Plaintiffs are unlikely to show a likelihood of success on the merits.  With respect to their First Amendment claim, the President and his staff have absolute discretion over which journalists they grant interviews to, as well as over which journalists they acknowledge at press events.  That broad discretion necessarily includes discretion over which journalists receive on-demand access to the White House grounds and special access during White House travel for the purpose of asking questions of the President or his staff.  No journalist has a First Amendment right to enter the White House and the President need not survive First Amendment scrutiny whenever he exercises his discretion to deny an individual journalist one of the many hundreds of

passes granting on-demand access to the White House complex. Plaintiffs rely on the D.C. Circuit's decision in *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), but that case is not as broad as they suggest. Far from establishing all-purpose rules for regulating White House press passes—rules that apply to everything from the Secret Service's determinations about security risks to the President's personal exercises of discretion based on his first-hand observations—*Sherrill* addressed solely the Secret Service's decision to deny a pass on security grounds to a journalist to whom the White House had otherwise decided to grant access. That critical predicate is absent here; "all parties" do not "recognize" that Mr. Acosta deserves access to the White House as soon as he clears a Secret Service security review. *Id.* at 131 n.22. In stark contrast to *Sherrill*, Mr. Acosta's access has been denied at a different stage in the decisional process (the White House's discretionary decision about which journalists to speak with), ratified by a much higher-level decisionmaker (the President), and is based on a personal interaction between the President and Mr. Acosta (the November 7 press conference). But even if the rules *Sherrill* expounded apply equally here, those rules have been satisfied. *Sherrill* bars only denials "based on arbitrary or less than compelling reasons." The stated rationale for the revocation of Mr. Acosta's pass—that he was disrupting press proceedings—is evident from the video he has proffered, is entirely viewpoint- and content-neutral, and clears this limited bar.

Plaintiffs cannot succeed on their due process claim, either. To the extent *Sherrill*'s framework even applies to the President's exercise of discretion based on a personal interaction with a reporter, Defendants' actions accord with that framework. Mr. Acosta received notice of the reasons for his pass's revocation the night it happened and again the next day (from the President himself), CNN submitted a response to the revocation on November 8, *see* Nov. 8 CNN Letter, Ex. 45 to Boutrous Decl., ECF No. 3-39 (describing CNN reaching out to various White

House officials), and the White House issued a formal statement yesterday (November 13) adhering to its prior decision and detailing its reasons for doing so.  Plaintiffs have not established that Due Process Clause requires more, particularly in the context of such a discretionary determination.

Plaintiffs likewise fail to establish the other standards required to receive preliminary injunctive relief.  They do not demonstrate the type of irreparable injury necessary for emergency relief.  *Sherrill* itself granted only procedural relief via additional process—never an emergency—and did so following orderly summary judgment briefing.  *See Forcade v. Knight*, 416 F. Supp. 1025, 1027 (D.D.C. 1976) ("In their motion for summary judgment …").  Plaintiffs attempt to claim harm from an alleged First Amendment violation, but their inability to show such a violation likewise dooms their claim of irreparable harm.  Besides, even if Plaintiffs could show First Amendment harm in the abstract, they cite no critical event expected in the next several weeks that requires immediate judicial intervention pending expedited preliminary injunction briefing.  Mr. Acosta remains able to practice his profession and report on the White House.  And CNN's straits are even less dire, given that the network *has roughly 50 other employees* who retain hard passes and who are more than capable of covering the White House complex on CNN's behalf.

Nor does the balance of equities favor Plaintiffs, who ask this Court to issue an unprecedented and extraordinarily intrusive order that would require the President and Secret Service to grant on-demand access to the White House complex, West Wing press offices, and other facilities in the President's official residence and personal office suite to someone he has decided to exclude.  The public interest does not require that Mr. Acosta be given immediate access to the White House complex.  The public can benefit from his reporting from outside the complex during preliminary injunction briefing, and is additionally well-served by the numerous other

journalists who retain their hard passes and who will continue to tenaciously ask questions at press events, just as they have done since the revocation of Mr. Acosta's pass.  The non-merits factors are thus alone a sufficient basis to deny Plaintiffs emergency TRO pending orderly, thorough, and expedited briefing on their motion for preliminary injunction.

This Court should deny Plaintiffs' motion for a temporary restraining order.

## BACKGROUND

Many reporters cover the White House for a range of local, national, and international news outlets.  A subset of those reporters have access to facilities within the White House complex— access that requires certain credentials.  After completing a Secret Service background check, a reporter may then be approved by the White House for a so-called "hard pass," which allows access to the White House complex and briefing room.

