IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

CABLE NEWS NETWORK, INC., et al., CA No. 1:18-cv-02610-TJK

Plaintiffs, Washington, D.C.
v. Wednesday, November 14, 2018
3:30 p.m.

DONALD J. TRUMP, et al.,

Defendants.

- - - - - - - - - - - - - - - - x

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: Theodore J. Boutrous, Jr., Esq.
Theodore B. Olson, Esq.
Joshua S. Lipshutz, Esq.
Anne M. Champion, Esq.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7804

For the Defendants: James M. Burnham, Esq.
Michael H. Baer, Esq.
Eric R. Womack, Esq.
Joseph E. Borson, Esq.
U.S. DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-5049

Court Reporter: Timothy R. Miller, RPR, CRR, NJ-CCR
Official Court Reporter
U.S. Courthouse, Room 6722
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3111

Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

THE DEPUTY CLERK: Your Honor, this is civil matter 18-2610, Cable News Network, Incorporated, et al., v. Donald J. Trump, et al.

Will counsel please approach the lectern and state your appearance for the record.

MR. BOUTROUS: Good afternoon, Your Honor. Theodore J. Boutrous, Jr., representing the plaintiffs, Jim Acosta and CNN. And I want to thank you very much for getting us a hearing so quickly.

THE COURT: It's my job. It's no problem.

MR. BOUTROUS: Thank you.

THE COURT: Welcome, Counsel.

MR. OLSON: Good afternoon, Your Honor. Theodore B. Olson, Gibson, Dunn & Crutcher, also on behalf of the plaintiffs.

THE COURT: Good afternoon.

MR. LIPSHUTZ: Good afternoon, Your Honor. Joshua Lipshutz from Gibson, Dunn & Crutcher on behalf of the plaintiffs.

MS. CHAMPION: Good afternoon, Your Honor. Anne Champion from Gibson Dunn on behalf of the plaintiffs.

THE COURT: All right. Who will be handling the argument for the plaintiffs?

MR. BOUTROUS: I will, Your Honor.

THE COURT: All right.

MR. BURNHAM: Good afternoon, Your Honor. James Burnham from the Civil Division at the Justice Department on behalf of the defendants. And with me, I've got Michael Baer, Eric Womack and Joseph Borson, also from the Civil Division.

THE COURT: All right. Welcome.

MR. BURNHAM: Thank you.

THE COURT: Welcome to all of you.

MR. BURNHAM: Thank you, Your Honor.

THE COURT: I want to start by thanking Judge Kollar-Kotelly for the use of her courtroom today. I -- apparently, I picked a terrible week to have mine renovated.

(Laughter.)

So I appreciate that from her.

I thought we'd start by -- what I usually do in these situations is, I have a bunch of questions for each side. Of course, I'll start with the plaintiffs. You're -- it's your motion. I'll ask you the questions. Usually at the end, we tend to have hit all the topics, but if there's other things you want to hit that we haven't hit on, I'll turn it over to you for whatever you'd like to present to me at that point; do the same for the defendants; come back to the plaintiffs for rebuttal; and we'll see where we are at the end, if that works for everyone.

So Mr. Boutrous, please.

MR. BOUTROUS: Thank you, Your Honor.

THE COURT: Absolutely.

I want to start by -- start with your First Amendment claim and just make sure that I understand some of the nuances of your argument.

I first have to do a facial review of the Government's action here to determine whether it's neutral or content/viewpoint discriminatory on its face. Do you concede that on its face at least, the Government's actions here are neutral and that I should look to, you know, the surrounding circumstantial evidence to find that it's actually unlawfully discriminatory or do you -- or, you know, do you think -- or do you think that the action itself was content or viewpoint not neutral --

MR. BOUTROUS: Your Honor, I think, on its face, the Government's action was content-based. The Government's brief does not address the litany of statements we have that preceded the press conference from Mr. Trump, from enemy of the people, the things about CNN that the President has said going in, and it's all based on content that it's fake media and fake news; then in the press conference, Your Honor -- this really goes -- there are really three stages. In the press conference, Mr. Trump repeated the enemy of the people language and the same sort of language about, you know,

rudeness which, I think, goes to the nature of the questions, and then in subsequent statements, including the original statements but the rationale has shifted, the White House has made very clear that they don't like the content of the reporting of CNN and Mr. Acosta.

THE COURT: Well, let me firstly just address the -- some of the statements about CNN. So we have other statements from the President about CNN, not about Jim Acosta particularly; not about the reporter in question here, but about CNN. I'm not sure those -- well, we can -- we'll -- I suppose we'll get to it, but I don't know how to weigh those in determining what really happened here. CNN has plenty of reporters. Those could be referring to all sorts of other coverage. And the reality is, for however -- the many months that the reporter here has been covering the President, whether the President -- whether the administration liked that coverage or not, until this point, they took no action. So the thing that -- what makes it content-based, just triggering -- the -- because all we have -- what triggered a content-based response here as opposed to all those other months where -- the President may not have liked CNN; the President may not have liked Jim Acosta, but here, he didn't act about -- he didn't act against all CNN employees. He only acted against one. And how do those other -- how am I really supposed to consider some of those

past statements by the President as really, here, suggesting that what was being, you know -- that what was motivating the Government's action was content or viewpoint-based?

MR. BOUTROUS: Your Honor, a couple of things, you know? The -- I think the fact that before the campaign -- during -- I mean, it -- we referenced the -- I think it's January 11th, 2017, the President refused to take a question from Mr. Acosta and said CNN is fake news. So you've got -- I think this is an extraordinary situation. Never will there be more evidence of facial animus and discrimination against a particular reporter or a network. He's the chief White House correspondent for CNN. So he's the leader of their White House correspondents; then during the, you know -- the entire run-up to this event, there's been this constant campaign, the -- with -- and going about -- and talking about content; then -- I mentioned the press conference itself; then President Trump himself, the day after, said it was lack of respect for the presidency and the office of the presidency, and that's saying --

THE COURT: That could -- I mean, fair to say that could be spun either way? Respect. It could be just his demeanor in the, you know -- in the press conferences. I'll just -- let me just run through a couple of things that, to me, at least suggest that the evidence in the record -- that there is some evidence in the record at least to suggest

that it was the reporter's behavior and not his viewpoint that was the reason the pass was revoked. He continued, you know -- we've all seen the clip. He continued speaking after his turn had expired; he wouldn't yield to allow another journalist to ask a question; even when approached by a member -- by the individual there -- the intern -- he wouldn't give his microphone -- give up his microphone; he continued to talk. I think the President -- I think, in that moment, if I recall, the President referred to him as being rude which -- and, again, as you mentioned, this issue of respect which, I think, reasonable people could spin either way about whether that's, sort of, based on the content of reporting or just being rude and not sitting down when the President wanted to call on another reporter. So I mean, in light of all that -- I mean, I -- look, that was -- I mean, there's evidence here on both sides. But give me your best evidence that what was going on here wasn't about rudeness; wasn't about, Look, it's time, you know -- it's time for you to sit down, but was really about the content of his reporting, and not just CNN's reporting broadly, but this particular reporter's --

MR. BOUTROUS: Well, I --

THE COURT: -- reporting.

MR. BOUTROUS: -- would say, Your Honor, if standing alone, what happened in the press conference had

happened, then I would say there was -- it was a closer case, but here, a campaign against a particular network. We cited the video that the President himself tweeted with the wrestler with, you know, him attacking a CNN -- never in history has that happened. And rudeness really is a code word for, I don't like you being an aggressive reporter. I don't like you asking questions about the caravan. I don't like what you're saying. The next day -- this is a different reporter -- President Trump said to a -- the -- another White House correspondent from CNN, Those are stupid questions. You always ask stupid questions. So I think the content-based evidence is overwhelming. And if I may, Your Honor, I have an additional exhibit that I just got today that I'd like to -- may I approach --

THE COURT: Yes.

MR. BOUTROUS: Thank you.

(Brief pause.)

Your Honor, we've marked this Plaintiff's Exhibit-56, just picking up sequentially. This came out from the Trump-Pence campaign today. And it's interesting. It's an email -- blast email for fundraising purposes, I think, but it starts out by noting that CNN is suing President Trump and the other defendants, and then it says, All because they revoked Jim Acosta's press badge after his continuous grandstanding and inappropriate refusal to yield

to other reporters. And this, I think, is key, Your Honor: President Trump will not put up with the media's liberal bias and utter disrespect for the administration and the hardworking Americans who stand with us.

So contemporaneous, as we're walking into court, they're declaring that they don't like the viewpoint of CNN and Mr. Acosta. But one thing, Your Honor, I wanted to make clear -- I don't want to go off this topic, but --

THE COURT: No --

MR. BOUTROUS: -- I think that both the First Amendment and due process issues merge under Sherrill.

THE COURT: We are going to get to that.

MR. BOUTROUS: I'll come back to that.

THE COURT: I think that's an important, interesting point --

MR. BOUTROUS: And I do -- oh, go ahead.

THE COURT: Go ahead. No, go ahead. Finish your point.

MR. BOUTROUS: No, I was just going to say, but I really think it's telling, the brief -- I know they only had a day to file the brief, so I'm not being critical -- but not one word to say -- address these statements that we've identified in terms of content; not a single effort to say, Well, when President Trump said that, he wasn't talking about content. They don't even dispute that President Trump

and the White House was -- they -- was -- that those statements were going to the content of the reporting.

THE COURT: Right. I mean, they, obviously, dispute whether they connect --

MR. BOUTROUS: Yes.

THE COURT: -- to the governmental --

MR. BOUTROUS: Yes.

THE COURT: -- action that's being challenged here.

MR. BOUTROUS: Yes.

THE COURT: Before we -- just to close the loop on explaining and making sure I understand the logical sequence of the First Amendment -- of your First Amendment argument, so you're -- the argument is -- it goes, it's strict -- I mean, because it's viewpoint discrimination, it's subject to strict scrutiny. It cannot survive strict scrutiny. So you know, you have a likelihood of success on that claim --

MR. BOUTROUS: Yes.

THE COURT: -- fair to say?

MR. BOUTROUS: Exactly.

THE COURT: All right.

MR. BOUTROUS: Exactly, Your Honor.

THE COURT: Okay. I just wanted to be sure of that.

So how do you respond to the, I guess,

counterargument, then, that the evidence that talks about CNN generally, as unprecedented; as unusual as it may be, it really wasn't about the particular reporter here and it's separated in time from what happened here and that, at the end of the day, number one, it wasn't -- it didn't single out this reporter; but number two is, that's been going on -- I understand from the record, that's been something that's been going on for a while now between CNN and the President and, all along, we haven't had any journalists' credentials revoked. It was only on this occasion that that happened and that the Government's argument is what was notable about that occasion was not any new content; not anything that hadn't been said before by a CNN reporter or this particular reporter, but what happened -- what was unusual was that he was rude and wouldn't sit down and the President was trying to move on to somebody else and he wouldn't accede to that to the point where, you know, they -- there was a question about who would control the microphone. So -- I don't know. That -- I'm sure that's going to be their argument. So you know --

MR. BOUTROUS: Yeah. Thank you, Your Honor.

THE COURT: -- why don't you just go ahead and address it.

MR. BOUTROUS: I'd love to address it, and I have several responses.

First, this was the -- it's not the culmination, but it's been part -- and I think the record reflects this -- part of a campaign and the President -- I have another exhibit I'm going to give the Court -- back in May said -- complaining about news, said, What do we do? Let's -- tweeted, Credentials -- should we take away credentials? So threatening journalists -- all journalists, so this really is bigger than CNN and Mr. Acosta -- with taking away credentials. And it's interesting to note that they -- Ms. Sanders has said and the brief says that Mr. Acosta was particularly -- had been engaging this -- in conduct like this before. Then why did President Trump call on him as the second person at the press conference? It's because he's an aggressive, excellent reporter who asks tough questions. I went back and re-watched the -- parts of the press conference today before we came in. Almost -- many of the reporters declined to stop. They kept pushing, because President Trump takes an approach to these press conferences that's different than other Presidents. He is the most aggressive, dare I say, rude person in the room, and I'm not being critical. He -- this is the rough and tumble of the presidency, and that's what the First Amendment protects, the caustic, vehement debate, and so President Trump establishes the tenor and the tone of these press conferences. Under -- Mr. Acosta covered President

Obama; he covered other Presidents, and there were different approaches. President Trump wants it to be a free-for-all. That's his prerogative. So the other reporters were trying to ask questions and President Trump would cut them off and say -- and then they'd try to get their second question, because if you let the President, whoever he or she is, just cut you off and call your question stupid and tell you to sit down and then throw you out of the White House forever, that's not what the First Amendment was meant to protect.

THE COURT: So -- fair enough. But, again, I guess I come back to, why now? Why -- if this is truly content and viewpoint discrimination, why wake up one day and just decide, "Today's the day I'm going to yank it"?

