IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - x

CABLE NEWS NETWORK, INC., et al., CA No. 1:18-cv-02610-TJK


                Plaintiffs,          Washington, D.C.
v.                                   Friday, November 16, 2018
                                     10:00 a.m.


DONALD J. TRUMP, et al.,


                Defendants.

- - - - - - - - - - - - - - - - - - x

_____
                TRANSCRIPT OF MOTION HEARING
        HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiffs:        Theodore J. Boutrous, Jr., Esq.
                           Joshua S. Lipshutz, Esq.
                           Anne M. Champion, Esq.
                           GIBSON, DUNN & CRUTCHER LLP
                           333 South Grand Avenue
                           Los Angeles, CA 90071
                           (213) 229-7804


For the Defendants:        James M. Burnham, Esq.
                           Michael H. Baer, Esq.
                           Eric R. Womack, Esq.
                           Joseph E. Borson, Esq.
                           U.S. DEPARTMENT OF JUSTICE
                           Civil Division
                           950 Pennsylvania Avenue, NW
                           Washington, DC 20530
                           (202) 353-5049


Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111



Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1              **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Your Honor, this is civil

3    matter 18-2610, Cable News Network, Incorporated, et al., v.

4    Donald J. Trump, et al.

5              Will counsel please approach the lectern and state

6    your appearance for the record.

7              MR. BOUTROUS:  Good morning, Your Honor.  Theodore

8    Boutrous for Plaintiffs CNN and Jim Acosta.

9              THE COURT:  Good morning, sir.

10             MS. CHAMPION:  Good morning, Your Honor.  Anne

11   Champion from Gibson Dunn for Plaintiffs CNN and Jim Acosta.

12             MR. LIPSHUTZ:  Good morning, Your Honor.  Joshua

13   Lipshutz from Gibson Dunn for Plaintiffs CNN and Jim Acosta.

14             THE COURT:  Good morning.

15             MR. BURNHAM:  Good morning, Your Honor.  James

16   Burnham here on behalf of the defendants, along with Michael

17   Baer, Eric Womack and Joseph Borson.

18             THE COURT:  All right.  Good morning to you all.

19             We are here for an oral ruling on the plaintiffs'

20   application for a temporary restraining order.

21             And I'd better get some water right away here.

22             (Brief pause.)

23             On November 7th, 2018, President Trump held a news

24   conference at the White House.  Soon after it started, he

25   called on Plaintiff Acosta, a reporter for CNN, to take a

1    question from him.  After Mr. Acosta asked several questions

2    about the caravan of migrants heading to the U.S.-Mexican

3    border, the President indicated that he wanted to move on to

4    call on another reporter but Mr. Acosta would not be seated

5    and continued trying to ask his question and then he would

6    not give up the microphone, even when approached by an

7    intern employed by the White House Press Office who

8    attempted to retrieve it from him.  The President made

9    several comments toward Mr. Acosta while this happened,

10   including, You are a rude, terrible person, and, When you

11   report fake news which CNN does a lot, you are an enemy of

12   the people.  Eventually, Mr. Acosta did relinquish the

13   microphone.

14            That night, his Secret -- the Secret Service asked

15   Mr. Acosta to relinquish his hard pass, his credential that

16   allows him access to the White House press facilities.  That

17   same evening, the White House Press Secretary, Sarah

18   Sanders, posted a video on Twitter purporting to show the

19   exchange between Mr. Acosta, the intern and the President.

20   In a tweet, Ms. Sanders cited the conduct in the video as

21   the reason that Mr. Acosta's hard pass had been revoked.  In

22   a tweet, she characterized Mr. Acosta as placing her hand --

23   his hands on the intern and she also asserted that Mr.

24   Acosta had been disrespectful to his colleagues to not allow

25   them to -- the opportunity to answer a question.

1          The next day, on November 8th, CNN sent a letter

2     to the White House requesting that Ms. -- the reporter's

3     credentials be reinstated immediately.  CNN alleged that the

4     White House simply did not like the content of the questions

5     posed to the President and threatened to take legal action

6     if the revocation was not reversed.

7          The next day, on November 9th, the President

8     suggested that other reporters might have their credentials

9     revoked and that reporters must treat the White House with

10     respect and treat the presidency with respect and he also

11     conceded that Mr. Acosta's -- but he also conceded that Mr.

12     Acosta's conduct toward the Press Office intern had not been

13     overly horrible.

14          Then the long holiday weekend intervened.  And on

15     the morning of Tuesday, November 13th, CNN and Mr. Acosta

16     filed this lawsuit and moved for a temporary restraining

17     order.

