# EXHIBIT 57

```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - x
CABLE NEWS NETWORK, INC., et al.,   CA No. 1:18-cv-02610-TJK


              Plaintiffs,           Washington, D.C.
v.                                  Friday, November 16, 2018
                                    10:00 a.m.

DONALD J. TRUMP, et al.,

              Defendants.
- - - - - - - - - - - - - - - - - x
```

---

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiffs:      Theodore J. Boutrous, Jr., Esq.
                         Joshua S. Lipshutz, Esq.
                         Anne M. Champion, Esq.
                         GIBSON, DUNN & CRUTCHER LLP
                         333 South Grand Avenue
                         Los Angeles, CA 90071
                         (213) 229-7804

For the Defendants:      James M. Burnham, Esq.
                         Michael H. Baer, Esq.
                         Eric R. Womack, Esq.
                         Joseph E. Borson, Esq.
                         U.S. DEPARTMENT OF JUSTICE
                         Civil Division
                         950 Pennsylvania Avenue, NW
                         Washington, DC 20530
                         (202) 353-5049

Court Reporter:          Timothy R. Miller, RPR, CRR, NJ-CCR
                         Official Court Reporter
                         U.S. Courthouse, Room 6722
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3111


Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S
 2              THE DEPUTY CLERK:  Your Honor, this is civil
 3    matter 18-2610, Cable News Network, Incorporated, et al., v.
 4    Donald J. Trump, et al.
 5              Will counsel please approach the lectern and state
 6    your appearance for the record.
 7              MR. BOUTROUS:  Good morning, Your Honor.  Theodore
 8    Boutrous for Plaintiffs CNN and Jim Acosta.
 9              THE COURT:  Good morning, sir.
10              MS. CHAMPION:  Good morning, Your Honor.  Anne
11    Champion from Gibson Dunn for Plaintiffs CNN and Jim Acosta.
12              MR. LIPSHUTZ:  Good morning, Your Honor.  Joshua
13    Lipshutz from Gibson Dunn for Plaintiffs CNN and Jim Acosta.
14              THE COURT:  Good morning.
15              MR. BURNHAM:  Good morning, Your Honor.  James
16    Burnham here on behalf of the defendants, along with Michael
17    Baer, Eric Womack and Joseph Borson.
18              THE COURT:  All right.  Good morning to you all.
19              We are here for an oral ruling on the plaintiffs'
20    application for a temporary restraining order.
21              And I'd better get some water right away here.
22              (Brief pause.)
23              On November 7th, 2018, President Trump held a news
24    conference at the White House.  Soon after it started, he
25    called on Plaintiff Acosta, a reporter for CNN, to take a
```

1  question from him.  After Mr. Acosta asked several questions
2  about the caravan of migrants heading to the U.S.-Mexican
3  border, the President indicated that he wanted to move on to
4  call on another reporter but Mr. Acosta would not be seated
5  and continued trying to ask his question and then he would
6  not give up the microphone, even when approached by an
7  intern employed by the White House Press Office who
8  attempted to retrieve it from him.  The President made
9  several comments toward Mr. Acosta while this happened,
10 including, You are a rude, terrible person, and, When you
11 report fake news which CNN does a lot, you are an enemy of
12 the people.  Eventually, Mr. Acosta did relinquish the
13 microphone.
14          That night, his Secret -- the Secret Service asked
15 Mr. Acosta to relinquish his hard pass, his credential that
16 allows him access to the White House press facilities.  That
17 same evening, the White House Press Secretary, Sarah
18 Sanders, posted a video on Twitter purporting to show the