On November 7, 2018, President Trump held a press conference to discuss the 2018 midterm elections.  *Id.* ¶ 30.  One of the attendees was Jim Acosta, chief White House Correspondent for CNN, who held a hard pass at that time.  *Id.* ¶¶ 7, 22.  At that press conference, as reported in a statement by Press Secretary Sarah Huckabee Sanders, "[a]fter Mr. Acosta asked the President two questions—each of which the President answered—he physically refused to surrender a White House microphone to an intern, so that other reporters might ask their questions."  *CNN sues Trump and White House aides* (Nov. 13, 2018), https://www.cnn.com/business/live-news/cnn-sues-trump-acosta-reaction/   h_60ac   92e98a6 edf377df982c9ecd131ad [hereinafter "Sanders Statement"]; *see also* Compl. ¶ 34 (explaining that Mr. Acosta "held onto the microphone" after a "White House staffer" had put her hands on the microphone and attempted to reclaim it).

Later that day, Press Secretary Sanders announced that Mr. Acosta's hard pass had been suspended until further notice.  Compl. ¶ 39.  She stated that "[Mr. Acosta's] conduct is absolutely unacceptable.  It is also completely disrespectful to the reporter's colleagues not to allow them an opportunity to ask a question."   @PressSec [Sarah Sanders] (Nov. 7, 2018), https://twitter.com/PressSec/status/ 1060333619728801792.   Following that action, Mr. Acosta's application for a day pass on November 8, 2018, was rejected, and he was not permitted access to the President's events during a trip to Paris the following day.  *Id.* ¶¶ 49-50.  Also on November 8, CNN sent the White House a letter on Mr. Acosta's behalf, responding to his suspension on conduct grounds.  In that letter, CNN asserted that "the nature and tone of [Mr. Acosta's] questions was appropriate and newsworthy."  Nov. 8 CNN Letter.   Following that letter, the Press Secretary further explained the decision in a written statement released on November 13, 2018:

> This was not the first time this reporter has inappropriately refused to yield to other reporters.  The White House cannot run an orderly and fair press conference when a reporter acts this way, which is neither appropriate nor professional. The First Amendment is not served when a single reporter, of more than 150 present, attempts to monopolize the floor. If there is no check on this type of behavior it impedes the ability of the President, the White House staff, and members of the media to conduct business.

Sanders Statement.

Plaintiffs, Mr. Acosta and CNN, filed their complaint, a motion for preliminary injunction, and a motion for a temporary restraining order on November 13, 2018.  *See* ECF Nos. 1, 2, 4.  This Court has scheduled oral argument on Plaintiffs' motion for a temporary restraining order for the afternoon of November 14, 2018.  Minute Order (Nov. 13, 2018).

## ARGUMENT

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high."  *Jack's Canoes & Kayaks, LLC v. Nat'l*

*Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted).  An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  A party moving for a temporary restraining order or a preliminary injunction "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).  Because Plaintiffs have not demonstrated these factors, their motion for a temporary restraining order should be denied.

## I.   Plaintiffs Are Not Likely to Succeed on Their First Amendment Claim.

### A.   The President Has Broad Discretion in Granting White House Access to Journalists.

The First Amendment does not restrict the President's ability to determine the terms on which he does, or does not, engage with particular journalists.  As the D.C. Circuit recognized in *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), the principal case on which Plaintiffs rely, the President may of course "grant interviews or briefings with selected journalists" and deny that opportunity to others; any other result would "certainly be unreasonable." *Id.* at 129.  The President may choose the journalists he calls on at press conferences or which journalists he invites to an interview in the Oval Office or a press conference (just a large-form interview) in the East Room.  That discretion extends to his White House staff; the President is free to instruct White House officials to respond positively to particular journalists' requests for information, interviews,

or questions, and he is equally free to instruct White House officials to do the opposite by declining similar requests from a different journalist.

If the rule were otherwise, courts frequently would be called on to police the daily give-and-take between public officials and reporters—an arena that is defined by discretion and where public officials *routinely* grant or deny interviews to specific reporters based on their judgment about how the reporter's viewpoints will color the interview. That concern led the Fourth Circuit to uphold the governor of Maryland's decision to prohibit everyone "in the Executive Department or Agencies" from speaking with two reporters from the Baltimore Sun. *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 413 (4th Cir. 2006). In reaching that conclusion, the court explained that providing "relatively less information" to one reporter was permissible, even when done "on account of [that journalist's] reporting[.]" *Id.* at 418. Such decisions regarding the level of access a journalist receives to public officials are "a pervasive feature of journalism and of journalists' interaction with government." *Id.*; *see also* Pls.' Br. 10 (suggesting the Court should view this case as an example of a public official "granting favorable treatment to certain members of the media" (quoting *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986)).