MR. BOUTROUS: It was a bad day for the President. It was the day after the midterm elections. I know -- and I don't expect the Court to try to read President Trump's mind. There are a lot of people who do that, but you asked me. This was a, you know -- the -- and --

THE COURT: Well, I do have to -- I don't have to read the President's mind, but I do have to decide what was -- I mean, part of what your claim turns on, right, is the Government's purpose here and what they did.

MR. BOUTROUS: And this -- I know you asked me about a facial challenge, but, as I said, I think you can view the events and the things that were said at the press

conference; the things that were said afterwards, but if you think about it, in an ordinary case, if you had someone who was making threats against a person for years and attacking them and saying they didn't like their speech and then one day, they took action -- took physical action or other action, it would be an overwhelming case. If we were trying this case -- if I -- if and when we do, we have overwhelming evidence that leads up to the events that support -- there's really nothing that goes the other way.

THE COURT: Well, I would just say, the analogy you just put forth breaks down a little bit if he had been personally -- I mean, again, most of, I think, the evidence you're citing is about the press generally. Maybe it's about CNN generally. It's not as directed to this particular person. So it -- the closer analogy would be someone threatening, sort of, large groups of people and then taking action as to one particular person. It's a -- just a -- it's a weaker link --

MR. BOUTROUS: But --

THE COURT: -- than if it was as your analogy suggests, but fair enough.

What is your position -- I just want to get this on the record. I presume I know what it is. The factual question of whether the reporter put his hands on the White House intern, as Ms. Sanders suggested, what is your

position on that factual question?

MR. BOUTROUS: It's absolutely false. And if the Court scours the brief that was submitted today; scours the statement that Ms. Sanders put out yesterday that they're relying on heavily, the post hoc rationalization, they've abandoned that. And one thing that jumped out -- go ahead, Your Honor.

THE COURT: No, no, please.

MR. BOUTROUS: I was going to say, one thing that jumped out at me, I thought it was -- the -- several stunning things about the brief, but since you asked, that was the original rationalization for Ms. Sanders; that putting -- placing hands, a serious accusation. We -- it's on video. And in -- on Page 17 of their brief, they make the argument that because there was a video, the risk of an erroneous deprivation of Mr. Acosta's due process rights is lessened when there was a video, and they tweeted out a doctored video and claimed that somehow, he had placed his hands on her. That was their original assertion. It was absolutely false, as the witnesses -- the reporters were there -- as the world has recognized. So it's -- and if one looks at it, it's -- the intern -- and I'm not blaming her. It was -- she was put in a difficult position just being told to go around and try to grab the mic, but she did reach over and grab it and then he said, Pardon me, ma'am, and

tried to keep asking his question and, I think, acted totally appropriately, and they don't -- they've abandoned that argument, and that's why we need due process. They have come up with four different reasons --

THE COURT: I suspect that they are going to assert that their reasons haven't changed over time and that was all of a piece. I -- we'll see, but that it was all, sort of, similar -- that the reason really didn't evolve. But I guess what you're arguing to me is that -- well, let's put -- let me ask it this way. What am I to make of that? Let's assume I agree with you that the Government's reasons for taking this action have changed over time. What, you know -- how should that weigh in my analysis?

MR. BOUTROUS: I think it both destroys the credibility of their arguments as to now why it was done -- as in any case, it's a real credibility killer -- and the fact that the White House tweeted a manipulated video that even Kellyanne Conway said -- the counselor to the President said, Well, it was sped up. That's manipulating the video. So I think, as the Court weighs these issues, credibility is at -- about as low as it could go in terms of making factual determinations. And I think the other point is, in terms of looking at due process, this is why Sherrill v. Knight -- which is directly on point -- the Court -- they want you to ignore it. As the Court knows, it's binding. They said we

only cited one case from the D.C. Circuit on White House press credentials. That's right, because it's directly on point and wins the case for us. But Sherrill says there needs to be a -- protections both so there's not viewpoint discrimination so we have some certainty, procedures in advance --

THE COURT: Well --

MR. BOUTROUS: -- rather than this post hoc --

THE COURT: -- Sherrill --

MR. BOUTROUS: -- effort --

THE COURT: Sherrill doesn't turn on viewpoint discrimination, does it?

MR. BOUTROUS: It didn't, but it was --

THE COURT: Okay.

MR. BOUTROUS: I think it -- but the court mentioned -- it did say, of course, that viewpoint discrimination would be a First Amendment violation, but the procedures that it imposed -- advanced notice; opportunity to rebut; written decision -- were meant to ensure that there weren't arbitrary, less-than-compelling reasons for -- there, it was denying a press pass. Here, it's revoking.

THE COURT: We are going to get to Sherrill in one second.

MR. BOUTROUS: Okay.

THE COURT: What -- I don't want to artificially

cut you off, but I just have a few more on the First Amendment -- kind of, your pure First Amendment claim. Let's put it that way.

On this issue of what the Government's purpose was here, what if I were to find that there was a dual purpose? What if I thought that you all successfully had proved that at least part of the reason was improper viewpoint discrimination just for the -- for sake of argument? Is that -- what level of scrutiny would I apply and -- in going forward there?

MR. BOUTROUS: I think that the strict scrutiny would apply. They would need to show a compelling reason. And there's a case, Your Honor -- we didn't cite it here yet, but -- NAACP v. Claiborne Hardware where the question was -- it was a boycotting case and there was an argument that some of the conduct was protected by the First Amendment and then the argument was some of it wasn't --

THE COURT: Yes.

MR. BOUTROUS: -- and the Supreme Court said, Well, if it's both, the First Amendment standards kick in.

THE COURT: You all didn't go into this other point in your motion and I -- you'll know -- you'll understand -- I understand why you didn't. Let's say, though, that I do agree -- let's say I were to agree with the Government that there was a legitimate

non-viewpoint-based reason for this action. Under that scenario, am I applying intermediate scrutiny, then? And what would the test be? And would the Government's actions survive that?

MR. BOUTROUS: If you were to find that there --

THE COURT: For the sake of argument. I understand this is not your argument.

MR. BOUTROUS: Yeah. Thank you.

THE COURT: Right. Yeah.

MR. BOUTROUS: Then I think, because there are speech interests, you know -- we're, sort of, more into the, you know -- sort of, it's speech. It's First Amendment. So the very acts -- and I should add, this has never happened before. No President, at least in modern times, has kicked someone off -- taken away their pass. And this goes to the point that under the intermediate scrutiny test, that we'd have -- there must be a substantial rather than compelling Government interest with a close fit to the conduct. And I'm hoping this is what you're getting at, Your Honor, because here, Mr. Acosta's had his -- has had his hard pass -- which it's called -- for five years. They don't argue that the security -- the Secret Service has, in any way, questioned his security clearance to this day. And there were much less and much more -- much less drastic and much more narrowly-tailored ways to deal with it. They

don't have to call on Jim Acosta at a press conference. They could have turned off his mic. They didn't -- to strip him of his hard credentials -- and we have the declarations that say it's essential to have that to be a White House correspondent.

THE COURT: Could they let him keep the pass but tell him, "You can't come to presidential press conferences"?

MR. BOUTROUS: No, Your Honor. And this goes to, I think -- before I -- I know we're going to get to Sherrill on due process, but -- and this is a real flaw in their argument.

THE COURT: Well, isn't that a -- wait. Isn't that a less restrictive means; a tighter fit, if the concern was, Well, okay, he's misbehaving in some of these press conferences, for a period of time -- or we're just going to say, "You can keep your pass. You can roam around and report and talk to folks, but when we have the President in here, we're not going to include you"?

MR. BOUTROUS: It's -- it would definitely be less restrictive, but I think it would still violate the First Amendment because it would be high content-based, even if it's mixed, and the problem with the --

THE COURT: Well, I'm assuming for the purposes of this question that it wouldn't -- why would it be

content-based, then? What if they, you know -- what if we're in a -- we're -- for purposes of this question, we're in a place where, I think, they had a legitimate -- that their motivation was legitimate and non-content-based and they just think he's being rude and they want to do something to, kind of, enforce those standards. Why wouldn't they, then, be able to say, "Look, you can keep your pass. So we're not infringing to the extent there are First Amendment interests in that pass. The only way we're going to, kind of, impose a restriction that is tight is when we have the President here -- yes, one thing we could do is not call on you. Fair enough. But one thing we could also do, maybe, is just say we're not going to invite you to that -- those particular press conferences"?

MR. BOUTROUS: That -- first, that, Your Honor, was -- would -- it would be overbroad because there are less restrictive means. So I think under intermediate scrutiny, you start with the lesser restrictions, but also, in terms of the -- you mentioned standards. I suggest the Court ask the Government, what are the standards? There are no standards. Rudeness is not a standard. If it were, no one could have gone to the press conference or at least many people couldn't. And I -- again, I don't mean to be challenging the President, but he encourages that sort of rough and tumble discussion, but rudeness is not a standard,

and we have a declaration speaking of rudeness. I don't think he'd mind me saying this. We have a declaration from Sam Donaldson who said, you know -- he was known for his aggressive questioning. People called him rude. He's seen it all and he -- this was not anything unusual to him.

The other point, Your Honor, I wanted to make about CNN and the Court was asking about the broader statements --

THE COURT: And just to --

MR. BOUTROUS: Oh, yeah.

THE COURT: Just to circle back really quickly, though, the issue -- if we're applying intermediate scrutiny, the fact that there would be a less restrictive means would not make the governmental action unlawful; correct? It doesn't have to be the most restrictive.

MR. BOUTROUS: It has to be substantially connected to the --

THE COURT: Substantially --

MR. BOUTROUS: Yes.

THE COURT: But not the most -- and just one --

MR. BOUTROUS: And I may want to go back and make sure I'm giving you the precise test, but, as the Court knows, in the intermediate scrutiny cases, the Supreme Court -- the Sorrell case -- and, again, we didn't brief this, but we can expand on this, but the court has made very

clear that the two tests are coming very close to being the same, and so there has to -- even in pure commercial speech, there needs to be a tight fit. And here, where there's never been a standard; there's never been a suggestion that you can't try to ask a follow-up question, there's -- they're talking about grandstanding. Again, grandstanding has not been a standard for a White House press conference. That's just not the standard. And so -- and, as the Court knows, with First Amendment, you need precision in the standards. It's an incredibly vague standard. And President Trump, the day after the revocation, suggested other credentials might be pulled. We don't know for what, you know? A fit of pique? It's, kind of -- it's the definition of arbitrariness and capriciousness that my favorite case, Sherrill, talks about.

THE COURT: So let's transition to Sherrill. I want to make sure -- let me just walk through how I understand your argument, again, just to make sure we're on the same page. As you suggested, I think it interacts with the First Amendment in, kind of, a subtle way. I -- this -- I understand your argument to be that under Sherrill, the reporter has certain due process rights -- in that case, the court found that and you would say that applies here -- and that the reporter here did not receive those due process rights. And you further read Sherrill to success -- to

suggest that the lack of due process infringed on the reporter's First Amendment rights and -- or rights or interests. In effect, the lack of due process has caused a First Amendment injury; is that a fair way to think of it?

MR. BOUTROUS: That is, indeed, Your Honor.

THE COURT: All right. And in its brief, the Government describes certain, you know, process it says that the reporter got here. So as we've all -- as we all know, the concept of due process is flexible. Why wasn't the process that he was given here -- well, first of all, outline for me factually -- I mean, I'll ask the Government to do this, too, but -- from your client's perspective, what process was he afforded? And why wasn't that process adequate here?

MR. BOUTROUS: Your Honor, the process that he was afforded was no process. He asked his questions at the press conference; was going back to work; saw that Ms. Sanders had issued a statement that his credentials had been revoked; and was, then, trying to get into the White House area which is really his place of work, as we -- as the declarations show, and the Secret Service officer doing his job demanded that he turn over his credentials. That's not due process.

THE COURT: This was how much longer after the press conference?

MR. BOUTROUS: It was the same day.

THE COURT: Okay.

MR. BOUTROUS: It was the night of the -- November 7th. So there wasn't a, you know -- a long deliberation by the White House and careful consideration and, Let's look at Jim Acosta and CNN's full value, or anything like that or, What were the facts? And the fact they were looking -- they were using --

THE COURT: Well, we don't know. They have a lot of very talented people working at the White House that could be doing that, but it was a short period of time.

MR. BOUTROUS: It was a short period of time and then they relied on doctored video. And they do have talented people working at the White House. And that's -- they weren't -- I -- as far as we can tell --

THE COURT: Right.

MR. BOUTROUS: -- they -- there was no process and, certainly, none that comported with what Sherrill says which is the fundamental elements of due process: Notice; opportunity to -- for a meaningful hearing before your liberty and property rights are taken away; and then some sort of reasoned decision.