18          That morning, after -- the same morning, after the

19     suit was filed, Ms. Sanders issued a written statement

20     setting forth reasons for the revocation of Ms. -- Mr.

21     Acosta's hard pass.  It read:  We have been advised that CNN

22     has filed a complaint challenging the suspension of Jim

23     Acosta's hard pass.  This is just more grandstanding from

24     CNN and we will vigorously defend against this lawsuit.

25     CNN, who has nearly 50 additional hard pass holders, and Mr.

1    Acosta is no more or less special than any other media

2    outlet or reporter with respect to the First Amendment.

3    After Mr. Acosta asked the President two questions, each of

4    which the President answered, he physically refused to

5    surrender a White House microphone to an intern so that

6    other reporters might ask their questions.  This was not the

7    first time this reporter had -- has inappropriately refused

8    to yield to other reporters.  The White House cannot run an

9    orderly and fair press conference when a reporter acts this

10   way which is neither appropriate nor professional.  The

11   First Amendment is not served when a single reporter, of

12   more than 150 present, attempts to monopolize the floor.  If

13   there is no check on this type of behavior, it impedes the

14   ability of the President, the White House staff and members

15   of the media to conduct business.

16          To obtain a temporary restraining order, the

17   plaintiffs must clearly demonstrate, one, a likelihood of

18   success on the merits of their claim; two, a likely

19   irreparable harm in the absence of preliminary relief;

20   three, a balance of the -- that the balance of the equities

21   is in their favor; and, four, that the TRO is in the public

22   interest.  And where the Government is the party opposing

23   the TRO, the Court merges the latter two factors into a

24   single inquiry.

25          Much of our discussion at the hearing the other

1      day concerned the applicability or inapplicability of the

2      D.C. Circuit case Sherrill v. Knight.  I'm going to first

3      talk about the likelihood of success of [sic] the merits

4      with regard to the plaintiffs' Fifth Amendment due process

5      claim.

6              Much of our discussion at the hearing concerned

7      the applicability of Sherrill v. Knight.  I've read the case

8      closely and I think it's fair to conclude, as the Government

9      argued, that there are at least some portions of it that

10     plaintiffs would rely on that are fairly characterized as

11     dicta, but if Sherrill stands for anything at all, I think

12     it's unavoidable to conclude that it -- to conclude anything

13     other than it stands for the Fifth Amendment's due process

14     clause protects a reporter's First Amendment liberty

15     interest in a White House press pass.  Whether that's a

16     holding I agree with or not is another thing, but that is

17     not relevant.  The case has not been abrogated and, as a

18     district judge, I must apply the precedent of this circuit

19     as I see it.

20             So let me quote from Sherrill.  Quote, In our

21     view, the procedural requirements of notice and the factual

22     basis for denial and opportunity for the applicant to

23     respond to these and a final written statement of the

24     reasons for denial are compelled by the foregoing

25     determination that the interest of a bona fide Washington

1    correspondent in obtaining a White House press pass is

2    protected by the First Amendment.  This First Amendment

3    interest undoubtedly qualifies as liberty which may not be

4    denied without due process of law under the Fifth Amendment.

5              A few more words about Sherrill before I move on.

6              The Government argued that the holding of Sherrill

7    is limited to Secret Service restrictions based on security

8    concerns, and the Government points out there's nothing in

9    the record here that the security of the President or the

10   White House is at issue, but Sherrill, as I read it,

11   provides no reason why the court's recognition of a First

12   Amendment interest in a press pass -- in a White House press

13   pass would turn on whether that decision to limit that

14   interest was made by the White House Press Office or the

15   Secret Service or any other part of the executive branch,

16   and the case suggests no reason to me why the due process

17   required to deny someone a pass would turn on a specific

18   component of the executive branch that made that decision.

19   The court was very clear that the basis of this interest was

20   rooted in the First Amendment and not the decision of any

21   part of the executive branch to agree that Sherrill should

22   be granted the press pass.

23             The Government also made the point that there is

24   case law for the proposition that the public doesn't have a

25   general First Amendment right to enter the White House

1    grounds.  I have no quarrel with that at all, but Sherrill

2    holds that once the White House opens a portion of it up to

3    reporters for their use, some kind of First Amendment

4    liberty interest protected by a due process right is

5    created, and I simply have no choice but to apply that

6    precedent here.