19 exchange between Mr. Acosta, the intern and the President.
20 In a tweet, Ms. Sanders cited the conduct in the video as
21 the reason that Mr. Acosta's hard pass had been revoked.  In
22 a tweet, she characterized Mr. Acosta as placing her hand --
23 his hands on the intern and she also asserted that Mr.
24 Acosta had been disrespectful to his colleagues to not allow
25 them to -- the opportunity to answer a question.

1              The next day, on November 8th, CNN sent a letter
2     to the White House requesting that Ms. -- the reporter's
3     credentials be reinstated immediately.  CNN alleged that the
4     White House simply did not like the content of the questions
5     posed to the President and threatened to take legal action
6     if the revocation was not reversed.
7              The next day, on November 9th, the President
8     suggested that other reporters might have their credentials
9     revoked and that reporters must treat the White House with
10    respect and treat the presidency with respect and he also
11    conceded that Mr. Acosta's -- but he also conceded that Mr.
12    Acosta's conduct toward the Press Office intern had not been
13    overly horrible.
14             Then the long holiday weekend intervened.  And on
15    the morning of Tuesday, November 13th, CNN and Mr. Acosta
16    filed this lawsuit and moved for a temporary restraining
17    order.
18             That morning, after -- the same morning, after the
19    suit was filed, Ms. Sanders issued a written statement
20    setting forth reasons for the revocation of Ms. -- Mr.
21    Acosta's hard pass.  It read:  We have been advised that CNN
22    has filed a complaint challenging the suspension of Jim
23    Acosta's hard pass.  This is just more grandstanding from
24    CNN and we will vigorously defend against this lawsuit.
25    CNN, who has nearly 50 additional hard pass holders, and Mr.

1   Acosta is no more or less special than any other media
2   outlet or reporter with respect to the First Amendment.
3   After Mr. Acosta asked the President two questions, each of
4   which the President answered, he physically refused to
5   surrender a White House microphone to an intern so that
6   other reporters might ask their questions.  This was not the
7   first time this reporter had -- has inappropriately refused
8   to yield to other reporters.  The White House cannot run an
9   orderly and fair press conference when a reporter acts this
10  way which is neither appropriate nor professional.  The
11  First Amendment is not served when a single reporter, of
12  more than 150 present, attempts to monopolize the floor.  If
13  there is no check on this type of behavior, it impedes the
14  ability of the President, the White House staff and members
15  of the media to conduct business.
16          To obtain a temporary restraining order, the
17  plaintiffs must clearly demonstrate, one, a likelihood of
18  success on the merits of their claim; two, a likely
19  irreparable harm in the absence of preliminary relief;
20  three, a balance of the -- that the balance of the equities
21  is in their favor; and, four, that the TRO is in the public
22  interest.  And where the Government is the party opposing
23  the TRO, the Court merges the latter two factors into a
24  single inquiry.
25          Much of our discussion at the hearing the other

1    day concerned the applicability or inapplicability of the
2    D.C. Circuit case Sherrill v. Knight.  I'm going to first
3    talk about the likelihood of success of [sic] the merits
4    with regard to the plaintiffs' Fifth Amendment due process
5    claim.
6         Much of our discussion at the hearing concerned
7    the applicability of Sherrill v. Knight.  I've read the case
8    closely and I think it's fair to conclude, as the Government