More broadly, there is no First Amendment right of access to the White House. As the Supreme Court recognized decades ago, even though any restriction on a citizen's access to the White House "diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, . . . that does not make entry into the White House a First Amendment right." *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965). The President is generally free to open the White House doors to political allies, in the hopes of furthering a particular agenda, and he is equally free to invite in only political foes, in the hopes of convincing them of his position. The First Amendment simply does not regulate these decisions. And the

First Amendment does not impose stricter requirements when journalists, as a subset of the public, are granted or denied access to the White House. *See Pell v. Procunier*, 417 U.S. 817, 834-35 (1974) (holding that journalists do not have a First Amendment right to "information not available to members of the public generally"). The Supreme Court reinforced that the press does not receive special treatment for First Amendment purposes in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010). *See id.* at 352 ("We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers." (citation omitted)). A rule that limits the White House's discretion to grant or deny journalists hard passes would thus risk requiring the White House to grant full access to any member of the public who would like to ask the President or his staff questions.

Accordingly, the decision to provide a journalist a White House hard pass takes place at the intersection of two realms the First Amendment does not reach: access to the White House, and White House interactions with particular journalists. And where, as here, the White House has determined that it wants to scale back its interactions with a particular journalist, denying that journalist a hard pass is a permissible way to accomplish that goal.

Plaintiffs' argument to the contrary rests primarily on *Sherrill*—the only D.C. Circuit case they cite regarding press access to the White House.[1] Plaintiffs rely on *Sherrill* for the broad proposition that press "access [should] not be denied arbitrarily or for less than compelling reasons." Pls.' Br. 9 (quoting *Sherrill*, 569 F.2d at 129). But *Sherrill* is not so broad. In that case, the sole question was whether the Secret Service had permissibly denied a hard pass to a journalist, who the parties agreed was otherwise eligible to receive it, for concerns over presidential security.

---

[1] Plaintiffs cite a number of cases that discuss the standards for content- and viewpoint-based distinctions. *See* Pls.' Br. 10-11. But those cases do not apply because the First Amendment does not restrict discretionary choices about White House access.

*See, e.g.*, *Sherrill* at 126 ("The denial resulted solely from the determination of the Secret Service, after investigating Mr. Sherrill, that he not be issued the pass."); *id.* ("Whether a pass is then issued depends solely on the recommendation of the Secret Service.").  The Court noted "that all parties to this case recognize the right of a journalist to a White House press pass," assuming that the journalist satisfies some basic objective criteria and is not "a source of potential danger to the President or his family."  *Id.* at 131 n. 22.  The particular question the Court had to answer was thus what standards governed the Secret Service's denial of a hard pass based on security reasons—*i.e.*, a hard pass to an "otherwise eligible journalist," *id.* at 130, on the "sole[] … recommendation of the Secret Service," *id.* at 126.

In this case, by contrast, it is not conceded that Mr. Acosta is an "otherwise eligible journalist." The President and his designees in the White House Press Office have exercised their discretion not to engage with him and, by extension, to no longer grant him on-demand access to the White House complex so that he can attempt to interact with the President or White House officials.  Unlike the situation in *Sherrill*, where only the Secret Service was objecting to the issuance of a pass to the reporter, the White House Press Office here has so objected and thus does not "recognize the right of a journalist to a White House press pass" in all cases absent a demonstrated security threat.  *Sherrill*, 569 F.2d at 131 n.22.  Put differently, Defendants do not concede—and, in fact, reject—the premise that White House "press facilities are perceived as being open to *all* bona fide Washington-based journalists[.]"  *Id.* at 129 (emphasis added).  Such a conclusion is untenable in light of the numerous discretionary determinations the White House Press Office must make in allocating hard passes to a *subset* of bona fide Washington-based journalists—for example, the degree to which the requester's beat requires reporting on the White House, whether a requester is a journalist with a sufficiently broad audience, and whether hard

passes are fairly distributed between comparable organizations.  Accordingly, the premise on which the D.C. Circuit's opinion in *Sherrill* depends—that the White House Press Office does not exercise discretion in giving out hard passes to journalists, and that access is subject solely to a security review by the Secret Service—does not exist here.  *Sherrill*'s framework thus simply does not apply and does not constrain the President's broad discretion over which journalists receive on-demand access to the White House to ask questions of him and his staff.

> **B.** **Even if the D.C. Circuit's Decision in *Sherrill* Applies to All White House Decisions About Hard Passes, the Decision to Revoke Mr. Acosta's Pass Was Permissible.**

Even if the Court decides that *Sherrill*'s more restrictive framework is controlling, the decision to revoke Mr. Acosta's pass was permissible.  Under *Sherrill*, the government cannot deny hard passes "arbitrarily or for less than compelling reasons."  *Sherrill*, 569 F.2d at 129.[2]  Mr. Acosta's decision to engage in conduct that disrupts press events and impedes other reporters from asking questions provides a more-than-sufficient reason for revoking his hard pass.