And to walk the Court through the timeline, so his -- he's stripped at the gate -- and we've given the Court the video that Mr. Acosta took while it was happening,

very polite; always -- he turned them over -- his credentials over -- then Ms. Sanders made her statements, now proven to be discredited, that it was based on this laying of hands. And, again, that's, like, a smear on someone's reputation. It's false. The White House should not be putting out those sorts of statements about anyone, but then the President, the very next day in his impromptu press conference -- which you could only get to if you had a hard pass because it was something that happened very quickly -- he says, Well, it wasn't because of that because it wasn't so horrible, but it was because he didn't show enough respect. Again, at the same time, Mr. Feist, who submitted a declaration here, had reached out immediately, the same night as the revocation, to Ms. Sanders and to Mr. Shine, both defendants here, and asked that it be reinstated. What's going on? No response. Then Mr. Zucker, the President of CNN, sent a letter to General Kelly on November 8th saying, We -- this is wrong; requesting that it -- the credentials be reinstated. Radio silence. So we, you know -- we didn't come to the Court as a first resort.

And then there was this Paris trip. Mr. Acosta went; was not able to go the way he normally would; was denied what -- the day pass and was denied credentials to cover the President's visitation -- visiting a cemetery, even though the French -- a foreign government gave him

credentials, but he couldn't cover the President of the United States in a foreign country because the White House wouldn't give him a pass even for that event.

Then as -- there's been lots of public discussion about the false statements regarding the video and then we pointed it out in our lawsuit. And, finally -- I may be skipping one misstatement or two here, but -- November -- yesterday, after we filed our lawsuit, Ms. Sanders issued another statement that they rely on heavily after we filed the lawsuit. That's not due process. That's post hoc, after-the-fact rationalizations that does not mention the placing of the hands false statement and it talks about being grandstanding and the like. So that's the sequence and, I think, basic due process says that does not comport. It certainly doesn't comply with Sherrill v. Knight and the advance notice and due process requirements.

THE COURT: As we -- as you referred to earlier -- as we discussed earlier, I didn't see anything about the -- in the Sherrill decision -- it's not really grounded in viewpoint -- in a viewpoint discrimination finding at all. So is it your contention that, sort of, a -- we'll call it a Sherrill First Amendment injury, that can exist entirely independently of whether there was viewpoint discrimination here? So I could find a likelihood of success on the merits of that claim without even reaching the question of whether

there's viewpoint determination --

MR. BOUTROUS: Absolutely.

THE COURT: -- discrimination?

MR. BOUTROUS: Absolutely, Your Honor. I was going to say, you know, we're at a TRO stage. I know it's a lot to ask you to make these, you know, findings about intent and the like. That's really the key here. For the TRO -- and Sherrill, you're right, said we're not -- that that would violate the First Amendment, but we don't have to get there, and it's because of the First Amendment right of access to the White House. And if I may, Your Honor, this, I think, is a crucial point and shows how we have an overwhelming likelihood of success and the Government has a very low likelihood. They take the position in their brief on Page 1 that the President has absolute discretion to bar -- to toss people out of the White House -- toss reporters out. They take the position on Page 7 -- I love this -- they say, basically -- first, they say absolute discretion; then on Page 7, they say there's no First Amendment right of access to the White House. Go back to Sherrill. Sherrill says the exact opposite --

THE COURT: I plan on --

MR. BOUTROUS: -- that there is.

THE COURT: I plan on asking them about that --

MR. BOUTROUS: Okay. Good.

(Laughter.)

THE COURT: -- Mr. Boutrous.

MR. BOUTROUS: Good. You're focused on the same issues I am --

THE COURT: All right.

MR. BOUTROUS: -- because it --

THE COURT: All right. And so -- but, anyway, I didn't mean to -- finish your --

MR. BOUTROUS: Yes.

THE COURT: Finish your point.

MR. BOUTROUS: So I was just going to say -- so their fundamental mistake is, there isn't -- if there wasn't a press operation; if there hadn't been this tradition -- and it's a grand tradition -- that our President and the White House lets journalists come in and have booths and be right off the Oval Office, that's great for the American people. It's not for the reporters. It's not for CNN. And that is a tradition. You can get these hard passes with -- you go through a few hoops and get Secret Service clearance. That's a wonderful thing for our country. And as Sherrill pointed out, if that hadn't been the process; if we were just -- it was a vacuum and nothing was happening over there, that's a different question, but having given access; having created this public forum and this process, the First Amendment is triggered. There is a First Amendment right of

access to the White House for journalists. It's -- and their role as surrogates for the American people. That's what the law is of this circuit, and I don't think that the White House can get around that.

THE COURT: I suppose the follow-up, then, is whether -- let's assume there is a First Amendment injury under Sherrill, as you describe; is that -- does that injury connect to irreparable harm? Obviously, Sherrill was not in the context of preliminary relief. I know there are cases that suggest, certainly, that First Amendment rights are often -- there are certainly cases that suggest that First Amendment violations are, per se, irreparable harm in many circumstances. Is -- I assume that's your contention here.

MR. BOUTROUS: It is our contention. That's the other -- several other decisions that the Government has just disregarded; that the key cases that -- I call it the PAG case. The -- they have -- it's an acronym for -- I keep forgetting what it is -- Protect [sic] America's Greatness.

THE COURT: Yes.

MR. BOUTROUS: So I'll call it PAG just to --

(Laughter.)

But PAG picks up on the Supreme Court's decision in Elrod v. Burns that says the deprivation of First Amendment rights, even for minimal periods of time, is irreparable harm, and that's because speech, in covering the

news, is a fleeting thing. If you miss it; if you're not there; if you don't have a hard pass and you can't be there when the President pops out and starts talking or Sean Spicer is down in the bushes giving a, you know -- sort of, impromptu back when that happened, the news is gone. That's irreparable. And so the court -- PAG was an election law case, but the court said that's irreparable. You can't get it back. And these access cases -- and I've handled them in other circumstances where you're seeking access to court and you -- you're -- there's a, you know -- you -- the essence of these First Amendment issues is that once it happens, it's history. It's not news if you don't get it when you're -- and be on the scene to see it and report on it.

THE COURT: Although, in some of those cases, I assume the circumstances are that if the particular plaintiff isn't there, then no reporter will cover it; right? So the counterargument here -- and I -- it runs into Sherrill pretty quickly, but, like, the counterargument here is -- I assume it will be -- is, Well, you know, there are not only 100 -- I don't even know how many -- hundreds of other journalists with this pass. There are whatever the record indicates -- a substantial number of journalists at CNN that have this pass. So that certainly is distinguishing from some of those other cases you're citing. I assume when you mentioned access to courts, for example,

where the press is fighting for access collectively and, if there is no access, then, you know, no -- the event will not be covered. Here, all the events will be covered. They won't be covered by this particular reporter.

MR. BOUTROUS: But that really is the point, Your Honor. We're asserting both CNN's rights -- this goes back to your questions about attacks on CNN -- and Mr. Acosta's rights. And Sherrill -- and I think the Court was alluding to this -- it says that the public and the journalists have a First Amendment right for that particular people -- for all voices to be heard. So it's not just the notion -- it's not irreparable harm generally. It's irreparable harm to these -- this reporter and the news organization. And Sherrill points out that the First Amendment, if we start thinking of it that way, if one group of journalists who have one viewpoint or one angle are there and others are excluded, the news might be different --

THE COURT: Well --

MR. BOUTROUS: -- might be reported differently.

THE COURT: That's true --

MR. BOUTROUS: Different questions.

THE COURT: Again, though, you're going back to viewpoint and Sherrill isn't about viewpoint, but --

MR. BOUTROUS: I wasn't, Your Honor. In fact --

THE COURT: Okay.

MR. BOUTROUS: -- this goes to your point as to Sherrill --

THE COURT: Well, you mentioned viewpoint.

MR. BOUTROUS: Without -- it's hard to get away from viewpoint, but without viewpoint discrimination as a matter of fact in this case, the purpose of Sherrill is to say, White House, you opened yourself up. You have a procedure. If you're going to revoke or deny a reporter the right to participate in the White House press process, then you need to do it consistent with due process because otherwise, the White House could engage in punishing reporters because of their viewpoint, and the fact that a particular reporter or news organization is banned from an event or banned from the White House, that's irreparable injury to those individuals, and Sherrill talks about it as having a public injury because of the First Amendment's purpose of having a wide array of voices.

THE COURT: Do you think that even without -- does this depend on -- well, in this case, even if I find, you know -- I don't buy your viewpoint discrimination claim, is there a chilling effect on the press, even apart from viewpoint discrimination? And is that something that's required to find the kind of irreparable harm that I would need to find to grant your relief?

MR. BOUTROUS: It's not required, but I believe

that we've established a record. We have both the declarations that we've submitted. We also have the amicus brief that has been submitted.

THE COURT: Even apart from viewpoint. I'm saying --

MR. BOUTROUS: Yes.

THE COURT: -- in a world in which I don't --

MR. BOUTROUS: Absolutely.

THE COURT: -- buy that argument -- okay. You think --

MR. BOUTROUS: Absolutely.

THE COURT: -- you can get over the hump there?

MR. BOUTROUS: Absolutely. The -- and, in fact, in the chilling effect, it's -- if the President or the White House can arbitrarily, without due process, ban reporters on the spot -- maybe, they liked their viewpoint until one particular day, but it's -- and, again, I mentioned the -- President Trump said the day after this happened, There might be more. He threatened it earlier in May. And we cited CBS's Lesley Stahl saying that President Trump told her, I'm basically trying to completely undermine the press so that when you report bad things, nobody will believe you. And I think that's part of the -- whatever the viewpoints are of the reporters knowing -- and Sam Donaldson says this in his declaration. Other reporters, if they know

they can get tossed out because of a vague application after the fact of a rudeness or grandstanding standard asking a follow-up, they're going to be chilled. Now, do we have to prove that? At this stage, I think we've definitely shown a likelihood of success on that point. I don't think we have to prove it as a matter of fact, but it's certainly something that the Court, you know -- that the cases recognize. Times v. Sullivan recognized that the threat of a libel verdict, just as an objective matter, has a chilling effect.

THE COURT: Let me ask a few questions about remedy, and then I'll turn it over to any points we haven't covered that you want to cover.

There are cases out there that suggest that a preliminary -- the preliminary relief should not work, sort of, the entire relief that a plaintiff is seeking. And so if -- I noticed you asked for two, kind of, potential remedies, but the first being that I order the reporter's press pass to be returned indefinitely. If I did that, wouldn't I be doing that? Wouldn't I be giving your client all the relief he would seek, even at the end of the litigation, at the beginning?

MR. BOUTROUS: It's a great point. I noticed that when I was going back through the way we rephrased it. What we're really asking at the TRO stage, Your Honor, is much

less than that; that the Court return us to the status quo before the dispute arose -- that's the test -- which is to require that his -- the Secret Service to give him his press pass back during the 14-day period that a TRO can be in effect; then I was going to propose that we come back, maybe, the week after Thanksgiving so we're in -- we're moving quickly for the preliminary injunction proceedings, and that is a simple -- it's not the, sort of, overbroad -- it's not like the English case where someone's asking you to force the President to appoint an officer of the government, and so -- and it wouldn't give us all the relief because we'd still come back in and explain why it should be restored for a longer period of time until we get to the merits. So I think that it does not raise that issue. And we'd also -- would be -- still be seeking a declaration regarding lawfulness and unlawfulness that would have consequences beyond this case for other journalists and for the First Amendment generally regarding access to the White House.

THE COURT: Is the, sort of, two -- as I recall reading, the -- you, sort of -- whether "indefinitely" was perhaps not worded exactly the way you would word it today, report -- return the press pass and then there was the, sort of -- in the alternative, that it be reinstated until he receives whatever process perhaps Sherrill would require or

whatever the Constitution requires. The latter -- was -- in suggesting relief as you did, was part of your thinking that, sort of, if I found you're likely to succeed on the First Amendment claim, it would be, sort of, the first form of relief and if I found it was, sort of, a -- more of a due process/Sherrill situation, that, basically, I would give the second form of relief? That is, kick -- remand for whatever process and, maybe, we'll be right back here pretty quickly. Who knows? But was that the thinking?

MR. BOUTROUS: That was one, you know -- the -- sort of, our fallback position, but with respect to Sherrill, we -- our first form of relief is the broader form; that for now, grant a TRO; order that the relief be given back, because I do think it would -- it will be futile. It's a little bit like we've had the jury declaring their views vehemently and then we go back to the same jury and I don't think there's any surprises in store for us. So in this particular case, I think, particularly at the TRO stage -- and we recognize we need to move quickly and that's -- we want to move quickly because every day that the press pass is gone is a day where Mr. Acosta is not covering the White House. So -- but it's a -- it's the second form of relief, but I think for all parties concerned, it would be better to just restore for the period of the TRO -- the Secret Service clearance is in place -- and then we come

back; give the Government a fuller opportunity to brief and, maybe, put some evidence in the record; and then go to the preliminary injunction; and then, if necessary, on to the merits.

THE COURT: Talk to me about the balance of the equities and the public interest and how you think they weigh.

MR. BOUTROUS: Yes.

The balance of the equities first here, I think, tip very strongly in favor of CNN and Mr. Acosta because the first -- the -- we've got irreparable harm and we start with that under the other three factors. In terms of the equities, here, Mr. Acosta is being barred from covering the news at the White House and engaging in news gathering and that's a significant, substantial impairment and there's news breaking -- who knows what's happened while we've been having this hearing? So it is -- it's a severe impairment for Mr. Acosta and for CNN to not -- they have other -- they said 50 credentials, but it's really about 8 reporters or photographers and others, but -- and then in terms of the public interest which, here, fuses with -- in the balance of equities because it's the Government, the PAG case and Sherrill say that where the first -- the public's interest in protecting First Amendment rights and in the free speech and free press, that's the public interest. And here, those

factors strongly tip in our favor.