7         The Government also argued that some of the

8    factual underpinnings of Sherrill had changed and that

9    today, the White House routinely exercises discretion in

10   different ways, giving out hard passes to certain

11   journalists aside from whatever review the Secret Service

12   undertakes for security purposes.  I can see how that might

13   be relevant in examining the nature of whatever liberty

14   interest Sherrill holds is at stake here, but even assuming

15   that was a distinction that would make a difference in terms

16   of how I apply Sherrill, I don't have any evidence in the

17   record here; I don't have any declarations or sworn

18   statements that explain how that factual landscape has

19   shifted since Sherrill was decided.

20        And, finally, the Government makes the point that

21   the First Amendment does not restrict the ability of the

22   President to dictate the terms of how he chooses to engage

23   or not engage with any particular journalist.  That seems

24   entirely correct to me, but nothing in the holding of

25   Sherrill relating to the Fifth Amendment due process right

1    it recognized contradicts that.  In fact, Sherrill

2    explicitly recognizes the President's right to engage with

3    whomever he pleases.  Certainly, he need not ever call on

4    Mr. Acosta again.  But under Sherrill, as I read it, the

5    government must provide Mr. Acosta due process if it is to

6    revoke his hard pass.  Accordingly, the likelihood that the

7    plaintiffs succeed on the First -- on the Fifth Amendment

8    claim hinges on whether the government provided adequate due

9    process to Mr. Acosta.  The court in Sherrill held that this

10   process must include notice, an opportunity to rebut the

11   government's reasons and a written decision.  And all the

12   court -- although the court in Sherrill did not have

13   occasion to address it, when an important interest is at

14   stake and when the government is able to provide this

15   process before deprivation, it generally must do so.  There

16   is no evidence that one of the few exceptions to this rule

17   would apply here such as some kind of emergency.  So I do

18   hold that plaintiffs have demonstrated a likelihood of

19   success on their claim that adequate process was not

20   provided to Mr. Acosta.  Indeed, whatever process occurred

21   within the government is still so shrouded in mystery that

22   the Government could not tell me at oral argument who made

23   the initial decision to revoke Mr. Acosta's press pass --

24   his hard pass.

25             On the notice, as for notice, the Government

1     points to only one statement that could possibly constitute

2     prior notice to Mr. Acosta that his pass would be revoked,

3     the President's statements to him during the exchange at the

4     press conference on November 7th, but the President's

5     statements did not revoke -- did not reference Mr. Acosta's

6     hard pass at all, let alone that it would be revoked;

7     therefore, that statement cannot have put him on notice of

8     the government's intention to revoke it.

9          Now, it is true that the public and Mr. Acosta

10     were eventually provided two things.  First, explanations as

11     to why his hard pass was revoked through Ms. Sanders's

12     tweets; and a written statement of explanation, apparently

13     prompted by this litigation, but given their timing and

14     their lack of connection to Mr. Acosta's opportunity to

15     rebut -- which we'll talk about in a moment -- these belated

16     efforts were hardly sufficient to satisfy due process.

17          As for Mr. Acosta's opportunity to be heard in

18     rebuttal, the Government points to the letter CNN sent to

19     the White House the day after his hard pass was revoked, but

20     this does not reflect a meaningful opportunity to rebut the

21     government's reasons for the revocation or to challenge the

22     appropriateness of the government's action.  Indeed, anyone

23     can avail themselves of the mail, and there's nothing in the

24     record that demonstrates that whoever the decisionmaker --

25     the initial decisionmaker was in this case read or

1    considered the letter.  And, of course, the letter was sent

2    after the revocation, not beforehand.  The need for the

3    opportunity to be heard seems especially important in this

4    case when the record strongly suggests that one of the

5    initial specific reasons for the revocation cited by the

6    government -- that Mr. Acosta laid his hands on the White

7    House intern -- was likely untrue and was at least partly

8    based on evidence that was of questionable accuracy.

9         At oral argument, the Government made the point

10   that more process would not have helped here because the

11   ultimate decisionmaker -- I believe, is how the Government

12   referred to the President -- at a minimum, ratified this

13   action.  Maybe that's so, but on the record before me which,

14   at this point, is devoid of evidence concerning who, in the

15   government, first reached this decision; how they reached

16   the decision; whether they considered CNN's letter or

17   whether they considered potential other responses by the

18   government, I simply cannot assume that that would be so.

19        So in light of all the above, I find that the

20   plaintiffs are likely to succeed on the merits of their

21   Fifth Amendment due process claim.

22        I'll now talk about irreparable harm with regard

23   to that claim.

24        The plaintiffs also must demonstrate that

25   irreparable harm will result in the absence of preliminary

1    relief.  That harm must be both certain and great, and it

2    must be actual and not theoretical.  Here, harm to Mr.