9    argued, that there are at least some portions of it that
10   plaintiffs would rely on that are fairly characterized as
11   dicta, but if Sherrill stands for anything at all, I think
12   it's unavoidable to conclude that it -- to conclude anything
13   other than it stands for the Fifth Amendment's due process
14   clause protects a reporter's First Amendment liberty
15   interest in a White House press pass.  Whether that's a
16   holding I agree with or not is another thing, but that is
17   not relevant.  The case has not been abrogated and, as a
18   district judge, I must apply the precedent of this circuit
19   as I see it.
20        So let me quote from Sherrill.  Quote, In our
21   view, the procedural requirements of notice and the factual
22   basis for denial and opportunity for the applicant to
23   respond to these and a final written statement of the
24   reasons for denial are compelled by the foregoing
25   determination that the interest of a bona fide Washington

1  correspondent in obtaining a White House press pass is
2  protected by the First Amendment.  This First Amendment
3  interest undoubtedly qualifies as liberty which may not be
4  denied without due process of law under the Fifth Amendment.
5         A few more words about Sherrill before I move on.
6         The Government argued that the holding of Sherrill
7  is limited to Secret Service restrictions based on security
8  concerns, and the Government points out there's nothing in
9  the record here that the security of the President or the
10 White House is at issue, but Sherrill, as I read it,
11 provides no reason why the court's recognition of a First
12 Amendment interest in a press pass -- in a White House press
13 pass would turn on whether that decision to limit that
14 interest was made by the White House Press Office or the
15 Secret Service or any other part of the executive branch,
16 and the case suggests no reason to me why the due process
17 required to deny someone a pass would turn on a specific
18 component of the executive branch that made that decision.
19 The court was very clear that the basis of this interest was
20 rooted in the First Amendment and not the decision of any
21 part of the executive branch to agree that Sherrill should
22 be granted the press pass.
23        The Government also made the point that there is
24 case law for the proposition that the public doesn't have a
25 general First Amendment right to enter the White House

1  grounds.  I have no quarrel with that at all, but Sherrill
2  holds that once the White House opens a portion of it up to
3  reporters for their use, some kind of First Amendment
4  liberty interest protected by a due process right is
5  created, and I simply have no choice but to apply that
6  precedent here.
7        The Government also argued that some of the
8  factual underpinnings of Sherrill had changed and that
9  today, the White House routinely exercises discretion in
10 different ways, giving out hard passes to certain
11 journalists aside from whatever review the Secret Service
12 undertakes for security purposes.  I can see how that might
13 be relevant in examining the nature of whatever liberty
14 interest Sherrill holds is at stake here, but even assuming
15 that was a distinction that would make a difference in terms
16 of how I apply Sherrill, I don't have any evidence in the
17 record here; I don't have any declarations or sworn
18 statements that explain how that factual landscape has
19 shifted since Sherrill was decided.
20       And, finally, the Government makes the point that
21 the First Amendment does not restrict the ability of the
22 President to dictate the terms of how he chooses to engage
23 or not engage with any particular journalist.  That seems
24 entirely correct to me, but nothing in the holding of
25 Sherrill relating to the Fifth Amendment due process right