Plaintiffs' First Amendment argument rests on the assertion that "there can be no question that the revocation of Acosta's credentials is a content and viewpoint-based punishment imposed on him because the President and his administration do not like CNN or Acosta's reporting."  Pls.' Br. 11.  Not so.  Even in this preliminary posture, the record available to the Court contradicts Plaintiffs' characterization.  Rather, as the Press Secretary publicly explained, Mr. Acosta's conduct impeded the White House's ability to "run an orderly and fair press conference[.]" Sanders Statement; *see also id.* ("After Mr. Acosta asked the President two questions—each of which the President answered—he physically refused to surrender a White House microphone to

---

[2] The D.C. Circuit appears to equate those two standards, repeating a second time in *Sherrill* that a hard pass cannot be denied "based on arbitrary or less than compelling reasons" *Id.* at 131.

an intern, so that other reporters might ask their questions. This was not the first time this reporter has inappropriately refused to yield to other reporters.").

First, Plaintiffs' own description of the November 7 press conference validates the White House's stated reasons for revoking Mr. Acosta's hard pass.  In Plaintiffs' telling, Mr. Acosta asked a question of the President, but the President did not permit him a follow-up.  Compl. ¶¶ 33-34.  Rather than acknowledge the President's attempt to move on to a different journalist, however, Mr. Acosta continued to try to hold the floor, such that a White House staffer attempted to physically reclaim the microphone Mr. Acosta had been using.  *Id.* ¶ 34.  Even after the staffer actually had her hands on the microphone, Mr. Acosta continued his refusal to permit another journalist to ask a question, ignoring both the stated wishes of the President and the efforts of a staffer tasked with helping to manage the event.  *See id.*; *see also* Donaldson Decl. ¶ 9 (acknowledging the salience of "Jim Acosta's conduct" during the press conference).

Second, Plaintiffs claim that the decision to revoke Mr. Acosta's hard pass was the result of the President's allegedly "clear . . . antipathy" for "CNN [and] Acosta's reporting."  Pls.' Br. 11.  But approximately *50 other CNN journalists* retain hard passes to enter the White House complex, undercutting their argument that revoking Mr. Acosta's pass was part of an effort to punish or silence CNN.  Plaintiffs' complaint alleges that this antipathy is longstanding, without any plausible explanation as to why there were no allegedly retaliatory actions against Mr. Acosta previously.  Compl. ¶¶ 27-29.  The more natural explanation for the White House revoking Mr. Acosta's pass on November 7, 2018—and to not revoke any of the other 50 passes held by CNN journalists—is that Mr. Acosta's revocation is based on his conduct at the November 7, 2018 press event.

Third, and relatedly, Plaintiffs' description of the White House's conduct towards *other* reporters reinforces that Plaintiffs have failed to demonstrate that the White House made a content- or viewpoint-based decision with respect to Mr. Acosta.  Plaintiffs' papers include no allegations that the White House has revoked the hard pass of any other reporters—including from CNN— whose reporting the President allegedly disagrees with.  *See, e.g.*, *id.* at 11-12 (Abby Phillip of CNN); Compl. ¶ 36 (Peter Alexander of NBC).  In fact, dozens of CNN reporters still retain White House hard passes, *see* Sanders Statement, as do a number of other journalists who ask him hard-hitting questions.

Together, this evidence undermines any claim of content- or viewpoint-based retaliation; the better explanation is that the White House responded to conduct that was particularly disruptive to a press conference with a decision denying one specific reporter further opportunities to cause disruptions.  Revoking a reporter's hard pass for impeding the White House's ability to conduct fair and orderly press conferences is not "arbitrary."  *Sherrill*, 569 F.2d at 131.  Rather, it preserves the White House's ability to balance each individual reporter's desire to ask questions with the need to abide by norms that permit other reporters to ask questions as well.  Indeed, "the need to avoid disruptions" has long been a non-arbitrary basis for government action.  *Fenceroy v. Morehouse Parish School Bd.*, No. Civ. A. 05-0480, 2006 WL 39255, at *4 (W.D. La. Jan. 6, 2006).  The White House's actions, accordingly, do not run afoul of even Plaintiffs' articulation of the relevant First Amendment standards.

## II.     Plaintiffs Are Not Likely to Succeed in Demonstrating that Defendants Violated the Due Process Clause.

In order to sustain a claim under the Due Process Clause, "a plaintiff must show (i) deprivation of a protected liberty or property interest; (ii) by the government; (iii) without the process that is 'due' under the Fifth Amendment."  *NB ex rel. Peacock v. Dist. of Columbia*, 794

F.3d 31, 41 (D.C. Cir. 2015) (citations omitted).  This is a necessarily fact-sensitive inquiry, and

"calls for such procedural protections as the particular situation demands."  *Mathews v. Eldridge*,

424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  But even

assuming that Mr. Acosta has a constitutionally protected liberty interest in the discretionary

grant of a hard pass, he has not shown that he has been denied the process he is due.[3]

As an initial matter, it is far from clear that Mr. Acosta or CNN has a constitutionally

protected liberty interest in Mr. Acosta's access to the White House complex.  While the D.C.