And in terms of injury to the Government, he -- Mr. Acosta has had a press pass for -- a hard pass for five years. He has never had anything like this. No warning; no issue. And he has Secret Service clearance. There's no threat. And that's the other point that, I think, you may hear from them; that they've -- they argued that, Well, Sherrill was only about Secret Service and national security. Well, there would be more deference to the Government there. It's nothing like that here.

So there's a way to restore the pass for the next couple of weeks while we go to preliminary injunction. The equities strongly favor that, and there's nothing on the other side that I can see concrete injury or anything. There are all these -- this, kind of -- their emphasis on the other reporters cuts against them. There are hundreds of people -- reporters with hard passes. People are going to be asking questions. They have -- they don't have to -- I don't want to -- knowing President Trump, he'll probably call on Mr. Acosta the first day he gets his press pass back, but -- so I don't want to discourage that, but they don't have to engage with him. So there's a reasonable, rational, fair way to protect the First Amendment interests; avoid irreparable harm; respect the Government's interests to get their full briefing in; and then we can come back and

argue it more fully.

THE COURT: All right. Any other points that we haven't covered that you want to make?

MR. BOUTROUS: I think I've hit them all, Your Honor. Your questions were very helpful in just drilling down into the key issues.

THE COURT: Well, thanks.

MR. BOUTROUS: Thank you.

THE COURT: All right. Thank you, Mr. Boutrous.

I'll hear from the Government. Mr. Burnham?

(Brief pause.)

So we'll -- well, I'll give you a chance to set up.

MR. BURNHAM: Thanks, Your Honor. Just give me one second.

THE COURT: Absolutely. No, no, no.

MR. BURNHAM: I appreciate it.

THE COURT: Take your time.

MR. BURNHAM: Okay.

THE COURT: Let's start, again, with the First Amendment claim like I did with the plaintiffs.

First, what -- I guess, just -- let's -- I know there have been at least allegations that the Government's, sort of, rationale has shifted here. So why don't you set me straight. Let me know what was the reason and whether --

and address this issue of whether the Government's reason has changed over time.

MR. BURNHAM: Certainly, Your Honor.

So -- and I'm sure we'll get back to this, you know? One of our threshold positions is that there doesn't need to be a reason because there's no First Amendment protection and the President has broad discretion. So I know you'll get to that. I just want to let that -- set that forth at the outset.

THE COURT: Yep.

MR. BURNHAM: In terms of the reason why this happened, I think the Government -- or I'm sorry, I think the White House was pretty consistent throughout. If you watched the video of the exchange, in the moment, the President tells Mr. Acosta that he was being rude. I think it's pretty clear that he's talking about Mr. Acosta's refusal to yield the microphone; refusal to let another reporter ask a question; his refusal to comply with the, sort of, general standards of the press conference that all the other reporters, even if you just watched that one video, complied with.

That evening, the revocation happens. Sarah Sanders puts out her tweet with a couple rationales. One is the hands on the intern issue that we don't have in the brief and we're not relying on here and I don't think the

White House is relying on here. The other is that Mr. Acosta refused to yield the microphone. We quoted that tweet in our brief to Your Honor.

That evening, CNN clearly understood the basis for the revocation because they sent a letter to the White House disputing whether that was an adequate, sufficient, fair -- whatever word you prefer -- basis to deprive Mr. Acosta of his hard pass. The White House considered that letter. That was on, I believe, Thursday night; then it was Friday; then it was the weekend. Monday was Veterans Day; Tuesday morning, CNN filed its lawsuit in this court. That same morning, the White House put out a statement. I'd like to -- I wouldn't normally read such a long quote, but I do think it's worth reading the statement because the statement, I think, sets forth the White House's rationale pretty clearly.

So the White House statement said -- and I'm quoting -- After Mr. Acosta asked the President two questions, each of which the President answered, he physically refused to surrender a White House microphone to an intern so that other reporters might ask their questions. This was not the first time this reporter has inappropriately refused to yield to other reporters. The White House cannot run an orderly and fair press conference when a reporter acts this way which is neither appropriate

nor professional. The First Amendment is not served when a single reporter of more than 150 present attempts to monopolize the floor. If there is no check on this type of behavior, it impedes the ability of the President, the White House staff and members of the media to conduct business.

I think that statement is a pretty clear, pretty direct and pretty clearly non-viewpoint-discriminatory basis for the revocation of Mr. Acosta's hard pass.

I have some other points about viewpoint discrimination, but I didn't want to --

THE COURT: Well, let me ask this. As a threshold matter, then, is it -- if there's no First Amendment issue here, is it the Government's position that even if there had been viewpoint discrimination, that would be perfectly fine?

MR. BURNHAM: So I think -- it is the Government's position that as a matter of law, the answer to your question is yes. You don't need to address that issue in this case because -- for all the reasons that --

THE COURT: I understand you're --

MR. BURNHAM: -- you can anticipate.

THE COURT: I understand --

MR. BURNHAM: So --

THE COURT: -- you're contesting that.

MR. BURNHAM: So --

THE COURT: But --

MR. BURNHAM: Right.

THE COURT: -- it's the Government's position that viewpoint discrimination -- that in -- it -- that the President would be entitled or the White House or whoever -- that the White House would be entitled to say, "We don't like your reporting and so you're -- we're pulling your hard pass"?

MR. BURNHAM: Yes. And let me explain why, Your Honor.

THE COURT: Please.

MR. BURNHAM: So I think there are, sort of, two lines of cases that converge here that get to that answer. The first -- which I don't think anyone really disputes -- is -- comes from a 1965 Supreme Court case called Zemel v. Rusk. It's in our brief. It's at 381 U.S. 1. And that's a case where the Supreme Court recognizes that, yes, of course, the general public has a First Amendment interest in being in the White House. The President's there; important things are happening there, what have you, but that interest does not equate to a, quote, First Amendment right, and so that case says there's no First Amendment right at all to access the White House grounds, and I don't think anybody really disputes that that is black letter, settled law. Okay? Then -- well, maybe, they do, but I think that is a pretty established principle as a general proposition.

Whether it applies here, separate question.

The second line of cases, I think, kind of, grows out of the government speech doctrine. So there are lots of Supreme Court cases that say -- and this is a quote from a 2005 case called Johanns against Livestock Marketing Association. Quote, The government's own speech is exempt from First Amendment scrutiny. And that's -- the cite for that is 544 U.S. 550. That is, I think, also a pretty well-established proposition. And I think that's why Sherrill -- although Sherrill's a 1977 rather than, you know, more recently -- says very clearly, quote, It would certainly be unreasonable to suggest that because the President allows interviews with some bona fide journalists, he must give this opportunity to all.

THE COURT: Listen, as to that point, I mean, I don't know that anybody disagrees around this table; right? I mean --

MR. BURNHAM: No. I think I -- I think Mr. Boutrous actually agreed with that in his presentation to Your Honor when he said that not only does the President not have to give interviews, he doesn't even have to call on Mr. Acosta at the press conference ever.

THE COURT: Right.

MR. BURNHAM: So let me just -- if I could just tell Your Honor about one more case and then --

THE COURT: Please.

MR. BURNHAM: There's a Fourth Circuit decision that's more recent, 2006, that I really commend to Your Honor, because I think it deals with the issues at play here in a pretty detailed way and it's pretty analogous. So that case is called Baltimore Sun Company v. Ehrlich and that's 437 F.3d 410. It's a 2006 Fourth Circuit decision. In that case, Governor Ehrlich had been -- was, at the time, the Governor of Maryland and there were two reporters from the Baltimore Sun that he thought covered him unfairly.

THE COURT: Yes.

MR. BURNHAM: I think it's pretty clear that that's viewpoint discrimination because that's a -- the viewpoint is the content of their coverage.

THE COURT: Yes.

MR. BURNHAM: Governor Ehrlich said, You know what? No one in the government -- the whole executive branch, so not just my office; not just my comm staff; not just me -- no one is permitted to talk to those two reporters, and that's a pretty serious restriction. That's a much more serious restriction on the ability to gather information than the revocation of the hard pass at issue here. Mr. Acosta's still able to call White House staff; he's able to try to catch them on their way out; he's able to do what all the reporters who don't have hard passes --

of which are there are many -- do to gather news at the White House. And as the Fourth Circuit said, that didn't violate the Fourth [sic] Amendment. And it said a lot of things that are relevant. I'll just give Your Honor one quote because I think it captures the point. Quote, By giving one reporter or a small group of reporters information or access, the official simultaneously makes other reporters who do not receive discretionary access worse off, and that's at 418 of the court's opinion.

So I think, Your Honor, where we get our position -- oh. Did you have a -- sorry.

THE COURT: No.

MR. BURNHAM: Okay. Where we get our contention that viewpoint discrimination, in this specific context of hard passes at the White House to go to press events at the White House and ask questions -- comes from the convergence of those two rules. So you have the general rule that nobody has a right to come on the property -- which makes sense; it's the President's official residence --

THE COURT: Sure.

MR. BURNHAM: -- it's his personal office suite -- and the other rule that no reporter has a right to get answers to any questions from any official. And I think we agree. And I think it's been agreed in this argument that if the President said, No one speaks to Jim Acosta ever

again -- well, maybe, I shouldn't say they've agreed to that, but I think it is fairly clear that if the President gave that directive to the White House staff and said, No one acknowledge his presence if he's in the building, that would be totally fine under the First Amendment. It certainly would be fine under Ehrlich. And so I think, at that point, the hard pass is just a device that reporters use to get -- that, sort of, memorializes the President's decision to grant reporters perpetual access to press events, and so I just -- I think, you know, at that point, it's, kind of, hard to see what the hard pass adds beyond a right to get answers which we, I think -- which, I think, is pretty clear, the reporter doesn't have.

THE COURT: So how do I square that with Sherrill?

MR. BURNHAM: Right. So that, I think --

THE COURT: I mean, I understand that Sherrill really wasn't about viewpoint, but the way I read Sherrill --

MR. BURNHAM: Certainly.

THE COURT: -- it certainly, at least arguably -- at least arguably -- can be read to suggest that the reporter has --

MR. BURNHAM: Yes.

THE COURT: -- a First Amendment interest in that kind of access.

MR. BURNHAM: No, I totally -- I certainly agree that you could read it that way.

THE COURT: Okay.

MR. BURNHAM: I just don't think that's --

THE COURT: And that other -- and the Ehrlich case is not, you know --

MR. BURNHAM: No, that's the Fourth Circuit.

THE COURT: It is the --

MR. BURNHAM: It's across the river.

THE COURT: It's in the Fourth Circuit --

MR. BURNHAM: Yes, sir.

THE COURT: -- across the river and is not binding on me and Sherrill is --

MR. BURNHAM: Yes. No, no, certainly. So --

THE COURT: -- as you know.

MR. BURNHAM: So I -- Your Honor, I totally agree that you could read Sherrill the way that plaintiffs have read it and the way Your Honor has just suggested in your question. I just don't think that's the best or the correct reading of Sherrill. I think if you read -- if you actually read the whole case, Sherrill is a case about mistakes. So in Sherrill, you had a reporter who the White House had decided would get a pass. Everyone in the case agreed that the reporter was entitled to get the hard pass. As the court put it, quote, All parties, quote, Recognize that the

-- where a journalist was entitled to a hard pass. That's at Page 131, Note 22. The only thing that needed to happen before the hard pass could go to the reporter was the Secret Service security check. And so I think what -- and then what happened was, the Secret Service does its check; it says, you know, We don't like you. You can't -- well, they didn't say that. They said --

THE COURT: Well, you've been --

MR. BURNHAM: They said that --

THE COURT: You've been arrested --

MR. BURNHAM: -- you don't get approved --

THE COURT: -- or something --

MR. BURNHAM: -- and so you don't get your hard pass.

THE COURT: Right.

MR. BURNHAM: And so the reporter is, you know -- says, Well, come on. They said I could have it. Now, I have an entitlement to it because the White House wants me to have it and I'm being deprived of it based on this bureaucratic mistake that I have no insight to at the Secret Service. So I think you have to read the court's opinion that way because -- and if you actually go through the opinion -- and we go through some quotes in our brief -- it's very clear that all the analysis is premised on an agreement between the White House counsel -- the -- not the

White House counsel -- the counsel for the White House -- or counsel, I guess, for the Justice Department but who's representing the White House and counsel for the journalist that the White House Press Office and the President agree that this journalist deserves to have access. So I think that is why Sherrill comes out the way it does. I don't think the court in Sherrill explicitly or implicitly meant to say that this rule for the Secret Service background check also means that the President of the United States doesn't have any discretion to decide what people are allowed to come into his official residence or his -- sorry, his -- sorry, I should have said that -- I overstated that a little bit -- doesn't have the ability to discriminate based on viewpoint who can come onto the property. And I think the -- so I don't think that's resolved by Sherrill at all.