3    Acosta has already occurred.  As already explained, he's

4    demonstrated a likelihood of success on the merits of his

5    claim that his Fifth Amendment due process rights were

6    violated such that his liberty interests were deprived;

7    therefore, I don't need to speculate or theorize as to

8    whether harm will occur absent preliminary relief, but for

9    plaintiffs to satisfy their burden, the harm must be

10   irreparable.  Constitutional injuries are often considered

11   irreparable due to their very nature.  Indeed, the D.C.

12   Circuit has held that, quote, Suits for declaratory and

13   injunctive relief against the threatened invasion of a

14   constitutional right do not ordinarily require proof of any

15   injury other than the threatened constitutional deprivation

16   itself, closed quote.

17           On the other hand, procedural due process injuries

18   do not necessarily cause irreparable harm when, for example,

19   the thing that is deprived is tangible property, because the

20   due process violation that led to that injury might be

21   reparable with money damages.  Here, the procedural due

22   process violation at issue that has led to the deprivation

23   -- to a deprivation of what Sherrill requires me to

24   recognize as a liberty interest as opposed to a property

25   interest that's grounded in, quote, The First Amendment

1    guarantee of freedom of the press, closed quote.

2            Moreover, the First Amendment interests, as

3    recognized in Sherrill, were not vested merely in

4    publications or agencies.  They were liberties of the

5    individual journalists themselves.  For that reason, that

6    CNN may still send another journalist or other journalist to

7    the White House does not make the harm to Mr. Acosta any

8    less irreparable.  Each day that he is deprived of that

9    interest without the process prescribed by the court in

10   Sherrill, he suffers a harm that cannot be remedied in

11   retrospect.  The Court cannot restore his access to press

12   briefings that have already occurred or to conversations in

13   the White House press facilities that have already been had.

14           And so on this highly, highly unusual set of facts

15   and interests at stake, I do find that the plaintiffs have

16   met their burden of establishing that irreparable harm has

17   and will continue to occur in the absence of preliminary

18   relief.

19           The next factors are the balance of the equities

20   and the public interests.

21           In balancing the equities at stake, I find that

22   the harm to Mr. Acosta from sustaining an ongoing violation

23   of his Fifth Amendment due process rights outweighs the

24   government's interest in orderly, respectful press

25   conferences.  This is especially so because the government

1    can serve its stated interest in other ways during this

2    litigation or perhaps until it is back before me arguing

3    that their due process obligations had been fulfilled.

4    Obviously, the balance of the equities would not likely have

5    come out this way if Mr. Acosta had been excluded for safety

6    or security reasons, in which case, my deference to the

7    executive equities would be far, far higher.  But even in

8    this circumstance, I don't take lightly the executive

9    branch's weighty general interest in control of its White

10   House press facility, but the balance here is tipped by the

11   fact that Sherrill obligates me to recognize the violation

12   of Mr. Acosta's due process rights and the resulting impact

13   on his First Amendment interests.  So in finding -- also, in

14   finding that these factors favor the plaintiffs, I have also

15   considered case law that suggests that constitutional

16   violations are always contrary to the public's interest.

17          So because the plaintiffs have shown a likelihood

18   that the government has violated Mr. Acosta's Fifth

19   Amendment rights under Sherrill, because the type of injury

20   he has suffered is irreparable and because the public

21   interest in the balance of equities favor granting a

22   temporary restraining order, I will grant the application

23   for a -- for the temporary restraining order here.  I will

24   order the defendants immediately restore Mr. Acosta's hard

25   pass until further order of the Court or the restraining

1    order expires.  And if, at some point after restoring the

2    hard pass, the Government would like to move to vacate the

3    restraining order on the grounds that it has fulfilled its

4    due process obligations, then it may, of course, do so and I

5    will promptly address that and then the remaining bases for

6    the TRO.

7          I want to emphasize the very limited nature of

8    today's ruling.  In resolving this TRO, I haven't -- because

9    I've found that it must be granted on -- as to the due

10   process claim, I haven't had to reach the plaintiffs' First

11   Amendment claim at all in which they alleged that the

12   government engaged in viewpoint or content discrimination.

13   So I want to make very clear a couple of things.  I have not

14   determined that the First Amendment was violated here; I

15   have not determined what legal standard would apply to the

16   First Amendment claim here; I have not determined the

17   specific nature of the First Amendment interest that

18   Sherrill recognizes -- or that Sherrill at least doesn't

19   describe but recognizes, yes; and I haven't determined what

20   portions of Sherrill, if any, would bind me on those

21   questions.