```
 1    it recognized contradicts that.  In fact, Sherrill
 2    explicitly recognizes the President's right to engage with
 3    whomever he pleases.  Certainly, he need not ever call on
 4    Mr. Acosta again.  But under Sherrill, as I read it, the
 5    government must provide Mr. Acosta due process if it is to
 6    revoke his hard pass.  Accordingly, the likelihood that the
 7    plaintiffs succeed on the First -- on the Fifth Amendment
 8    claim hinges on whether the government provided adequate due
 9    process to Mr. Acosta.  The court in Sherrill held that this
10    process must include notice, an opportunity to rebut the
11    government's reasons and a written decision.  And all the
12    court -- although the court in Sherrill did not have
13    occasion to address it, when an important interest is at
14    stake and when the government is able to provide this
15    process before deprivation, it generally must do so.  There
16    is no evidence that one of the few exceptions to this rule
17    would apply here such as some kind of emergency.  So I do
18    hold that plaintiffs have demonstrated a likelihood of
19    success on their claim that adequate process was not
20    provided to Mr. Acosta.  Indeed, whatever process occurred
21    within the government is still so shrouded in mystery that
22    the Government could not tell me at oral argument who made
23    the initial decision to revoke Mr. Acosta's press pass --
24    his hard pass.
25              On the notice, as for notice, the Government
```

1   points to only one statement that could possibly constitute
2   prior notice to Mr. Acosta that his pass would be revoked,
3   the President's statements to him during the exchange at the
4   press conference on November 7th, but the President's
5   statements did not revoke -- did not reference Mr. Acosta's
6   hard pass at all, let alone that it would be revoked;
7   therefore, that statement cannot have put him on notice of
8   the government's intention to revoke it.
9          Now, it is true that the public and Mr. Acosta
10  were eventually provided two things.  First, explanations as
11  to why his hard pass was revoked through Ms. Sanders's
12  tweets; and a written statement of explanation, apparently
13  prompted by this litigation, but given their timing and
14  their lack of connection to Mr. Acosta's opportunity to
15  rebut -- which we'll talk about in a moment -- these belated
16  efforts were hardly sufficient to satisfy due process.
17         As for Mr. Acosta's opportunity to be heard in
18  rebuttal, the Government points to the letter CNN sent to
19  the White House the day after his hard pass was revoked, but
20  this does not reflect a meaningful opportunity to rebut the
21  government's reasons for the revocation or to challenge the
22  appropriateness of the government's action.  Indeed, anyone
23  can avail themselves of the mail, and there's nothing in the
24  record that demonstrates that whoever the decisionmaker --
25  the initial decisionmaker was in this case read or

1  considered the letter.  And, of course, the letter was sent
2  after the revocation, not beforehand.  The need for the
3  opportunity to be heard seems especially important in this
4  case when the record strongly suggests that one of the
5  initial specific reasons for the revocation cited by the
6  government -- that Mr. Acosta laid his hands on the White
7  House intern -- was likely untrue and was at least partly
8  based on evidence that was of questionable accuracy.
9          At oral argument, the Government made the point
10 that more process would not have helped here because the
11 ultimate decisionmaker -- I believe, is how the Government
12 referred to the President -- at a minimum, ratified this
13 action.  Maybe that's so, but on the record before me which,
14 at this point, is devoid of evidence concerning who, in the
15 government, first reached this decision; how they reached
16 the decision; whether they considered CNN's letter or
17 whether they considered potential other responses by the
18 government, I simply cannot assume that that would be so.
19         So in light of all the above, I find that the
20 plaintiffs are likely to succeed on the merits of their
21 Fifth Amendment due process claim.
22         I'll now talk about irreparable harm with regard
23 to that claim.
24         The plaintiffs also must demonstrate that
25 irreparable harm will result in the absence of preliminary

1  relief. That harm must be both certain and great, and it
2  must be actual and not theoretical. Here, harm to Mr.
3  Acosta has already occurred. As already explained, he's
4  demonstrated a likelihood of success on the merits of his
5  claim that his Fifth Amendment due process rights were
6  violated such that his liberty interests were deprived;
7  therefore, I don't need to speculate or theorize as to
8  whether harm will occur absent preliminary relief, but for
9  plaintiffs to satisfy their burden, the harm must be
10 irreparable. Constitutional injuries are often considered
11 irreparable due to their very nature. Indeed, the D.C.
12 Circuit has held that, quote, Suits for declaratory and
13 injunctive relief against the threatened invasion of a
14 constitutional right do not ordinarily require proof of any
15 injury other than the threatened constitutional deprivation
16 itself, closed quote.
17         On the other hand, procedural due process injuries
18 do not necessarily cause irreparable harm when, for example,
19 the thing that is deprived is tangible property, because the
20 due process violation that led to that injury might be
21 reparable with money damages. Here, the procedural due
22 process violation at issue that has led to the deprivation
23 -- to a deprivation of what Sherrill requires me to
24 recognize as a liberty interest as opposed to a property
25 interest that's grounded in, quote, The First Amendment