Circuit in Sherrill found a "First Amendment" liberty interest that "may not be deprived without

due process of law," 569 F.2d at 130, that liberty interest was dependent on a First Amendment

right, which may not apply here for the reasons previously stated.  And even if this case did not

arise at the intersection of two unprotected areas under the First Amendment, the D.C. Circuit

made clear that any liberty interest at issue must be understood in the broader context of "the

---

[3] Although the D.C. Circuit held, in the context of *Sherrill*, that a reporter may have a liberty interest in a press pass, it did not hold that a reporter has a protected property interest in that same pass, for good reason.  The regulations that govern the grant or denial of a security clearance for a press pass by the Secret Service, 31 C.F.R. § 409.1, do not confer on plaintiffs any entitlement to such a pass, nor do they govern the White House Press Office's judgment as to whether to issue a pass. *See NB ex rel. Peacock*, 694 F.3d at 41 (a putative due process claimant must show a "legitimate claim of entitlement" to a government benefit to establish a protected privacy interest."); *see also id.* (legitimate claim of entitlement requires the court to determine whether "the statute or implementing regulations place substantial limitations on official discretion.").

Nor can Mr. Acosta point to an interest in "do[ing] his job," Pls.' Br. at 16, because he still remains employed at CNN and able to report on the White House, and a change in a person's ability to do his job is not sufficient to establish a cognizable due process property interest. *See Roberts v. United States*, 741 F.3d 152, 162 (D.C. Cir. 2014) (plaintiff lacks a property interest in her employment because she remains employed); *cf. Humberson v. U.S. Atty's Office for D.C.*, 236 F. Supp. 2d 28, 32 (D.D.C. 2003) ("federal courts have uniformly concluded that a change in a public employee's duties . . . unaccompanied by a reduction in salary is not a sufficient deprivation to trigger due process obligations.").  After all, Plaintiffs cannot dispute that, as the D.C. Circuit recognized in *Sherrill*, the President could choose never to hold another press briefing again and cancel all press passes, without implicating due process protections.  *See Sherrill*, 569 F.2d at 129.

publication for which" the newsman works and the public's interest in limiting restrictions on

newsgathering.  569 F.2d at 129–30.  That makes sense, for if Mr. Acosta were simply a member

of the public, it would be clear that he has no First Amendment right of access to the White

House complex, *see Zemel*, 381 U.S. at 16–17, and neither *Sherrill* nor any other precedent

suggests that every journalist has the same First Amendment right of access to the

complex.  Here, of course, it is clear that CNN has broad access to the White House complex

even without Mr. Acosta's hard pass—it employs more than 50 reporters who retain hard passes,

not to mention other CNN contributors.

To begin, as Plaintiffs acknowledge, Pls.' Br. at 18, "[d]ue process is not violated when a

person is unlawfully deprived of property and a meaningful post-deprivation remedy is

provided."  *Gallucci v. Chao*, 374 F. Supp. 2d 121, 126 (D.D.C. 2005); *see also Nurriddin v.

Acosta*, 327 F. Supp. 3d 147, 157 (D.D.C. 2018) (opportunity to move for reconsideration may

be sufficient post-deprivation remedy).

Here, even by *Sherrill*'s standard, there has been no denial of the process to which Mr.

Acosta claims he is entitled.  First, he has received "notice of the factual bases for denial."

*Sherrill*, 569 F.2d at 130.  On the evening of November 7, 2018, Press Secretary Sanders

referenced Mr. Acosta's conduct during the press conference as the reason for the suspension of

his hard pass.  She stated that "[Mr. Acosta's] conduct is absolutely unacceptable.  It is also

completely disrespectful to the reporter's colleagues not to allow them an opportunity to ask a

question." @PressSec [Sarah Sanders] (Nov. 7, 2018), https://twitter.com/PressSec/status/

1060333619728801792.  The President had similarly criticized Mr. Acosta's conduct during that

press conference, which complemented Ms. Sander's notice.  *See* Compl. ¶ 35.  Mr. Acosta had

thus received actual notice of his revocation and the rationale therefore, which the Supreme

Court has recognized can be sufficient in the due process context.  *See U.S. Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (holding that "actual notice of the filing and contents of [a proposed bankruptcy plan] . . . more than satisfied [plaintiff's] due process rights"); *cf. also GAC Enters. Inc. v. Medaglia*, 52 F.3d 451, 455 (2d Cir.1995) ("where a claimant demonstrated actual knowledge of the seizure of property in an administrative forfeiture proceeding the government's failure to provide published notice . . .  did not violate due process).