And just to go back to my earlier analogy where I was talking about who the President gives interviews to, just to concretize that a little bit, the President obviously works in the Oval Office during the day. The President routinely brings reporters into the Oval Office to do private interviews with him. Okay? That could be a group of 3; it could be a group of 6; it could be a group of 15. I don't think anyone disputes that the President has absolute discretion over which reporters to bring into the Oval Office. Viewpoint -- can -- he can discriminate based

on viewpoint; based on content; based on whether he thinks you'll get good coverage. That's totally within his prerogative. It's not clear to me why, if the President moves from the Oval Office, you know, call it, 1,000 feet to the East Room and expands the number from 10 to 100, he loses the discretion to pick everyone there, because a press conference, of course, is just a large-form interview. It's just an interview with 100 people instead of 10.

THE COURT: But wouldn't their argument be that what happened here went beyond that? In other words, that's, sort of, the -- what I was suggesting earlier. If you're talking about -- if you were in a world in which you're applying intermediate scrutiny to the situation, you know, are there other less -- are there other means that the Government could have done this? They could have, for example, said, We're not going to invite you to presidential press conferences. That's short of revoking the pass -- the hard pass completely.

MR. BURNHAM: Right.

THE COURT: So I'm not even -- I mean, I'm, kind of, with you that, like, there might be a way in which they would say, The President could say, at this particular press conference, I'm not inviting a particular reporter.

MR. BURNHAM: Right. So I think that's right, but that presupposes that I'm wrong and that there is First

Amendment scrutiny of the --

THE COURT: Right. I understand that. Right.

MR. BURNHAM: And so I'm happy and -- I'm happy to go back to that --

THE COURT: We're going to get to it.

MR. BURNHAM: -- in a second.

THE COURT: Right.

MR. BURNHAM: I just want to make sure to nail this down.

THE COURT: Yes.

MR. BURNHAM: I don't think anyone thinks -- or I don't think they've suggested that there's First Amendment scrutiny of who comes into the Oval Office --

THE COURT: Right.

MR. BURNHAM: -- to do the interview. And I don't think anyone's suggested -- and I think if they did, it would not prevail -- that there's First Amendment scrutiny of who the President grants TV interviews to; print interviews. I mean, these are areas where the President clearly has the ability and the discretion without any kind of judicial review to decide who he's going to speak to. And so that is the point I was making with the East Room.

Now, there is a separate question -- a subsidiary question -- where, if you either disagree with me or, also, would like to just assume -- because it's certainly

simpler -- for the sake of argument that Sherrill does apply to what we're talking about here, then we can get to the, sort of, secondary analysis about viewpoint discrimination and all of that. So let me just -- I think that's everything on that.

So just to get to that, Your Honor, on viewpoint discrimination, I think, let's do CNN first. As to the viewpoint discrimination against CNN, the entity, I don't think the evidence is even remote -- I mean, it's not compelling at all. CNN still has 50 employees who have hard passes to go into the White House at will. The other reporter that they talk about in their brief who had the exchange -- the, You're stupid, exchange with the President -- Abby Phillip, is a CNN reporter and she still has her hard pass. It's from the Washington Post because she just moved, but she still has it, and the President and the White House have not taken her hard pass away. They have not taken away any other hard passes at CNN. And I don't think that's because everyone else at CNN has different viewpoints than the entity or than Mr. Acosta. So I think as far as the entity is concerned, it's pretty compelling, you know? One out of 50 is a -- not a lot to show viewpoint discrimination.

Now, as for Mr. Acosta specifically, the video the plaintiffs have proffered which Your Honor's seen -- we've

all seen it; everyone has seen it -- is pretty clear. I mean, Mr. Acosta refuses to yield the microphone to other journalists; he attempts to ask a second question; the President says, I'm only -- I'm not doing more questions -- I mean, in substance -- and he persists; he continues to try to ask questions; he won't yield the microphone; and he won't sit down. A single journalist's attempt to monopolize a press conference is not a viewpoint and revoking a hard pass is not -- in response to that conduct is not viewpoint discrimination. And I don't think -- I think that's pretty clear.

Second, the video makes clear, if you watch the whole thing, that the President engages in questioning on the -- with other reporters on the very same topics that Mr. Acosta raised, immigration and the special counsel investigation. So to the extent Mr. Acosta's viewpoint is the questions he's asking, the same viewpoints are aired in the same press conference by other reporters, none of whom have been penalized for airing those questions -- for asking those questions. And I can assure you -- and you watch the video, you'll see -- those reporters were plenty tenacious in how they asked the questions.

THE COURT: Is that entire press conference in the record right now?

MR. BURNHAM: We are -- I --

MR. BOUTROUS: (Indicates affirmatively.)

THE COURT: Yes? Okay.

MR. BURNHAM: I believe so.

MR. BOUTROUS: Yes, Your Honor.

THE COURT: All right.

MR. BURNHAM: Yes. So Your Honor has that available. It's on C-SPAN. We'll stipulate to the video.

Finally, I think it's also clear -- I mean, I can assure Your Honor, there are countless journalists at the White House today who retain their hard pass who do not share the President's viewpoints on many topics and who probably are much closer -- to the extent, again, asking questions is expressing a viewpoint -- who are much closer to Mr. Acosta's viewpoints than the President's. Those reporters all still have their hard passes. Those reporters are all free to ask tenacious questions at press events and, I am sure, as we've seen even since this happened and will continue to see, those reporters will continue to aggressively question the President and his staff within the bounds of order at press conferences. And so I just think if you look at all that together, the evidence is -- they certainly haven't carried the burden they have to carry, particularly in a 48-hour emergency relief posture of showing what they have to show -- again, assuming I'm wrong

about Sherrill -- that there was viewpoint discrimination here.

THE COURT: What's your position on the factual question -- this -- of whether the reporter laid his hands on the White House intern? The first -- I won't even characterize whether it's a shifting explanation or not, but the first -- one of the early articulations for why this happened, as I recall, was that he -- the reporter put his hands on the intern.

MR. BURNHAM: What I would say, Your Honor, is that the one consistent explanation, the one that the President offers in real time that Sarah Sanders offers alongside the one Your Honor just referenced --

THE COURT: Yes.

MR. BURNHAM: -- and that animates the statement that was issued yesterday --

THE COURT: Yes.

MR. BURNHAM: -- is disorder at the press conference. Okay? And so --

THE COURT: Yes.

MR. BURNHAM: -- you know, I don't -- we don't have a position on that other statement --

THE COURT: You have no position on the accuracy of that statement --

MR. BURNHAM: No, Your Honor --

THE COURT: -- one way or the other?

MR. BURNHAM: -- we haven't -- we don't. But I think it's evident from yesterday's statement that the White House is no longer relying on that. I do think it's important, though, not -- that statement -- none of the rationales that have been offered are viewpoint-discriminatory rationales. And on that point, you know, my -- Mr. Boutrous brought a campaign fundraiser email. So I guess I would just note a couple things. First, it's a campaign email. So it's not at all clear that anyone at the White House has any --

THE COURT: Yes.

MR. BURNHAM: -- idea what these guys are saying in this specific email. I doubt the President reviews every campaign email, though I don't know. But even if you could attribute this to the White House, to the extent any of the decisionmakers had anything to do with it, it doesn't carry their burden at all. It says, They revoked Jim Acosta's press badge after his continuous grandstanding and inappropriate refusal to yield to other reporters. That's the part that's in bold, and that is the same rationale that the White House has offered consistently, and grandstanding and disrupting press conferences is just not a viewpoint. The only viewpoint they've identified, I think, is the nature of his questions; the hostility of his questions.

THE COURT: I just want to get a couple of things just --

MR. BURNHAM: Sure.

THE COURT: -- again, for the record.

So your position is that the Government's explanation here has been consistent? Maybe the -- some of the details, you know, may not have always been consistent. But the underlying rationale --

MR. BURNHAM: What --

THE COURT: -- has always been --

MR. BURNHAM: The way I would think about it, Your Honor, is they had two rationales at the beginning that were both viewpoint and content neutral and one --

THE COURT: Right.

MR. BURNHAM: -- has dropped away.

THE COURT: All right. I'll -- if you urge me to think of it that way, I will.

Okay. And I just, again, want to be clear, the -- this revocation didn't have anything to do with, sort of, this -- the kinds of things that Sherrill was talking about in terms of safety and -- this didn't have anything to do with the Secret Service or the President's safety or anything like that; is that --

MR. BURNHAM: I think the way I would answer that, Your Honor, is there's nothing in the record to suggest it

did.

THE COURT: Okay.

MR. BURNHAM: I don't -- I mean, I don't -- there's no evidence to suggest this was a security issue --

THE COURT: All right.

MR. BURNHAM: -- of -- in the sense that Sherrill was discussing.

THE COURT: All right. So let's talk a little bit more about Sherrill because, as I mentioned, it is binding on me.

The -- assuming that -- let's just assume for the moment that -- so if the First Amendment doesn't apply, is it your -- so there's no interest whatsoever. So you -- I guess your position is similarly that the reporter here's not entitled to any process --

MR. BURNHAM: Yeah, so the --

THE COURT: -- is that fair?

MR. BURNHAM: Your Honor, the way I think -- the way we think about it is that the liberty interest in Sherrill was the entitlement to the pass. The reason that interest came into existence was because the White House --

THE COURT: Had agreed.

MR. BURNHAM: -- Press Office had decided to grant him the pass.

THE COURT: Had agreed.

MR. BURNHAM: Had agreed. Yes, Your Honor.

THE COURT: Right. And --

MR. BURNHAM: Right.

THE COURT: And here, they did not.

MR. BURNHAM: And here, they did not.

THE COURT: So that's --

MR. BURNHAM: Right.

THE COURT: -- the distinction. No, I get it how you're distinguishing --

MR. BURNHAM: That is a distinction. I -- yes.

THE COURT: Fair. So let's assume -- okay. So I understand -- just like your First Amendment claim, I understand where you are, I think, on due process. Again, it's similar. You believe that Sherrill is distinguishable and that there's -- basically, the reporter has no due process interests here; fair?

MR. BURNHAM: Yes, as a first principles -- yes.

THE COURT: Yes. In the alternative, again, let's assume for the sake of argument I do find that Sherrill suggests -- that Sherrill is binding on me; that he does have a right to some process. Explain to me the process he received here --

MR. BURNHAM: Sure.

THE COURT: -- and why -- again, assuming the due process clause applies, why it would be sufficient.

MR. BURNHAM: Absolutely, Your Honor. So in terms of the process here, I've, sort of, summarily covered this. I'll go through it just in one clean place.

So assuming Sherrill applies, the process that was given here is, first, Sherrill says you have to receive, quote, Notice of the -- or the deprivee has to receive, quote, Notice of the factual basis for the denial. That's at Page 113 -- or I'm sorry, 130. In this case, the deprivee received it twice. The President himself said during the exchange -- now, he didn't say what the outcome would be, but he told the -- Mr. Acosta that he was being rude and disorderly; then that evening --

THE COURT: But the notice -- just to be clear, the notice of what -- he did not get pre-deprivation notice. I'm not saying it's required. I'm just trying to get the facts.

MR. BURNHAM: So I'm -- I'll -- that's correct. So it --

THE COURT: Okay.

MR. BURNHAM: So it is another separate due process principle that, generally speaking, pre-deprivation process is the way to go. There's a lot of cases that say that. I think here, just given the highly -- and I'll get to why this process makes sense. There -- I think, here, what happened was good enough for -- to satisfy due process,

but, yes, Your Honor, that's absolutely right. The President did not say, I'm revoking your hard pass tonight. Send me a letter, if you want, and I'll read it before we make our final decision, or something like that.

THE COURT: Who made the initial determination to revoke the press pass?

MR. BURNHAM: So that's not clear from the record. And so the -- but I think it's -- ultimately becomes clear because -- so what happens is, that evening, Sarah Sanders announces the rescission of the press pass with the tweets that we've been discussing. That happens the evening of November 7th. The next day, the President publicly explains why they did it. And so I -- while it's not clear from the record whether the President made the decision on November 7th, I think it becomes very clear on November 8th that he has at least ratified the decision --

THE COURT: Right.

MR. BURNHAM: -- because he's explaining it to the public.

THE COURT: You can't tell me -- I realize the record is what it is right now. But you're -- you have no information to add to the record to tell me --

MR. BURNHAM: Correct.

THE COURT: -- who made that decision?

MR. BURNHAM: Correct. I think our position in

this hearing is that the decision was at least made by Sarah Sanders on November 7th because she announced it and then was at least ratified by the President on November 8th after the CNN letter has come in, because the letter comes in -- I'm sorry, that's -- I misstated that. The letter comes in on November 8th. So you have the tweet; the deprivation; you have the announcement --

THE COURT: Do you -- let me just ask this. Do you have any information to suggest that it was anyone other than Ms. Sanders that made the initial determination?

MR. BURNHAM: No --

THE COURT: Okay.