22          So let me turn to the parties, then, and suggest

23   that as far as procedurally moving forward goes, one -- the

24   avenue I thought of is to give you all some time to consult

25   with your clients; assess your positions; and come back

1    early next week -- perhaps Tuesday afternoon -- to see how

2    you all would like to proceed from here.  I trust the --

3    this litigation will continue in a rapid pace.  Either

4    party?

5              MR. BOUTROUS:  Thank you.  Thank you very much,

6    Your Honor.

7              That sounds like a good process to us.  We can

8    confer.  We may be able to just confer and then report back

9    Monday with the proposal and see if we can work out either a

10   briefing schedule for the preliminary injunction or

11   something else and, if not, we can just come back and see

12   you on Tuesday.

13             THE COURT:  All right.  So your proposal would be

14   a written joint report for the parties --

15             MR. BOUTROUS:  Would that --

16             THE COURT:  -- on Monday?

17             MR. BOUTROUS:  Yeah.  Would that work for the

18   Court?

19             THE COURT:  All right.  That's fine, if that's --

20   but I'd like to hear from Mr. Burnham.

21             MR. BURNHAM:  Your Honor, I'd like to talk to our

22   clients.  That should be okay, but I'd just like to talk to

23   our clients and come up with a proposal before we --

24             THE COURT:  Absolutely.  I mean, we can't have any

25   quicker turnaround than a joint report --

1              MR. BURNHAM:  Right.

2              THE COURT:  -- on Monday.  So --

3              MR. BURNHAM:  Right.

4              THE COURT:  I mean, I --

5              MR. BURNHAM:  The timing certainly works for us.

6    Thank you.

7              THE COURT:  Fair enough.  So I'll get that report.

8    Obviously, if you can agree on something, great; if you

9    can't agree, if you would still submit it jointly but just

10   lay out your respective positions on where we go from here,

11   I'll take that under advisement, and my hope is -- well,

12   depending on what you all agree to, if we need to come back

13   to court next week, even though it's the short week -- the

14   holiday -- I will be available to do that.

15             MR. BURNHAM:  Okay.  Thank you, Your Honor.

16             THE COURT:  All right.

17             MR. BOUTROUS:  We greatly appreciate it, Your

18   Honor.

19             THE COURT:  All right.

20             MR. BOUTROUS:  And then just procedurally, under

21   the TRO, we'll just proceed to get the hard pass back

22   immediately and have it reactivated.  Thank you very much.

23             THE COURT:  Yes.  Is there any other -- anything

24   further -- else from the plaintiffs that you think I need to

25   address today before I turn to Mr. Burnham?

1              MR. BOUTROUS:  I think that's it, Your Honor.

2              THE COURT:  All right.

3              MR. BOUTROUS:  Thank you.

4              THE COURT:  Sir?

5              MR. BURNHAM:  So Your Honor, under the local

6     rules, our opposition to the PI is due on Tuesday.

7              THE COURT:  Okay.

8              MR. BURNHAM:  Would it be okay, given all that's

9     going on, to suspend that deadline until we file our joint

10    status report?

11             THE COURT:  Yeah.  I assume the plaintiffs --

12             MR. BURNHAM:  I assume --

13             THE COURT:  -- would agree to that.

14             MR. BURNHAM:  We haven't spoken about it.

15             THE COURT:  Yes.

16             MR. BOUTROUS:  That's fine with --

17             MR. BURNHAM:  Okay.

18             MR. BOUTROUS:  That's fine with us, Your Honor.

19             THE COURT:  Yeah.  So that deadline certainly will

20    be, you know, held in abeyance --

21             MR. BURNHAM:  Thank you, Your Honor.

22             THE COURT:  -- vacated until I get your report and

23    we'll see where we go from there.

24             MR. BURNHAM:  Thank you, Your Honor.

25             THE COURT:  All right.

1          MR. BOUTROUS:  Thank you.

2          THE COURT:  If there's nothing further, then,

3     counsel's dismissed.

4          THE DEPUTY CLERK:  All rise.  This Honorable Court

5     is adjourned.

6          (Proceedings concluded at 10:28 a.m.)

7               * * * * * * * * * * * *

8          **CERTIFICATE OF OFFICIAL COURT REPORTER**

9     **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

10    **that the above and foregoing constitutes a true and accurate**

11    **transcript of my stenographic notes and is a full, true and**

12    **complete transcript of the proceedings to the best of my**

13    **ability, dated this 16th day of November 2018.**

14                          **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                          **Official Court Reporter**
15                          **United States Courthouse**
                          **Room 6722**
16                          **333 Constitution Avenue, NW**
                          **Washington, DC 20001**

17

18

19

20

21

22

23

24

25