```
 1   guarantee of freedom of the press, closed quote.
 2           Moreover, the First Amendment interests, as
 3   recognized in Sherrill, were not vested merely in
 4   publications or agencies.  They were liberties of the
 5   individual journalists themselves.  For that reason, that
 6   CNN may still send another journalist or other journalist to
 7   the White House does not make the harm to Mr. Acosta any
 8   less irreparable.  Each day that he is deprived of that
 9   interest without the process prescribed by the court in
10   Sherrill, he suffers a harm that cannot be remedied in
11   retrospect.  The Court cannot restore his access to press
12   briefings that have already occurred or to conversations in
13   the White House press facilities that have already been had.
14           And so on this highly, highly unusual set of facts
15   and interests at stake, I do find that the plaintiffs have
16   met their burden of establishing that irreparable harm has
17   and will continue to occur in the absence of preliminary
18   relief.
19           The next factors are the balance of the equities
20   and the public interests.
21           In balancing the equities at stake, I find that
22   the harm to Mr. Acosta from sustaining an ongoing violation
23   of his Fifth Amendment due process rights outweighs the
24   government's interest in orderly, respectful press
25   conferences.  This is especially so because the government
```

1   can serve its stated interest in other ways during this
2   litigation or perhaps until it is back before me arguing
3   that their due process obligations had been fulfilled.
4   Obviously, the balance of the equities would not likely have
5   come out this way if Mr. Acosta had been excluded for safety
6   or security reasons, in which case, my deference to the
7   executive equities would be far, far higher.  But even in
8   this circumstance, I don't take lightly the executive
9   branch's weighty general interest in control of its White
10  House press facility, but the balance here is tipped by the
11  fact that Sherrill obligates me to recognize the violation
12  of Mr. Acosta's due process rights and the resulting impact
13  on his First Amendment interests.  So in finding -- also, in
14  finding that these factors favor the plaintiffs, I have also
15  considered case law that suggests that constitutional
16  violations are always contrary to the public's interest.
17          So because the plaintiffs have shown a likelihood
18  that the government has violated Mr. Acosta's Fifth
19  Amendment rights under Sherrill, because the type of injury
20  he has suffered is irreparable and because the public
21  interest in the balance of equities favor granting a
22  temporary restraining order, I will grant the application
23  for a -- for the temporary restraining order here.  I will
24  order the defendants immediately restore Mr. Acosta's hard
25  pass until further order of the Court or the restraining

1   order expires.  And if, at some point after restoring the
2   hard pass, the Government would like to move to vacate the
3   restraining order on the grounds that it has fulfilled its
4   due process obligations, then it may, of course, do so and I
5   will promptly address that and then the remaining bases for
6   the TRO.
7              I want to emphasize the very limited nature of
8   today's ruling.  In resolving this TRO, I haven't -- because
9   I've found that it must be granted on -- as to the due
10  process claim, I haven't had to reach the plaintiffs' First
11  Amendment claim at all in which they alleged that the
12  government engaged in viewpoint or content discrimination.
13  So I want to make very clear a couple of things.  I have not
14  determined that the First Amendment was violated here; I
15  have not determined what legal standard would apply to the
16  First Amendment claim here; I have not determined the
17  specific nature of the First Amendment interest that
18  Sherrill recognizes -- or that Sherrill at least doesn't
19  describe but recognizes, yes; and I haven't determined what
20  portions of Sherrill, if any, would bind me on those
21  questions.
22             So let me turn to the parties, then, and suggest
23  that as far as procedurally moving forward goes, one -- the
24  avenue I thought of is to give you all some time to consult
25  with your clients; assess your positions; and come back