Next, Mr. Acosta had an "opportunity to rebut," 569 F.2d at 131, which he availed himself of when CNN submitted a written response to the revocation on November 8, which specifically responded to the asserted basis that Mr. Acosta's conduct was the basis for the revocation.  *See* Nov. 8 CNN Letter, Ex. 45 to Boutrous Decl., ECF No. 3-39 (stating that "the nature and tone of [Mr. Acosta's] questions was appropriate and newsworthy").  Finally, on November 13, Press Secretary Sanders provided a "final written statement of the reasons for the denial."  *Sherrill*, 569 F.2d at 130.  She stated that:

> After Mr. Acosta asked the President two questions—each of which the President answered—he physically refused to surrender a White House microphone to an intern, so that other reporters might ask their questions. This was not the first time this reporter has inappropriately refused to yield to other reporters.
> The White House cannot run an orderly and fair press conference when a reporter acts this way, which is neither appropriate nor professional. The First Amendment is not served when a single reporter, of more than 150 present, attempts to monopolize the floor. If there is no check on this type of behavior it impedes the ability of the President, the White House staff, and members of the media to conduct business.

Sanders Statement.

This procedure accords with the requirements set out in *Sherrill* and, under the unique circumstances here, satisfies the flexible three-factor balancing test the Supreme Court expounded in *Mathews* for due process claims.  The first *Mathews* factor is "the private interest that will be affected by the official action."  *Mathews*, 424 U.S. at 335.  In weighing this factor,

courts are particularly concerned with the significance of those interests to the individual who possesses them: weighty private interests can include the termination of employment, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985); access to a vehicle, at least where "a car may be a person's only means to earn a livelihood, attend school, see family, or attend to the necessities of life," *Brown v. Dist. of Columbia*, 115 F. Supp. 3d 56, 66 (D.D.C. 2015); or the ability to conduct financial transactions where the inability to do so "would present a potentially existential threat," *FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 329 (D.D.C. 2016). Not all private interests are so significant. *See Gilbert v. Homar*, 520 U.S. 925, 932 (1997) (noting that "temporary suspension without pay" does not constitute a due process violation so long as employee "receives a sufficiently prompt postsuspension hearing."). Here, even if Mr. Acosta had a legally cognizable private interest in possessing a hard pass, the absence of one does not infringe his interests to the degree highlighted by other courts in cases where the private interest was substantial. For instance, the lack of a hard pass does not prevent Mr. Acosta—much less CNN—from reporting on the White House. *See* Sanders Statement (stating that CNN "has nearly 50 additional hard pass holders"). Nor does it limit his livelihood or cause his employment to be terminated. Indeed, given that *Sherrill* itself recognizes that the President need not give interviews to reporters the President prefers to avoid, 569 F.2d at 129, and that government officials may direct their staff not to speak with certain reporters, *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417-18 (4th Cir. 2006), the only interest that could be implicated by this case is Mr. Acosta's ability to be in a certain physical location, not to have access to any particular individuals or have his questions answered.

Second, there is a limited "risk of erroneous deprivation of such [private] interest through the procedures used," as well as a concurrently limited "probative value, if any, of additional or

substitute procedural safeguards." *Mathews*, 424 U.S. at 335.  The Supreme Court has defined

this factor as a "concern for accuracy." *City of Los Angeles v. David*, 538 U.S. 715, 718 (2003);

*see also Mackey v. Montrym*, 443 U.S. 1, 12 (1979) (court looks to "the likelihood of an

erroneous deprivation of the private interest involved as a consequence of the procedures used.").

In her initial and follow-up statements, Press Secretary Sanders identified the conduct at issue—

that Mr. Acosta has "inappropriately refused to yield to other reporters," Sanders Statement, *see

also* Nov. 7 Tweet—and it is not likely that there are disputes in fact about the conduct in the

November 7 press conference that additional process at the White House could better adjudicate,

particularly given that the press conference was recorded and personally involved the ultimate

decisionmaker (the President).  *See City of Los Angeles*, 538 U.S. at 718 ("A 30-day delay in

presenting evidence is unlikely to spawn significant factual errors.").

Indeed, this factual context distinguishes *Sherrill*.  Here, apparently unlike *Sherrill*, Mr.

Acosta's offending actions were personally witnessed by the President and other relevant White

House officials, who stated reasons for his hard pass's suspension that same evening.  Because

they had just observed the conduct, the risk that they would erroneously exercise their discretion

in revoking Mr. Acosta's hard pass based on a misapprehension of the factual context is small,

and additional process is not necessary.  The Federal Rules of Criminal Procedure embrace a

similar approach to due process in the context of contempt proceedings.  Although contempt

proceedings generally require "prosecution after notice," they permit summary punishment when

a person commits "criminal contempt in [the court's] presence if the judge saw or heard the

contemptuous conduct and so certifies."  Fed. R. Crim. P. 42; *see also Taylor v. Hayes*, 418 U.S.