MR. BURNHAM: -- not that I'm offering today, Your Honor.

THE COURT: Okay.

MR. BURNHAM: I can't -- I'm not denying it. I just don't -- I don't know anything beyond what's been --

THE COURT: Okay.

MR. BURNHAM: -- filed.

THE COURT: Okay.

MR. BURNHAM: And so then the weekend goes by and then the statement that I quoted earlier comes out yesterday morning shortly after the lawsuit was filed. And I would just note for the timing -- I mean, most of that period is weekend and a holiday. And so you know, the deprivation is

Thursday night -- I believe November 7th was a Thursday -- Friday goes by; and then Tuesday morning is the statement.

Now, let me explain why I think that was more than adequate here.

THE COURT: Yep.

MR. BURNHAM: So the touchstone of Mathews, what this is all about, is ensuring there's not erroneous deprivations; right? That's what Sherrill was concerned about. So Sherrill was worried, Gee, you know, maybe, the Secret Service needed -- didn't do a good enough job on the security check and so we need to have, you know, more process to make sure that their determination that this person is a threat to the President was accurate; was reliable; that we can depend on it. Here, the substantive standard for depriving Mr. Acosta of his hard pass is whether the President believes he was disorderly. I mean, I would say you don't even need that, but if Sherrill applies, that's clearly enough. I mean, Sherrill itself says that the -- let me find the exact quote -- that the standard for deprivation is that it cannot be done for, quote, Arbitrarily or less-than-compelling reasons. That's at Page 129. I think it's pretty clear that disrupting a press conference is not an arbitrary or less-than-compelling reason if that's, in fact, the reason. Here, the President, within a day of the deprivation, has clearly ratified the

deprivation and made the decision, and he's made the decision based on his own firsthand observation of the reporter, you know, disrupting the press conference as he did. So it's not at all clear to me what additional process -- how that would heighten the accuracy of the determination. It's not like Sherrill where the reporter might say, you know, You found that arrest, but that's not me. That's this other guy with the same name and you've got it wrong and that's, you know -- come on. This is a case where the President had an interaction with a reporter at a press conference and decided to revoke his hard pass.

THE COURT: Is it all about the -- is the process -- is the only interest at stake in the process the accuracy of the outcome or is it about allowing -- the outcome -- it may not be a binary outcome, I guess, is my point. It may not be, you know, either nothing happens or the thing that -- the Government action that happened, happened. There could be a range of things. And isn't the process -- part of the process designed to -- for the person who's going to be deprived of the right -- again, assuming there is a right or interest at issue here that's recognizable -- that allowing that person to make whatever claim they want to make so that, maybe, the, you know -- the -- whatever the deprivation isn't a 10? It's a 5, in other words.

MR. BURNHAM: Right. So I --

THE COURT: Is that fair? I mean, it's not just factual accuracy. I mean, I'm sure that's a part of it, but it's also making sure that the deprivation is fair.

MR. BURNHAM: So I think how I would -- sort of. So I think, as a matter of pure due process -- pure due process has no -- does not investigate the substantive basis for the outcome at all. So the only way you get to the world in what Your Honor has just suggested, I think, is if you import First Amendment constraints on what can happen; right? So -- and take a normal procedural due process case that a prisoner has his, you know, contraband confiscated. Mathews v. Eldridge and its progeny don't look at whether the prison guard -- whether the rule on contraband is a fair rule or a good rule --

THE COURT: Sure. Yes.

MR. BURNHAM: -- or a meritorious rule.

THE COURT: Yes.

MR. BURNHAM: They just look at whether the process was sufficient to figure out whether the rule was applied properly.

THE COURT: Correct.

MR. BURNHAM: It's a very odd fit here because the underlying standard is so discretionary because it's just, does the President believe that this person disrupted a press conference? And so that's why I say that the process

that's happened is more than enough, even if it was a bit of a shotgun process, to satisfy us that the President does, in fact, think -- which is all procedural due process is geared to obtain -- that Mr. Acosta disrupted a press conference.

THE COURT: I mean, the interesting thing about Sherrill, of course, is that it actually doesn't -- it's not about property interests, kind of, along the lines of what you're talking about about Mathews v. Eldridge. It suggests -- again, I take your point. I'm going to go back and read the case and you may well be right the way you're reading it, but at least the way the plaintiffs would have me read it, it certainly suggests that there's something beyond due process at issue here, given the First Amendment implications, etcetera, which almost suggests that, you know, unlike a typical case where, if we were only talking about his property interests -- and, again, they don't go -- in Sherrill, they don't go into the property interests piece, but it almost suggests that there might be more process required, given the, sort of, broader First Amendment rights, again, that that reading of Sherrill says are implicated.

MR. BURNHAM: Right. But, Your Honor, I think that's because in Sherrill, the decisionmaker at issue was, you know, lower. So the --

THE COURT: Yeah.

MR. BURNHAM: Sherrill was the case about, you know, the bureaucracy of the Secret Service giving a thumbs up or a thumbs down to a particular reporter. So here, it's just a very odd fit for this case because we literally have the highest level decisionmaker in the executive branch who's made the decision.

THE COURT: Well, does that matter? I mean, the due process runs to the entire government. I mean, does it really matter whether it's the President or someone low in the bureaucracy --

MR. BURNHAM: It just enhances the quality of the process that's been given because one of the things they talk about in their brief, for example, is the right to appeal.

THE COURT: Yes.

MR. BURNHAM: They have appealed. I mean, this has been appealed to the highest level decisionmaker in the White House and so it's, sort of, tantamount to the Supreme Court having made a decision. And so I just -- I think that --

THE COURT: Yes. Okay. That's fair.

MR. BURNHAM: -- enhances the quality of what Mr. Acosta has received, and so it's just not clear to me how -- if Your Honor -- if we -- if Your Honor agrees with me that disorder is an adequate basis -- sufficient basis to deprive

someone of their hard pass, it's not clear to me what more process is going to tell us about whether the President, you know, really thinks that Mr. Acosta was disorderly at the press conference because I think a letter exchange, something like that, is not going to add much. Of course, I do want to get to remedy on that because, you know, my friends really like Sherrill, but they have to take the bitter with the sweet, and Sherrill was a First Amendment and a Fifth Amendment case, just like this one, and Sherrill was very clear that the District Court was correct in concluding, quote, That it had no occasion to pass on the merits of the press pass denial. That's at Page 128 of the court's opinion. That's why Sherrill was adjudicated in a non-emergency posture. It was just about whether there would be more process. It was on summary judgment. And that's why all the court ordered was that the journalist be permitted to have more process with the Secret Service. So I think, at most, if Your Honor believes that they have a likelihood of success on the merits and meet all the other factors -- which we'll get to -- the only relief Sherrill entitles them to is additional process or, sort of, a remand, as it were, to the White House for additional process on Mr. Acosta's claim.

THE COURT: Was part of the reason, though, that the District Court -- that the court concluded that -- in

Sherrill that it had to do with, sort of, safety concerns of the President that, like -- that the court didn't want to get into second-guessing -- I think, probably rightfully so, right -- whether, you know -- second-guessing the determinations of the Secret Service about whether someone could appropriately be given such a pass, given the --

MR. BURNHAM: Well --

THE COURT: -- safety concerns?

MR. BURNHAM: -- I don't know. I mean, if the First -- if there's a First Amendment interest in the pass, normally, courts don't just defer. I think that's why I'm right about Sherrill. I mean, normally, if there's a First Amendment claim, the court doesn't just say, Well, you know, they said there's a security interest. They've thought about it really hard and I defer. Normally, the court would actually look at whether the agency's rationale is -- makes sense, and so I think the fact that Sherrill says, you know, We're not getting into the substance at all, sort of, proves my point about what Sherrill meant which was that they're not policing how the White House decides to allocate its finite space among journalists. What they're policing is whether someone who's been granted access has gotten adequate process from the Secret Service to perform -- to figure out a pretty discrete and knowable fact which is, is the person a threat to the President? So I think that's --

THE COURT: Okay.

MR. BURNHAM: -- my answer to that, Your Honor.

THE COURT: That's a pretty good answer.

Has the White House, to your knowledge, ever revoked a journalist's press pass before like this? The hard pass.

MR. BURNHAM: I don't want to say no, but not to my knowledge, Your Honor.

THE COURT: Okay. And is that --

MR. BURNHAM: There might be something in their declarations about that, but --

THE COURT: All right. At least to the best of your knowledge --

MR. BURNHAM: To the best of my knowledge, Your Honor. Yes.

THE COURT: Is that, sort of, unprecedented -- what -- how can I consider -- or how should I consider that unprecedented nature of what's happened here? I mean, I -- it, you know -- they have declarations from, you know, Sam Donaldson. I'm old enough to remember Sam Donaldson; right? And he, you know, wouldn't sit down. And so I guess, you know -- I assume the plaintiffs are going to ask me to, sort of, look at how unprecedented this is and draw a conclusion from that that this is really viewpoint discrimination, you know --

MR. BURNHAM: Right.

THE COURT: -- cloaked another way. And so -- I don't know. What -- there haven't been many other -- there have been plenty of reporters who are contentious who this didn't happen to. That doesn't mean there can't be a first time to institute some standards either.

MR. BURNHAM: Right.

THE COURT: So I guess what would you say I make of that, if anything?

MR. BURNHAM: So I guess a couple answers, Your Honor.

I mean, first, you know, every -- there are -- obviously, there have been multiple Presidents over the time that, you know, Sam Donaldson was a reporter and over the, sort of, historical period we're looking at. I don't think it's fair to say that because one President handled things one way, the subsequent President is somehow required to handle things in the same way. So it's not as though we have, you know, 50 years of this President having done things a certain way and then, all of a sudden, you know, he revokes a hard pass and so there's this really strong implication that that was based on viewpoint rather than the stated rationale, is my first -- I think, my first response.

My -- I think my second response is that, you know, there's a lot of things unprecedented about this

particular press conference and, sort of, everything that's happening in the media right now, and so I'm not sure why the default should be on their side. I mean, I think, you know, the -- I think the White House would say -- and their statement certainly does say -- that Mr. Acosta's behavior was atypical and across the arc of history and then at this event. And I think on whether it's atypical or whether it's disorderly, I think you have to defer to the President's discretion on that. I mean, the President -- we're talking about the physical White House. So I mean, the one building in which the President's authority over how people act and where they go should be at its apex, and so I think the President gets to have some discretion over what the rules are governing his press conferences. I go back to the Oval Office example. I don't think anyone disputes the President has plenary control over who sets foot in the Oval Office. It's not at all clear to me why he doesn't similarly have plenary control over who sets foot in the East Room or what the rules are going to be, and so if we agree on that, it's evident from the video that the rules were not, you know -- the standards and rules of the press conference were not being followed.

THE COURT: Does it matter that the standards -- I noticed that, you know, I think, in the wake of Sherrill, they codified the Secret Service's standards, anyway, for

how they do their job in terms of who should have access to the White House. Does it -- I assume there are no, sort of, written standards governing the decision you're talking about here in terms of, sort of, being disorderly. Does that -- I mean, I assume -- A, I assume that's true. You can correct me if I'm wrong. But assuming it is true, does it -- does that really -- does that matter?

MR. BURNHAM: So I think we can assume, for purposes of the hearing, that it's true.

THE COURT: Okay.

MR. BURNHAM: No. I mean, I think this is an inherently discretionary decision. I mean, it's really -- I mean, I keep going back to the analogy because I think it's quite apt. It's just an extrapolation from the President's decision on Monday, Who am I going to give an exclusive about, you know, the new trade deal on Tuesday? And how is he going to pick? Well, he's probably going to try to pick a reporter that's going to give him a good story about the trade deal, and so this is just an extrapolation from that. There's no requirement in statute; in the First Amendment; in the due process clause that the President, you know, publish a code of conduct for the reporters that he chooses in his discretion to allow on to the White House grounds.

I mean, one of the points I haven't made yet but I don't think -- again, don't think anyone would dispute, if

the President wants to exclude all reporters from the White House grounds, he clearly has the authority to do that. There's no First Amendment right, and that goes back to the 1965 case I talked about for journalists to be there. And just to concretize that a little -- I mean, the West Wing is tiny. I mean, this is a small, intimate workspace where people are tripping over each other. I mean, that's why, I think, journalists want to have access, because you run into people. It seems rather extraordinary to me to suggest that the First Amendment has a say over who the President can allow in this tiny workspace where he may himself, on the way to his house through the hallway -- the, you know -- the outdoor hallway by the rose garden, bump into these people while he's walking back and forth to his office.

THE COURT: Is there any -- we were talking before about the -- you were making the point that the President has at least ratified this and so that the effect on the quality of the decision was your point. Is it fair -- again, for purposes of our hearing here today so that -- is it fair to say that there are no further avenues of appeal? Again, it's the President. So I mean, I -- is there any process you know of that's contemplated or being available to the reporter to --

MR. BURNHAM: Absent judicial --

THE COURT: -- seek some sort of --

MR. BURNHAM: -- intervention --

THE COURT: Right. Yeah. No, no, I'm not talking about --

MR. BURNHAM: -- the process is --

THE COURT: -- within the executive branch to seek reconsideration or something like that?