```
 1    early next week -- perhaps Tuesday afternoon -- to see how
 2    you all would like to proceed from here.  I trust the --
 3    this litigation will continue in a rapid pace.  Either
 4    party?
 5              MR. BOUTROUS:  Thank you.  Thank you very much,
 6    Your Honor.
 7              That sounds like a good process to us.  We can
 8    confer.  We may be able to just confer and then report back
 9    Monday with the proposal and see if we can work out either a
10    briefing schedule for the preliminary injunction or
11    something else and, if not, we can just come back and see
12    you on Tuesday.
13              THE COURT:  All right.  So your proposal would be
14    a written joint report for the parties --
15              MR. BOUTROUS:  Would that --
16              THE COURT:  -- on Monday?
17              MR. BOUTROUS:  Yeah.  Would that work for the
18    Court?
19              THE COURT:  All right.  That's fine, if that's --
20    but I'd like to hear from Mr. Burnham.
21              MR. BURNHAM:  Your Honor, I'd like to talk to our
22    clients.  That should be okay, but I'd just like to talk to
23    our clients and come up with a proposal before we --
24              THE COURT:  Absolutely.  I mean, we can't have any
25    quicker turnaround than a joint report --
```

```
 1                 MR. BURNHAM:  Right.
 2                 THE COURT:  -- on Monday.  So --
 3                 MR. BURNHAM:  Right.
 4                 THE COURT:  I mean, I --
 5                 MR. BURNHAM:  The timing certainly works for us.
 6     Thank you.
 7                 THE COURT:  Fair enough.  So I'll get that report.
 8     Obviously, if you can agree on something, great; if you
 9     can't agree, if you would still submit it jointly but just
10     lay out your respective positions on where we go from here,
11     I'll take that under advisement, and my hope is -- well,
12     depending on what you all agree to, if we need to come back
13     to court next week, even though it's the short week -- the
14     holiday -- I will be available to do that.
15                 MR. BURNHAM:  Okay.  Thank you, Your Honor.
16                 THE COURT:  All right.
17                 MR. BOUTROUS:  We greatly appreciate it, Your
18     Honor.
19                 THE COURT:  All right.
20                 MR. BOUTROUS:  And then just procedurally, under
21     the TRO, we'll just proceed to get the hard pass back
22     immediately and have it reactivated.  Thank you very much.
23                 THE COURT:  Yes.  Is there any other -- anything
24     further -- else from the plaintiffs that you think I need to
25     address today before I turn to Mr. Burnham?
```

```
 1                  MR. BOUTROUS:  I think that's it, Your Honor.
 2                  THE COURT:  All right.
 3                  MR. BOUTROUS:  Thank you.
 4                  THE COURT:  Sir?
 5                  MR. BURNHAM:  So Your Honor, under the local
 6     rules, our opposition to the PI is due on Tuesday.
 7                  THE COURT:  Okay.
 8                  MR. BURNHAM:  Would it be okay, given all that's
 9     going on, to suspend that deadline until we file our joint
10     status report?
11                  THE COURT:  Yeah.  I assume the plaintiffs --
12                  MR. BURNHAM:  I assume --
13                  THE COURT:  -- would agree to that.
14                  MR. BURNHAM:  We haven't spoken about it.
15                  THE COURT:  Yes.
16                  MR. BOUTROUS:  That's fine with --
17                  MR. BURNHAM:  Okay.
18                  MR. BOUTROUS:  That's fine with us, Your Honor.
19                  THE COURT:  Yeah.  So that deadline certainly will
20     be, you know, held in abeyance --
21                  MR. BURNHAM:  Thank you, Your Honor.
22                  THE COURT:  -- vacated until I get your report and
23     we'll see where we go from there.
24                  MR. BURNHAM:  Thank you, Your Honor.
25                  THE COURT:  All right.
```

```
 1              MR. BOUTROUS:  Thank you.
 2              THE COURT:  If there's nothing further, then,
 3    counsel's dismissed.
 4              THE DEPUTY CLERK:  All rise.  This Honorable Court
 5    is adjourned.
 6              (Proceedings concluded at 10:28 a.m.)
 7                     *  *  *  *  *  *  *  *  *  *  *  *
 8              CERTIFICATE OF OFFICIAL COURT REPORTER
 9    I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify
10    that the above and foregoing constitutes a true and accurate
11    transcript of my stenographic notes and is a full, true and
12    complete transcript of the proceedings to the best of my
13    ability, dated this 16th day of November 2018.
14                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                                Official Court Reporter
15                              United States Courthouse
                                Room 6722
16                              333 Constitution Avenue, NW
                                Washington, DC 20001
```