488, 497 (1974) (affirming a "trial judge's power, for the purpose of maintaining order in the

courtroom, to punish summarily and without notice or hearing contemptuous conduct committed

in his presence and observed by him"). Moreover, the action challenged here, denial of access to the White House press area, is far less drastic than the sanctions for criminal contempt, which reinforces that the due process clause is not offended by such an action.

Finally, the government has a strong interest in ensuring the integrity and adequacy of its operations, in this case, press interactions without undue interruptions.[4] *See* Sanders Statement ("The White House cannot run an orderly and fair process conference when a report acts this way, which is neither appropriate nor professional."); *cf. FDIC v. Mallen*, 486 U.S. 230, 241 (1988) (public interest can be in preserving the integrity of government proceedings or those of the proceedings government regulates). Similarly, the need to prevent future disruption may justify post-deprivation procedures, at least where, as here, the government interest in preventing disruption might be frustrated if Mr. Acosta is granted continued access to the White House while his status is under adjudication.

## III.    The Most Plaintiffs Can Obtain is Additional Process.

Even if the Court determines that Plaintiffs are likely to succeed on the merits for their claims, the only remedy to which they would be entitled is additional written process—perhaps in the form of a written submission to the White House. It is clear from *Sherrill* that the Court should not, as Plaintiffs ask, require that Mr. Acosta's hard pass be reinstated. As the D.C. Circuit explained in *Sherrill*, the district court in that case was correct in concluding "that it had no occasion to pass on the merits of the press pass denial." 569 F.2d at 128. Instead, the only remedy

---

[4] Plaintiffs state that "the President's safety" is the only relevant government interest with respect to the awarding of press passes. Pls.' Br. at 18 (citing *Sherrill*, 569 F.2d at 130-31 & n.22). But *Sherrill* only considered what factors guided the *Secret Service's* decision to exclude an *otherwise eligible* journalist, *Sherrill*, 569 F.2d at 130; *id.* at n.22; it did not suggest that those were the only factors that could be considered by the White House Press Office. Indeed, were that so, the White House press facilities would be open to thousands, if not tens of thousands of individuals.

that was available there—and thus the most that could be available here—is a remand for any process to which Mr. Acosta is entitled. *Id.* That makes sense, given how extraordinary it would be for the judiciary to directly police access to the secure White House complex where the President lives and works, as well as to dictate who the President must invite to press events.

## IV.    Plaintiffs Cannot Demonstrate Irreparable Injury.

This Circuit sets "a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006). "[T]he injury must be both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiffs have not made such a showing. Plaintiffs focus their argument on the claim that because, "[i]n First Amendment cases, the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis," irreparable harm necessarily flowed from that initial merits determination. *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting *Joelner v. Vill. off Wash. Park, Ill.*, 378 613, 620 (7th Cir. 2004)); *see also* Pls.' Br. 19. But, for the reasons stated above, Plaintiffs have not demonstrated a likelihood of success, and therefore they cannot demonstrate irreparable harm based on a supposed constitutional violation.

Nor have Plaintiffs independently demonstrated irreparable harm. They speculate that there may be a "chilling effect" by the revocation of Mr. Acosta's hard pass, Pls.' Br. 19, but such speculation is merely "theoretical"; it is not "both certain and great." *Wisconsin Gas*, 674 F.2d at 674; *see also FEC v. GOPAC, Inc.*, 897 F. Supp. 615, 618-19 (D.D.C. 1995) (holding that political organization's speculation that donors will be chilled from participating in the political process if they are subject to calls from the FEC is "conclusory and without factual support"); *Nichols v. Agency for Int'l Dev.*, 18 F. Supp. 1, 5 (D.D.C. 1998) (holding that

plaintiff's "single-statement allegation, buttressed by no factual support, cannot support a finding

of irreparable injury based on a putative chilling effect.").[5]   If anything, the allegations in the

complaint reinforce that there has been no such chilling effect on the White House press corps—

journalists have continued to ask pointed questions of the President, including about the decision

to revoke Mr. Acosta's hard pass.  *See* Compl. ¶ 53.

Plaintiffs also cite several cases for the proposition that "restrictions on a reporter's

coverage of White House and government affairs . . . constitute irreparable injury."  Pls.' Br. 19.