MR. BURNHAM: So there is a -- as I understand it, there is a process to apply for day passes and hard passes, you know? Mr. Acosta is welcome to continue to apply. I don't know the particulars of how that process works, but for the -- for purposes of the decision before you, the revocation decision, I -- we're -- I mean, I think yesterday's statement was the final written statement of reasons.

THE COURT: Okay.

MR. BURNHAM: I do have a few points on irreparable harm and balance --

THE COURT: Sure. And I want to --

MR. BURNHAM: -- please.

THE COURT: And I want you to have them --

MR. BURNHAM: Yes, Your Honor.

THE COURT: -- to make them. I want to ask one other question.

Assume that I agree with the -- just for purposes of argument, I agree with the plaintiffs that there are

constitutional rights at issue here, but I agree with you all that we don't have viewpoint discrimination. In that narrow set of circumstances, again, for purposes of argument, what would -- how -- in that narrow set of circumstances, what would the law -- what law would apply --

MR. BURNHAM: So I think, then, the -- in that world, if you're either disagreeing or just, we'll say, assuming I'm incorrect for purposes of your decision --

THE COURT: Yes, just --

MR. BURNHAM: -- that Sherrill applies, the standard Sherrill expounds for the -- for how you assess whether the decision is good enough -- if there's viewpoint -- if it's just blatant, you know, viewpoint discrimination --

THE COURT: Right.

MR. BURNHAM: -- and that's it --

THE COURT: But I'm saying --

MR. BURNHAM: -- I think we agree that's not good, and so Your Honor's --

THE COURT: Sure. I'm --

MR. BURNHAM: -- hypothetical --

THE COURT: I'm suggesting that there's --

MR. BURNHAM: Right.

THE COURT: -- no viewpoint -- that you don't --

MR. BURNHAM: Then I think you only have to

decide, if we're in the world of Sherrill, is there a non-arbitrary reason that's not less than compelling? Okay? So -- because what Sherrill says is that you can't deny them for arbitrarily or less-than-compelling reasons. So it's, sort of, the --

THE COURT: Yep.

MR. BURNHAM: -- flip side of that.

THE COURT: Yeah, yeah.

MR. BURNHAM: And so I think here, we, you know -- that's -- on the current record, they certainly haven't overcome their burden, and it is their burden to --

THE COURT: Right.

MR. BURNHAM: -- obtain emergency relief.

THE COURT: Right.

MR. BURNHAM: They have not carried their burden to show that this was arbitrary or less than compelling.

THE COURT: So it may be --

MR. BURNHAM: And I --

THE COURT: It might be a very similar standard. But you would suggest the -- that Sherrill standard on the due process claim --

MR. BURNHAM: Oh, I'm sorry, Your Honor --

THE COURT: What about -- I mean, and I think that's fair -- on the First Amendment claim, intermediate scrutiny? I mean, it sounds like --

MR. BURNHAM: I think --
THE COURT: They sound --
MR. BURNHAM: -- they collapse. So --
THE COURT: -- pretty close, actually.
MR. BURNHAM: I think they basically collapse into one, because I think if Sherrill does apply to what we're talking about here, it -- that's only -- it is a unique role for a very unique circumstance.
THE COURT: Yes.
MR. BURNHAM: And so I think, if Your Honor's inclined to apply Sherrill, I would just use the standard in Sherrill which, again, is both a First Amendment and due process case. It's a case involving all of the same claims we have here, and the standard --
THE COURT: Did they bring affirmative First Amendment claims --
MR. BURNHAM: Oh, yes, Your Honor.
THE COURT: -- in Sherrill? Okay. All right. I just couldn't -- I know that the First Amendment is implicated and the --
MR. BURNHAM: Right.
THE COURT: -- court talks about it, but --
MR. BURNHAM: That's why --
THE COURT: -- and -- okay.
MR. BURNHAM: -- it's so important --

THE COURT: Yeah.

MR. BURNHAM: -- I think, that the court refuses to look behind the -- look, you know -- question the veracity of the Secret Service's determination, because I think what the court's saying is, you know, you have a right to a process that's accurate. You don't have a right to a hard pass. And you don't have a right to have the court second-guess the President and other decisionmakers in the White House. In that case, they agree, you get a hard pass. Anyway, we -- I've said this a few times, but --

THE COURT: Yeah. No, no, I -- okay. I understand. If there's things we haven't covered --

MR. BURNHAM: Just very, very briefly.

THE COURT: Please. Yes.

MR. BURNHAM: So I -- as we've talked about, Sherrill itself granted procedural relief. It didn't do so in an emergency posture. I just think that --

THE COURT: Yes.

MR. BURNHAM: -- tells you, sort of, why 48-hour TRO relief is not something Sherrill endorses.

I would also point out, as we note in our briefs, the plaintiffs haven't identified any specific critical -- I mean, there is, sort of, the aphorism that First Amendment harms are, per se, irreparable.

THE COURT: Right.

MR. BURNHAM: I mean, that's one thing for a -- sort of, a PI or a permanent injunction. It's another thing when you're talking about, you know, emergency relief, and I don't think they've identified --

THE COURT: Well, a PI isn't -- I mean --

MR. BURNHAM: No, no, but -- I mean, for purposes of today's decision, it's not as though there is a really irreparable thing that's happening tomorrow that, you know, if the Court doesn't grant relief --

THE COURT: Correct.

MR. BURNHAM: -- the ship leaves the country and --

THE COURT: That's right.

MR. BURNHAM: -- it's gone.

THE COURT: Well, how would you -- so since we're on it, I guess, assume we are in a world in which I agree that they've shown -- which is not, you know -- it may even be beyond Sherrill, I think, is what you're suggesting. But let's say we're in a world where I believe they have shown a First Amendment injury either through the due process claim or through their First Amendment claim. Why don't those -- you said -- you called it an aphorism, but it's also a bunch of, you know -- there are also cases --

MR. BURNHAM: Case law --

THE COURT: -- that I have to apply --

MR. BURNHAM: I didn't mean to --

THE COURT: -- right, exactly -- on the law and, in some circumstances, binding on me.

MR. BURNHAM: Right.

THE COURT: Distinguish those cases for me here.

MR. BURNHAM: Yeah. So I think there's -- I have, sort of, three levels to that.

The first -- the cases they cite, the actual -- one of which is a -- involves CNN, the Cable News Network v. American Broadcasting case from Georgia, you know? We talked about this in our brief. That was a case where the -- they were going to exclude completely television media, and so the harm was much more acute from the exclusion because there would be no video recordings. Nobody would be able to see the event. It wasn't a single reporter like this.

The other case they cite which is a 1977 Second Circuit case, American Broadcasting Companies v. Cuomo, involved the total exclusion of ABC from election night activities. And that was, of course, at a time when most Americans only -- there were only, you know, three networks --

THE COURT: Yes.

MR. BURNHAM: -- and so the court makes the point that some viewers may only get ABC and that's going to

deprive them of any coverage whatsoever of this important thing. So that's the cases.

On the principle, I think the equitable -- all these standards, sort of, hang together and it's an equitable determination. So I, you know -- I don't dispute that if Your Honor finds a First Amendment violation, there are cases that say that is, generally speaking, irreparable harm. What I'm saying, I think, is, you know, that's something we can talk about more at the preliminary injunction stage. I just think it's worth it noting that in this highly equitable role we're in of a TRO, all we're talking about, as I understand it, is the presumed harm that flows from First Amendment violations. There's not something more specific and more specific to Mr. Acosta that is going to happen. As for CNN --

THE COURT: Correct.

MR. BURNHAM: -- I don't think there's --

THE COURT: Yeah.

MR. BURNHAM: -- any harm at all because they have 50 other employees who have access to the grounds at least, including other employees from other outlets that have moved to CNN and have hard passes from the old outlets. So I think the harm to the network is very small. I mean, their cameras are still in there and --

THE COURT: No, I -- look, I think these cases are

difficult in many cases because, as you know --

MR. BURNHAM: Right.

THE COURT: -- the harm can, you know -- but the courts have said it in many instances that it's per se irreparable, even though I think you might look at it and say, Gee, it's hard to quantify --

MR. BURNHAM: No, certainly, Your Honor. And the only other point I would make on this is that the First Amendment harm to Mr. Acosta is a very narrow form of First Amendment harm. Just to go back, if I could, to what we were talking about before --

THE COURT: Yeah.

MR. BURNHAM: -- there's a few things, I think, we've agreed on; that Mr. Acosta -- the President never has to speak to Mr. Acosta again. He has no First Amendment right to that. Whether the President would actually do that, I don't know, but there's no First Amendment scrutiny of that. The President never has to give an interview to Mr. Acosta. And the President never has to call on Mr. Acosta at a press conference. So the First Amendment injury, I guess, is Mr. Acosta's ability to be in a room where he has no right to speak -- I -- because I think they said -- I think Mr. Boutrous said you could turn off his microphone. So he has no right to say anything. He has no right to elicit any information directly. I -- so it just

seems to me like an odd First Amendment injury that all we're talking about is the right to, you know, be a spectator in the gallery at an event where he's not engaging in any expressive conduct at all. And, by the way, the vast majority of these events -- in fact, all of the events, I suspect, where he would have a right of access as a hard pass holder -- are televised live. So he could watch all of them on CNN and then report on it just as effectively as he could if he was physically in the room.

THE COURT: And I think that distinguishes a number of the cases --

MR. BURNHAM: Right.

THE COURT: -- that both parties have -- keep going.

MR. BURNHAM: Okay. So I'll be very brief.

On the balance of the equities, I think we've talked about their cases. I just want to talk a second about the chilling effect. I don't think the plaintiffs have offered anything that credibly shows the rest of the White House press corps is, sort of, hiding under their desks and afraid to ask the President tough questions because of what happened with Mr. Acosta. I suspect -- I have not watched the footage over the weekend of all the press events since this happened. I suspect nothing has changed and that they are continuing to be tenacious

questioners of the President and his staff, and so I find it a little -- I don't think they have carried their burden of showing that the rest of the press corps has been chilled or will be chilled by this revocation.

THE COURT: I mean, in fairness to them, it's often hard to have hard evidence of chilling. It's, sort of, a -- it's an argument based on, sort of, logic; right?

MR. BURNHAM: Well, that's true, Your Honor, except that they do have the burden of proof, and so they --

THE COURT: Yeah, I'm not saying they've met their burden. I'm just saying it's --

MR. BURNHAM: Right, but I think there's judicially-noticeable evidence that the chill has not -- is not -- there's no chill --

THE COURT: Okay.

MR. BURNHAM: -- and that the rest of the White House press corps continues to do its job as aggressively and professionally as it did, you know, before November 7th.

And then, finally, I just -- I want to focus for just a second on what the plaintiffs are asking for. So they asked for more process which, I think, as we've talked about, is -- all Sherrill would entitle them to, even if they prevail, is just more process at the White House.

The other request that the Court reinstate Mr. Acosta's hard pass, you know, that is a really -- an

unprecedented and intrusive form of relief. I mean, what that -- what they're seeking, as I understand it, in that request is an immediate decree ordering the President to grant access to facilities in his official residence where he lives and his personal office suite just down the way to a specific person that he has decided himself needs to be excluded from the complex. I am not aware of any precedent for that sort of judicial relief and I think that, at this stage, you know, that is something the Court needs to weigh pretty heavily and that weighs heavily in favor of the Government in the, sort of, balancing of the equities.

THE COURT: Do I have to order the President to do it?

MR. BURNHAM: Sorry. I'm not making -- no, Your Honor. I don't think so.

THE COURT: I mean, I could --

MR. BURNHAM: I think it would -- I think --

THE COURT: I could simply order --

MR. BURNHAM: The Secret Service --

THE COURT: Again, we're getting ahead. I mean, I --

MR. BURNHAM: Right.

THE COURT: This is assuming I'm in that place, but --

MR. BURNHAM: Right.

THE COURT: -- I think the case law suggests that I can -- I could order, you know -- if the decisionmaker was Ms. Sanders, I can order her to --

MR. BURNHAM: So I don't mean to --

THE COURT: I wouldn't have to --

MR. BURNHAM: -- invoke the cases about --

THE COURT: Okay.

MR. BURNHAM: -- whether you can --

THE COURT: Okay.

MR. BURNHAM: -- direct the President.

THE COURT: Just as a --

MR. BURNHAM: I just mean that as --

THE COURT: -- prudential matter.

MR. BURNHAM: -- a practical matter --

THE COURT: Yeah. Okay.

MR. BURNHAM: -- what Your Honor would be doing is --

THE COURT: Yeah.

MR. BURNHAM: -- essentially, countermanding the President's directive about -- of -- concerning who can come into his personal space.

THE COURT: Yes.