But these cases do not apply in this context.  *See id*. at 19-20.  In *Cable News Network, Inc. v.*

*American Broadcasting Companies, Inc.*, 518 F. Supp. 1238 (N.D. Ga. 1981), a case challenging

"the total exclusion of television media from limited coverage White House events," the court

concluded that irreparable injury would occur "[i]f television crews are totally excluded from

White House pool coverage, [because] the unique continuous visual element of television news

coverage will be denied *to the public and the press*."  *Id.* at 1245-46 (emphasis added); *see also*

*id.* at 1246 ("By totally excluding television participants, a complete visual record of the

Presidential activities covered by the press pools is lost forever.").  Here, of course, there is no

such comparable exclusion, as the American public—and, indeed, CNN—will still have

significant White House Access.  *See* Sanders Statement (noting that CNN "has nearly 50

additional hard pass holders).  Likewise, in *American Broadcasting Companies, Inc. v. Cuomo*,

570 F.2d 1080 (2d Cir. 1977), the court addressed the situation in which state actors could

prohibit television networks from election headquarters.  The court concluded that "irreparable

---

[5] *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995), which is plaintiffs'
sole citation for their "chilling effect" theory, Pls.' Br. 19, was not a case in a preliminary
injunction posture, and therefore had no occasion to apply the D.C. Circuit's "certain and great"
requirement.  *Wisconsin Gas*, 758 F.2d at 674.

harm will result if ABC is not permitted to broadcast live coverage of the post-election activities at the respective headquarters," particularly given that some "viewers might be limited to a single channel." *Id.* at 1082.  Again, here, there is no such limitation; CNN is not limited in what it can broadcast, or even what it can report from the numerous CNN-affiliated reporters who continue to hold hard press passes.

Finally, Plaintiffs complain that Mr. Acosta has been denied the ability to cover the President's recent trip to Paris.  Pl.'s Br. at 20. But "[t]he purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1267 (10th Cir. 2005). Here, Plaintiffs point to no upcoming events—trips, press conferences, etc.—that Mr. Acosta would miss, much less that he would suffer irreparable harm from missing.  And they certainly cite nothing imminent that necessitates an emergency temporary restraining order based on less than 48 hours of briefing.

To conclude, Plaintiffs put forward no facts demonstrating irreparable injury; rather, they rely on speculation, itself insufficient in this Circuit, and an argument that irreparable injury follows necessarily from a constitutional violation that Plaintiffs have not shown they are likely to establish.  For that reason alone, preliminary relief is improper.

## V.      The Balance of Harms and the Public Interest Weigh Against Injunctive Relief.

A party seeking a temporary restraining order or preliminary injunction must also demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  "These factors merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009).

Here, Plaintiffs have not established that the *public*'s interest is harmed by denying access to one reporter while retaining (extensive) access for that reporter's outlet, reporters from other outlets, and, indeed, giving reporters the chance to ask questions or otherwise engage with the White House.  Said differently, Plaintiffs have not established that the public interest is uniquely harmed by Mr. Acosta's absence, in light of the other tenacious reporters still on the White House beat.  This basic fact distinguishes this case from those that Plaintiffs cite in their brief.  In *Telemundo of Los Angeles v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1103-04 (C.D. Cal. 2003), the issue was whether the public interest was harmed when an entire television network had been denied access to a public event.  *Cable News Network* went even further, addressing the public interest when an entire segment of the news industry, television, was denied access to a public event.  518 F. Supp. at 1245.  None of these cases addressed the situation here, where a single reporter was excluded from a place where many other reporters, including many from his organization, were equally present.

Plaintiffs also suggest that "Defendants actions are designed to and will chill not just Acosta's reporting, but also reporting generally."  Pls. Br. 22.  But this is simple speculation that, absent more, is not sufficient for preliminary or temporary injunctive relief.  *Wisconsin Gas*, 758 F.2d at 674.  And as noted above, it is speculation that is particularly unfounded in light of the allegations in this case.  *See supra* § I.B.

Finally, Plaintiffs fail to reckon with the extraordinarily intrusive nature of the judicial relief they seek—a decree ordering the President to grant access to facilities in his official residence and personal offices to a specific journalist he has decided to exclude.  At this preliminary stage, that hardship is far more significant than any hardship on Plaintiffs.  For that reason, too, emergency relief is unwarranted.

## **CONCLUSION**

For the aforementioned reasons, this Court should deny Plaintiffs' Motion for a

Temporary Restraining Order.

Dated: November 14, 2018     Respectfully submitted,

               JOSEPH H. HUNT
               Assistant Attorney General

               JAMES BURNHAM
               Deputy Assistant Attorney General

               ERIC R. WOMACK
               Assistant Branch Director

               /s/ *Michael H. Baer*
               MICHAEL H. BAER (NY Bar No. 5384300)
               JOSEPH E. BORSON (Va. Bar No. 85519)
               Trial Attorneys, U. S. Dept. of Justice
               Civil Division, Federal Programs Branch
               1100 L St., NW
               Washington, D.C. 20005
               Tel. (202) 305-8573
               Michael.H.Baer@usdoj.gov
               Joseph.Borson@usdoj.gov

               *Attorneys for Defendants*