MR. BURNHAM: And I think that is pretty extraordinary, particularly where the public interest is fully served by the other 50 employees of CNN who retain

their hard passes and all the other reporters who have access to the complex. I mean, the public interest and Mr. Acosta's reporting specifically, I don't -- I mean, I don't think is enough to outweigh what I just described, and they certainly haven't provided any cases that suggest the public interest in some specific reporter being present in the facility is high. The cases they cite, as we've talked about, are much more categorical cases.

So with that, Your Honor --

THE COURT: A couple of just quick, sort of, cleanups.

I think I covered this with the plaintiffs and somehow, we were about there and then didn't get to it. Just to clean this up for the record, so I take it your all -- your position is that the -- that the Government's explanation for this did not shift over time -- or I think you -- what you said -- you characterized it as if there are, you know -- there were two explanations and one was -- is no longer operable, but that that same initial one is still consistent; is that --

MR. BURNHAM: Yes, that's right.

THE COURT: I just --

MR. BURNHAM: They've been consistent --

THE COURT: I don't want to mischaracterize --

MR. BURNHAM: -- on the operative rationale which

is the rationale that is in yesterday's statement.

THE COURT: And so there's no occasion for me to, sort of -- I don't know -- you know, construe that against the Government in some way as pretextual, given that there was one consistent reason?

MR. BURNHAM: No. I mean, the -- with the -- as for the President -- I mean, it's contemporaneous. It's happening in --

THE COURT: Right.

MR. BURNHAM: -- real time.

THE COURT: Yep.

MR. BURNHAM: It's very hard for me to believe that the President was so conniving that he anticipated the First Amendment lawsuit and, in real time, articulated a viewpoint-neutral basis that was sufficient under Sherrill to deny the hard pass that evening. I mean, I just, you know -- I think the record is pretty -- does not carry the day for them --

THE COURT: Okay.

MR. BURNHAM: -- and it is, of course, their burden.

THE COURT: Okay. Okay. I'm out of questions.

MR. BURNHAM: Thank you, Your Honor.

THE COURT: Thank you.

Mr. Boutrous, any responses? Rebuttal?

MR. BOUTROUS: Yes, Your Honor. I have a number.

First, the Government has just articulated a fundamentally warped view of due process; of the First Amendment; and of journalism and what journalism is all about. Different reporters break different stories. This notion that it's some minor thing to be in the White House; to be at a gaggle, we talk about this in the declarations. And to work your sources in the White House; to go talk to the government officials who are there, that is invaluable access. Our -- we have evidence. They have no evidence. Counsel has just -- again, that's a version of journalism I've never heard. But in Mr. Feist's declaration, Paragraph 4, he talks about Mr. Acosta's unique capabilities; his long-established sources. There's no doctrine -- First Amendment doctrine that, if there are a bunch of other reporters, you can bar someone else and it's not a violation of the First Amendment rights of that individual.

Secondly, there is a case that says barring one reporter, even though there are other people in the White House -- I think you know what I'm going to say. It's Sherrill. It literally says exactly the opposite of what Mr. Burnham just said. It says there's an interest to ensure that no one reporter is excluded and it's the public's interest to make sure. Maybe that's the reporter who would break the story wide open because of their

sources. And not everything is televised. The notion that, Well, he can just watch it on TV, that's not how reporters break stories. So it's just simply a fundamental misconception of journalism. And the President does not have the right to choose who CNN sends to the White House and chooses who their chief -- the chief correspondent is. That's a discretionary editorial discretion.

And I think counsel suggests that you would be countermanding the President. You're a coequal branch. You're allowed to review what the President does. And under their argument, the President's above the First Amendment. If a due process violation is committed; if someone's property is taken without notice or opportunity to be heard, as long as President Trump says it's okay after the fact and ratifies it, then it's okay. That's not due process.

The other stunning thing, Your Honor, is they don't know who made the decision. I think the due process clause, if it holds anything, is if the Government can't explain who made the decision to take away someone's property and their liberty, that's not due process. And counsel didn't even state the right day. Ms. Sanders made the decision, supposedly, if she -- we don't know if she made the decision -- on Wednesday night and she -- her overriding smear was false, and that is a pretext. And that, you should consider everything counsel just said, and

there's no evidence in the record from the Government with that in mind.

Counsel also talked about the standards and he admitted, there are no standards. And the due -- the essence of due process means that you know the rules in advance. And when we're talking about the First Amendment, vagueness concerns are at their apex. And so here, I -- counsel said there were no standards, but he -- he just declared that the standard is if the President decides someone's disorderly. That's a new standard. I've never heard that. And if it were the standard, it -- there would be a whole new regime.

THE COURT: Well, this is a unique circumstance, also; fair to say? It may be a new -- it may be a unique standard. It's a -- I mean, this is a unique circumstance.

MR. BOUTROUS: It's -- but it's certainly not -- it's unique because no President has ever disregarded the First Amendment and the procedural process and no -- the Justice Department has never argued that this is due -- something like this is due process.

And, Your Honor, on standards, here's what Sherrill says. First of all, I posed the question after all of that, what are the rules and what are the standards? It's anything the President says after the fact to try to justify taking away someone's liberty and property. That's

not a due process standard. That's not the kind of precise standards that are meant to guide. That's standardless discretion.

THE COURT: What should I make of the fact that -- counsel's point that, in Sherrill, the court was reluctant -- or reluctant may not be -- but had -- I believe the phrase was, like, Had no occasion to address the merits of the underlying decision.

MR. BOUTROUS: Yeah, in that case, Your Honor, they -- the way it was litigated, it was just -- came to the court and they were focused solely on the question of whether there were procedures. Counsel is absolutely wrong. And he urged you to read Sherrill again, and I know you've already read it several times. I urge you to read it again. There was no basis to -- there's no basis who says that there was some agreement that Mr. -- that they -- that -- all he did was pass the same things -- the standards of having a residence, you know -- I mean, or living near Washington and those things.

THE COURT: Well, okay. But isn't the fundamental point that the hang-up was the Secret Service --

MR. BOUTROUS: Yes.

THE COURT: -- /security concerns? I mean --

MR. BOUTROUS: And this goes to your point, Your Honor. The reason -- that's a higher degree, a threat to

safety. Counsel have -- there's no threat to the President's safety. There's a threat to him not being questioned aggressively by a particular reporter. That's what the case is all about. And the court specifically said, kind of, what you were suggesting; that there's a degree of deference when we're talking about threats to the President's safety. None of that is here. So the arguments are much stronger. And on the property right, the -- they didn't make a property right deprivation argument. And counsel -- the Government loves Footnote 22. It says there's a strong argument that there was a property right there where he didn't even have the pass. Mr. Acosta has had it for five years.

The other point, again, on -- in terms of -- put aside viewpoint or motive. There's a separate First Amendment argument under Sherrill -- or claim under Sherrill and Fifth Amendment due process that comes right from Sherrill. Irrespective of viewpoint or anything else, Sherrill unquestionably requires, and I quote -- says that, quote, Failure to articulate and publish an explicit and meaningful standard governing denial of White House press passes for -- and to afford procedural protections to those denied passes violates the Fifth and First Amendments. It couldn't be clearer. The -- and, as the Court pointed out, the Fourth Circuit's Ehrlich decision is from a different

circuit. It's completely distinguishable. It wasn't a public forum where the White -- where a government -- here, it's the White House. It hasn't -- the rule isn't that no one can go in the White House unless President Trump says so. The rules don't change because of the President's personality or characteristics.

THE COURT: Well, neither party has briefed it, but I don't know that the White House is a wholly -- I, you know -- we haven't looked at it, but I'm not sure that it's a public forum and --

MR. BOUTROUS: It's not --

THE COURT: -- a wholly public forum.

MR. BOUTROUS: -- generally, but it's a limited public forum -- and this is what Sherrill stands for -- because it has been opened up; because reporters can roam certain areas and talk -- and it -- and, as I said, this is a highly valuable thing for our government and for the American people. The Government's now taking the position the President can do anything he wants; absolute discretion to thwart particular journalists. That violates the First Amendment. And on the -- without standards, there's no notice of what will guide you.

And, again, so just to divert quickly -- and I know you've been very generous with your time, Your Honor. I just had a few other points I wanted to make.

One, on this question of whether Mr. Acosta has been targeted, let me just read you from -- this is Exhibit-14. This is a tweet from the President of the United States, January 2018. Even crazy Jim Acosta of fake news agrees -- fake news CNN agrees, and then he goes on to say, Thank you for your honesty. He's given the reporter a derogatory name and then we have all the other pieces of evidence.

THE COURT: I mean, but in fairness, you know, he gave him a derogatory name 8 months ago, 10 months ago, whatever it is. So again, I -- the factual -- the connection between a tweet like that and what happened the other day is not as tight as it would be if you had a stronger case.

MR. BOUTROUS: But it's extremely powerful, Your Honor, that we have, over and over, attacks on CNN, the network, which has its own independent First Amendment rights. Calling it the -- CNN and Mr. Acosta the enemy of the people in the East Room of the White House is a pretty direct connection, nothing we -- like that that we've ever seen. And the Court asked about -- counsel was talking about other reporters. It's nice that the White House today -- yesterday, in their statement, suggested that Ms. Sanders, if she was, in fact, the decisionmaker -- we don't know -- barred Mr. Acosta because she was trying to help the

other reporters at the press conference. That doesn't deserve any credit from this Court. In fact, the reporters have come out in overwhelming support. The -- Fox News -- basically every major news organization have put out statements. There's the amicus brief. And Mr. Alexander -- Peter Alexander from NBC News, you'll remember from the tape, he was the next reporter up. He stood up for Mr. Acosta and said he's a hardworking reporter. They -- the reporters in the White House would tell you that that's another pretext. They -- the White House was not trying to protect the ability of other reporters to ask questions. And --

THE COURT: So it is very clear on the tape that the President is trying to move to the next questioner. I don't know how there's, you know -- I don't know how -- you can't dispute that; fair?

MR. BOUTROUS: I totally --

THE COURT: All right.

MR. BOUTROUS: -- don't dispute that --

THE COURT: Okay.

MR. BOUTROUS: -- and that happens all the time. It happened about 10 times during that press conference. He wants to move to the next question; avoid the question; give his own point of view; cut people off; and, as I said, I'm not even being critical. That's the robust, vehement,

caustic debate that the Supreme Court's talked about. The First Amendment is all about disrupting government officials. And it may be unpleasant, and the Supreme Court has said that. That's what it's about. And here, the question is the process -- the First Amendment right of access which Sherrill says exists. The Ehrlich case was a -- was not that circumstance. It was about the daily interactions -- I don't want to talk to you -- totally different. So even the Fourth Circuit doesn't apply.

And I had one more exhibit, Your Honor. I don't want to take any more time. I had, maybe, one other point, but new Exhibit-55 that I'd like to enter into the record.

THE COURT: It will be entered.

MR. BOUTROUS: Thank you.

(Brief pause.)

This goes to the -- Your Honor, the bigger picture because this emphasis on, Well, there are all these other reporters and it's all to help the other reporters. This is the tweet I mentioned earlier from the President of the United States, May 2018, May 9. The President declared -- and it was a few months ago, but it's only gotten worse. This is the quote from the President: The fake news is working overtime; just reported that, despite tremendous success we are having with the economy and all things else, 91 percent of the network news about me is negative,

parentheses, fake, close parentheses. Why do we work so hard in working with the media when it is corrupt? Take away credentials? And then he said the same thing on -- or he suggested the same thing on November 8 that, More to come. And if that's not chilling; if that's not -- doesn't implicate First Amendment rights, I don't know what is.

And so Your Honor, what we're asking for, the Court does not need to order the President to do anything. We're asking for a simple order that temporarily returns us to the status quo. Mr. Acosta can do his job, and we'll come back in a couple of weeks and go to the preliminary injunction.

THE COURT: All right.

MR. BOUTROUS: Thank you very much.

THE COURT: All right. Thank you, Mr. Boutrous.

Mr. Burnham, do you have any response to that? I will indulge you at my peril to give a rebuttal to a rebuttal.

MR. BURNHAM: Your Honor, unless the Court has further questions, I think we're good. I would just note that the tweet was from May --

THE COURT: Yes.

MR. BURNHAM: -- seven months ago.

THE COURT: I did note that.

MR. BURNHAM: Yes, Your Honor.

THE COURT: All right. What I would like to do is take this under advisement and come back tomorrow and give you a decision. Are counsel available -- I do have a packed morning of other matters. So my thought was to come back at 3:00 o'clock; is that -- are counsel available at that time?

MR. BOUTROUS: Absolutely, Your Honor.

MR. BURNHAM: Yes, Your Honor.

THE COURT: All right, then. That's what we'll do. I will see everyone tomorrow at 3:00 o'clock. Counsel are dismissed.

MR. BURNHAM: Thank you, Your Honor.

THE DEPUTY CLERK: All rise. This Honorable Court is adjourned.

(Proceedings concluded at 5:33 p.m.)

* * * * * * * * * * * * *

**CERTIFICATE OF OFFICIAL COURT REPORTER**

**I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability, dated this 15th day of November 2018.**

**/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
**Official Court Reporter**
**United States Courthouse**
**Room 6722**
**333 Constitution Avenue, NW**
**Washington, DC 20001**